## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ x

In re:                                                    :    Chapter 11

                                                          :

USEC INC.,                                                :    Case No. 14-_____ (_____)

                                                          :

              Debtor.[1]                                  :

------------------------------------------------------------ x

## DECLARATION OF JOHN R. CASTELLANO,
## CHIEF RESTRUCTURING OFFICER OF USEC INC.,
## IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

I, John R. Castellano, state:

1.      I am the Chief Restructuring Officer of USEC Inc. (the "Debtor"), a corporation organized under the laws of the state of Delaware and the debtor and debtor in possession in the above-captioned chapter 11 case (the "Chapter 11 Case").

2.      I am employed as a managing director of AP Services LLC, which was engaged by the Debtor in October 2013 to provide interim management services and to make me available to serve as Chief Restructuring Officer.  My position as Chief Restructuring Officer was approved by the Debtors' Board of Directors and I report to the Debtor's Chief Executive Officer.

3.      I am generally familiar with the Debtor's day-to-day operations, financial conditions, business affairs, and books and records.  I submit this declaration (the "Declaration") on the Debtor's behalf in conjunction with its petition for relief under Chapter 11 and in support

---

[1]      The Debtor's federal tax identification number is 52-2107911.  The Debtor's mailing address is 6903 Rockledge Drive, Suite 400, Bethesda, Maryland 20817.

1

of the various motions and applications for orders filed with the Court contemporaneously herewith (collectively, the "First Day Pleadings").[2]

4.      Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge; my review of the Debtor's books and records, relevant documents and other information prepared or collected by the Debtor's employees; my discussions with members of the Debtor's management team; or my opinion based upon experience, expertise and knowledge of the Debtor's operations and financial condition.  In making my statements based on my review of the Debtor's books and records, relevant documents and other information prepared or collected by the Debtor's employees, I have relied upon these employees accurately recording, preparing or collecting any such documentation and other information.

5.      I am over the age of 18 and am competent to testify.

6.      If I were called to testify as a witness in this matter, I could and would testify competently as to the veracity of the facts set forth herein.

7.      The Declaration is divided into two parts.  Part I of this Declaration provides background information about the Debtor and its non-Debtor subsidiaries, its business operations, and the circumstances surrounding the commencement of the Chapter 11 Case.  Part II sets forth the relevant facts in support of each of the Debtor's First Day Pleadings.

## PART I

## BACKGROUND

A.      <u>Chapter 11 Filing</u>

8.      On the date hereof (the "Petition Date"), the Debtor filed in this Court a voluntary petition commencing a case for relief under Chapter 11 of Title 11 of the United States

---

[2]      Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the applicable First Day Pleadings.

Code (the "Bankruptcy Code").  The Debtor will manage and operate its business as a debtor in possession pursuant to Bankruptcy Code Sections 1107 and 1108.

B.      Prearranged Process

        9.      The Debtor commenced the Chapter 11 Case with the support of the holders of over 65% in principal amount of the Debtor's convertible note debt (the "Consenting Noteholders"), who are parties to or assignees under a Plan Support Agreement executed with the Debtor on December 13, 2013 (the "Noteholder Plan Support Agreement"), as well as the support of the two holders of the Debtor's preferred stock interests, Babcock and Wilcox Investment Company ("B&W") and Toshiba America Nuclear Energy Corporation ("Toshiba"), each of which executed its own Plan Support Agreement with the Debtor on March 4, 2014 (the "B&W Plan Support Agreement") and March 4, 2014 (the "Toshiba Plan Support Agreement"), respectively (the Noteholder Plan Support Agreement, the B&W Plan Support Agreement and the Toshiba Plan Support Agreement collectively, the "Plan Support Agreements").

        10.     On the Petition Date, consistent with the terms of the Plan Support Agreements, the Debtor filed the ***Plan of Reorganization of USEC Inc.***, dated as of March 5, 2014 (as it may be amended, supplemented or otherwise modified from time to time, the "Plan"), which sets forth the manner in which Claims against and Interests in the Debtor will be treated upon or following the Debtor's emergence from Chapter 11.

        11.     Through the Plan, the Debtor is attempting to implement a financial restructuring designed to reduce its outstanding indebtedness and strengthen its balance sheet, thereby enabling it to emerge from Chapter 11 on a financial footing that is expected to  improve its prospects for later achieving certain strategic initiatives that are essential to its long-term viability.  The proposed restructuring is focused on (a) convertible note debt maturing in October

3

2014, in the principal amount of $530 million, (b) preferred stock obligations of approximately

$113.9 million, and (c) common stock holdings.  The Debtor's priority, secured and general

unsecured obligations are not impaired by the restructuring.

12.　　　　The ***Disclosure Statement with Respect to Plan of Reorganization of***

***USEC Inc.*** (the "Disclosure Statement") has also been filed, and the Debtor is prepared to move

forward as quickly as the Court's calendar will permit to obtain approval of the Disclosure

Statement and authorization to commence the solicitation of votes from the holders of the

convertible note debt and the preferred stock obligations.

C.　　　Basis Information Concerning the Debtor

13.　　　　The Debtor is a publicly-owned Delaware corporation, with headquarters

in Bethesda, Maryland and operational locations in Piketon, Ohio and Oak Ridge, Tennessee. Its

workforce consists of approximately 505 employees.

14.　　　　The Debtor is the parent of  a corporate family that includes the following

seven non-debtor direct and indirect domestic subsidiaries (collectively, the "Non-Debtor

Subsidiaries," and the Debtor  together with the Non-Debtor Subsidiaries, the "Company"):

- United States Enrichment Corporation ("Enrichment Corp"), which is wholly owned by the Debtor
- American Centrifuge Holdings, LLC ("AC Holdings"), which is wholly owned by the Debtor
- American Centrifuge Demonstration, LLC ("AC Demonstration"), which is wholly owned by AC Holdings
- American Centrifuge Enrichment, LLC ("AC Enrichment"), which is wholly owned by AC Holdings
- American Centrifuge Operating, LLC ("AC Operating"), which is wholly owned by AC Holdings
- American Centrifuge Technology, LLC ("AC Technology"), which is wholly owned by AC Holdings
- American Centrifuge Manufacturing, LLC ("AC Manufacturing"), which is 55% owned by AC Holdings and 45% owned by Babcock & Wilcox Technical Services Group, Inc.

15.     As the following discussion of the Company's history, current business operations and future strategic path indicate, the Company is truly one-of-a-kind.  Thus, the restructuring of the Debtor, although extraordinarily simple by its terms, presents some unique issues and challenges.

D.     <u>Company Overview and History</u>

16.     The Company is a global energy company that is heavily regulated by the U.S. Department of Energy (the "DOE") and the U.S. Nuclear Regulatory Commission (the "NRC").  The Company's business consists of supplying low enriched uranium ("LEU") for commercial nuclear power plants.  LEU is a critical component in the production of nuclear fuel for reactors to produce electricity. At this time, the Company's primary operating entity and sole revenue generator is Enrichment Corp.  Enrichment Corp currently supplies LEU to both domestic and international utilities for use in nuclear reactors worldwide. Enrichment Corp's sources of LEU are (a) its own inventories of LEU (i) derived from the historical enrichment of uranium at the Paducah Plant and (ii) LEU previously purchased from Russia originally under the government-sponsored nuclear nonproliferation program and (b) commercial LEU currently purchased from Russia under a ten-year contract.  Enrichment Corp also provides a limited amount of contract work for the DOE at the Portsmouth Plant and the Paducah Plant.

17.     In October 1992, Congress established a uranium enrichment corporation through the Energy Policy Act of 1992. This government corporation began operations in mid-1993 under the name United States Enrichment Corporation.  In April 1996, the USEC Privatization Act, 42 U.S.C. § 2297h, was signed into law, permitting this government corporation to be converted into a privately owned company of the same name.  This privately owned company is Enrichment Corp, one of the Non-Debtor Subsidiaries.

5

18.     In June 1998, the Debtor USEC Inc. was incorporated as a Delaware corporation for the purpose of acting as the parent company of the privately owned Enrichment Corp.  At the same time, Enrichment Corp was incorporated in Delaware as a private company. In July 1998, USEC Inc. completed an initial public offering of 100,000,000 shares of its common stock on the New York Stock Exchange and began trading under the symbol USU.

19.     Upon its privatization, the U.S. government transferred the business of the government corporation to Enrichment Corp, with the exception of certain liabilities from prior operations of the U.S. government.  Enrichment Corp continued as a uranium enrichment corporation, operating gaseous diffusion plants leased from the DOE in Portsmouth, Ohio (the "Portsmouth Plant") and Paducah, Kentucky (the "Paducah Plant"), from which it produced LEU, and obtained additional LEU supply through its role under the Megatons to Megawatts non-proliferation agreement between the United States and Russia. Enrichment ceased at the Portsmouth Plant in 2001 and at the Paducah Plant at the end of May 2013.

20.     The Company began exploring a transformation from gaseous diffusion technology to gas centrifuge technology in 2002.  Gaseous diffusion technology is over 60 years old and requires substantial amounts of energy to produce LEU.  With the cessation of enrichment at the Paducah Plant, there are no longer any facilities anywhere in the world utilizing this technology to enrich uranium.  All of Enrichment Corp's competitors have deployed more modern gas centrifuge technology to produce LEU.

21.     In connection with the effort to deploy gas centrifuge technology in September 2008, the Debtor created AC Holdings to wholly own AC Enrichment, AC Operating and AC Technology.  Later, in August 2010, AC Holdings created AC Manufacturing, owned 55% by AC Holdings and 45% by Babcock & Wilcox Technical Services Group, Inc.  In May

6

2012, AC Holdings created AC Demonstration.  These subsidiaries were created to carry out commercial activities related to the development of gas centrifuge technology (the "American Centrifuge Project") and the financing, construction and deployment of the American Centrifuge Plant.

E.    The Company's Future Strategic Path

22.    The Company is currently engaged in a process of re-positioning its business for long term success.  Key to the re-positioning is transitioning from the expensive and non-competitive gaseous diffusion technology previously used by Enrichment Corp to more advanced gas centrifuge technology. The Debtor is leading this re-positioning through its efforts to commercialize its "American Centrifuge" technology at the American Centrifuge Plant, a new plant to be constructed on property leased from the DOE in Piketon, Ohio.  As part of this re-positioning, Enrichment Corp has discontinued the production of LEU but, as indicated above, is continuing operations as a supplier of LEU, relying on its existing inventories, as well as LEU purchased from Russia to satisfy customer contracts, until the production of LEU at the American Centrifuge Plant can begin.  This is a multi-year process that will require significant third-party funding and cooperation from the U.S. government.

F.    The Challenges Affecting the Company's Strategic Path

23.    As mentioned above, the Debtor is working to deploy the American Centrifuge Plant utilizing highly efficient uranium enrichment gas centrifuge technology. The American Centrifuge technology requires 95% less electricity to produce LEU than Enrichment Corp's existing gaseous diffusion technology. This technology was originally developed by the DOE during the 1960's through the 1980's. With the successful commercialization of the American Centrifuge Plant, the Debtor will have a long-term competitive source of uranium

7

enrichment. Moreover, as the only domestic enrichment facility using U.S. technology, the Debtor believes the American Centrifuge Plant will be critical to the long-term energy security and national security interests of the United States.  As of December 31, 2013, the Debtor has spent approximately $2.5 billion on the development of the American Centrifuge Plant, in addition to the approximately $3 billion (in 1985 dollars) invested by the DOE through 1985. The Debtor began construction of the American Centrifuge Plant in May 2007.  To complete the construction and commercialization of the American Centrifuge Plant, more than $4 billion of additional capital investment is required, as well as market conditions supporting a price for enriched uranium that will provide an adequate return on such an investment.

24.      As part of the original plan to raise such capital, in July 2008, the Debtor applied for a $2 billion loan guarantee for the project under the DOE Loan Guarantee Program. However, instead of moving forward with a conditional commitment for a loan guarantee, in the fall of 2011, the DOE proposed the "RD&D Program" as a cooperative cost-sharing research, development and demonstration program, deferring efforts to raise capital for and commercialize the American Centrifuge Plant until sometime in the future. Accordingly, construction activities on the American Centrifuge Plant were significantly reduced in recent years and are not expected to be recommenced until financing for the commercial deployment of the project, including the DOE loan guarantee, is in place.

25.      The Debtor and its affiliate AC Demonstration entered into the "RD&D Cooperative Agreement" with the DOE on June 12, 2012.  Through 15 subsequent amendments to the original agreement, the RD&D Program has been extended through April 15, 2014.  The RD&D Cooperative Agreement provides for 80% DOE (initially funded by Enrichment Corp as DOE's 80% share is a cost reimbursement) and 20% Debtor cost sharing (ultimately funded by

8

Enrichment Corp) for work performed during the RD&D Program.  With the most recent amendment, which was executed on February 12, 2014, the total estimated cost of the RD&D Program is $350 million, of which the DOE provides $280 million and the Debtor provides $70 million.  The DOE's contribution has been and continues to be incrementally funded.  However, given the market challenges in commercializing this technology, the RD&D Program provides the only option to demonstrate the capability of the technology.

26.    The objectives of the RD&D Program were to (a) demonstrate the American Centrifuge technology through the construction and operation of a commercial demonstration cascade of 120 centrifuge machines and (b) sustain the domestic U.S. centrifuge technical and industrial base for national security purposes and potential commercialization of the American Centrifuge technology. The RD&D Program provided for various technical and operational milestones to reduce the technical risks and improve the future prospects of deployment of the American Centrifuge technology. Over the course of 18 months, the Debtor met these objectives through the construction and operation of one complete demonstration cascade and supporting infrastructure. Among other achievements, the Debtor has demonstrated the redundancy of the primary cascade support systems for commercial plant operation and completed integrated system testing against operational requirements. To date, the Debtor has achieved or exceeded all of the milestones and performance indicators on or ahead of schedule and on or under budget.

27.    As described above, the Company's business is in a state of significant transition as it moves from the gaseous diffusion technology employed for more than 60 years to a modern, cost-effective gas centrifuge technology. Managing this transition has been made more challenging by current enrichment market conditions. In March 2011, a tsunami resulting from a

major earthquake caused irreparable damage to four reactors in Japan and subsequently resulted

in more than 50 reactors in Japan and Germany being taken off-line in the aftermath of the

tsunami. The Japanese reactors will remain off-line for an undetermined period of time until

federal and local approval is obtained for re-start. In recent months, five Japanese utilities

applied to nuclear regulators for permission to restart 14 of the idled reactors, but restarts are not

expected until later in 2014. In addition, low prices for competing fuels such as natural gas in the

United States could slow the need for new base-load nuclear power capacity and has resulted in

early retirement of five U.S. nuclear plants. Germany has announced a national policy to phase

out nuclear power by 2022. Together, these shutdowns have significantly affected the global

supply and demand for LEU and if there is a further delay or reduction in the number of Japanese

reactor restarts, the impact could worsen. An oversupply of nuclear fuel available for sale has

increased over time and has resulted in significant downward pressure on market prices for LEU,

where current market prices are more than 30% below prices prior to the Japanese tsunami in

2011. In particular, based on current market conditions, the Debtor sees limited uncommitted

demand for LEU relative to supply prior to the end of the decade, and therefore fewer

opportunities to make additional sales for delivery during that period. The difficult market

conditions have affected the Debtor's business plans to date, including the decision to cease

enrichment at the Paducah Plant, and pressured the economics associated with the Debtor's plan

to deploy the American Centrifuge technology.

28.    Despite these market challenges, the Debtor plans to incorporate the 120-

machine cascade that was constructed and tested pursuant to the RD&D Program in a full

commercial plant of 96 identical cascades. It is in the process of developing an updated plan and

evaluating alternatives for the financing and commercialization of the American Centrifuge

Plant. Factors that can affect this plan include key variables related to project cost, schedule, market demand and market prices for LEU, financing costs and other financing terms. The Debtor has experienced cost pressures due to delays in deployment of the project. Furthermore, and as described above, the economics of the project are severely challenged by the current supply/demand imbalance in the market for LEU and related downward pressure on spot market prices for "SWU" that are now at their lowest levels in more than a decade.[3]  At current market prices the Debtor does not believe that its plans for commercialization of the American Centrifuge Plant are economically viable without incremental U.S. government support beyond a DOE loan guarantee. In addition, the Debtor does not currently have any of the more than $4 billion of required financing in place for the American Centrifuge Plant following the completion of the extended RD&D Program in April 2014.  The Debtor anticipates that funding will be needed for the project for the period from the completion of the extended RD&D Program until the closing of financing for commercial deployment of the American Centrifuge Plant. The amount of any such funding would depend on the level of operations, manufacturing and other project infrastructure that is to be maintained in order to support a potential future ramp up to commercialization, as well as the length of time until financing could be obtained for the American Centrifuge Plant.

29.     As a result of these current market conditions, the Debtor's short-term prospects to maintain the infrastructure that has been developed requires funding from the DOE, as well as continued financial support from Enrichment Corp.  Financial projections for the commercialization of the American Centrifuge Program do not exist given the uncertainty in many of the key variables necessary to justify financing, development and construction of the

---

[3]     LEU consists of two components: separative work units ("SWU") and uranium.  SWU is a standard unit of measurement that represents the effort required to transform a given amount of natural uranium into two components, enriched uranium and depleted uranium.  Enrichment sales are normally denominated in cost per SWU.

American Centrifuge Plant at its full scale.  However, I believe that the DOE has acknowledged the importance of maintaining a domestic enrichment capability to serve national security, nonproliferation and energy independence needs in a continuous fashion and that with the cessation of enrichment at the Paducah Plant at the end of May 2013, the U.S. for the first time in over 60 years has no domestic source of uranium enrichment in operation that can support these policy imperatives. Specifically, I believe that the American Centrifuge technology will be the only source of domestic enrichment production capability, as compared to downblending highly enriched uranium or restarting the Paducah Plant, that can (a) provide LEU for the production of tritium for use in the U.S. nuclear weapons arsenal and (b) meet U.S. nonproliferation objectives by continuing to have a leadership role based on an advanced U.S. enrichment technology with a domestic supply availability absent foreign influence.

30.     Continuation of the current RD&D Program is dependent upon funding from the DOE.  As mentioned above, DOE funding has consistently been on an incremental basis.  The Debtor has been working constructively with the DOE in providing options to maintain the existing infrastructure and expand capacity at a minimum funding level that would meet the budget requirements of the DOE.  As commercialization of the full capacity of the American Centrifuge Plant requires a significant change in the current market conditions -- the timing of such changes being unpredictable -- the Debtor has provided the DOE with options to maintain domestic enrichment capability for national security purposes utilizing the American Centrifuge technology.  While funding of the current RD&D Program goes through April 15, 2014, the government fiscal year 2014 omnibus appropriations bill passed by Congress and signed by the President on January 17, 2014, appropriates $62 million for the RD&D Program for the current government fiscal year 2014.  These appropriated funds include the cost

12

reimbursement through April 15, 2014, and could extend the current program for another 30 days.  The omnibus appropriations bill also provides the DOE with authority to transfer up to an additional $56.65 million of funding within the DOE's National Nuclear Security Administration appropriations to fund the RD&D Program, subject to further approval of the House and Senate Appropriations Committees.  While the feasibility of receiving additional funding past the completion of the extended RD&D Program from the U.S. government is uncertain, the Debtor believes that short-term and long-term funding plans for the commercialization of the American Centrifuge Project can be developed in partnership with the DOE given the strategic importance of maintaining a domestic source of enriched uranium. Accordingly, the Debtor is working cooperatively with the DOE on options to maintain domestic enrichment capability to meet national security requirements and to preserve a path towards the deployment of the American Centrifuge Plant on a joint basis until future commercialization is both viable and appropriate.

G.      The Debtor's Funding Source

31.     As mentioned above, the Company's sole revenue generator is Enrichment Corp.  The Debtor is simply a holding company parent that does not have, and historically has never had, any of its own liquidity and, thus, has not been able to independently fund its share of the RD&D Program, the debt service on the convertible note debt or other operating expenses. Consequently, the Debtor has relied on Enrichment Corp for funding, through dividends until September 2011 and subsequently through intercompany lending.

32.     In consideration of the dependence of the Debtor on Enrichment Corp, and the importance of the Debtor's restructuring to Enrichment Corp's long-term viability, the board of directors of Enrichment Corp (the "Enrichment Board") determined in November 2013 that its governance practices with respect to funding decisions should be enhanced.  Consequently, the

DC\3143575.8

Enrichment Board was increased in size from two to five members and three new independent members were added.  In addition, the Enrichment Board hired a separate law firm, Young Conaway Stargatt & Taylor, LLP, to represent Enrichment Corp in connection with matters involving the Debtor.

33.    As to intercompany lending, initial amounts borrowed by the Debtor from Enrichment Corp were reflected as intercompany payables due to Enrichment Corp but were not repaid and were documented solely in the books and records of Enrichment  Corp and the Debtor.  On May 28, 2013, the Debtor executed an unsecured demand note, bearing interest at the annual rate of 10.5%, to reflect amounts borrowed from Enrichment Corp from February 21, 2013 through August 1, 2013 (the "Unsecured Intercompany Note").  On August 2, 2013, the Debtor entered into a new demand note and a pledge and security agreement (together, as amended, the "Secured Intercompany Note") to secure the amounts owing under the new demand note and borrowed amounts ceased to be recorded under the unsecured demand note.  At that time, the only security pledged was the receivable from the DOE under the RD&D Program to ensure reimbursement by the Debtor to Enrichment Corp of the 80% cost share ultimately reimbursed by the DOE under the RD&D Program, but funded by Enrichment Corp subject to later reimbursement by the DOE.  At the direction of the Enrichment Board, the new demand note and associated pledge and security agreement were amended and restated on January 24, 2014, to reflect the addition of equipment as collateral securing all amounts loaned by Enrichment Corp to the Debtor for any purpose after January 24, 2014.  Under this secured arrangement, Enrichment Corp provided funds to the Debtor as and when required.  Amounts outstanding accrue interest at an annual rate of 10.5%, which is capitalized monthly, and are due upon demand.

14

34.    The Debtor routinely made payments against the balance owed to Enrichment Corp when reimbursements were received from the DOE under the RD&D Program. In addition, the balance was reduced monthly by the amount of corporate expenses incurred and paid by the Debtor that were allocated to Enrichment Corp in accordance with the Company's budget (which funds had been provided by Enrichment Corp to the Debtor in the first instance pursuant to the Company's ordinary course cash management practices).   These corporate expenses, which include, among other types of expenses, senior management salaries and benefits and  professional fees and costs, are allocated 82% to Enrichment Corp based on an historical rate of cash disbursements for Enrichment Corp's operations as a percentage of the Company's total disbursements.  As of January 31, 2014, the Debtor owed Enrichment Corp $202.1 million in intercompany payables, $72.0 million under the Unsecured Intercompany Note, and $56.3 million under the Secured Intercompany Note.

35.    With the approval of the Enrichment Board, Enrichment Corp will continue to provide funding to the Debtor during the pendency of the Chapter 11 Case, acting as the debtor-in-possession lender under postpetition secured financing to be approved by the Court, as described below.  In addition, Enrichment Corp will act as the exit lender to the Debtor under the Plan.  In essence, the postpetition and exit financings are designed to continue the existing intercompany practices.  However, all such prospective funding by Enrichment Corp is on a discretionary basis.  Because Enrichment Corp has its own significant liabilities, Enrichment Corp will only provide such funding if the Debtor is on a plausible path to continuing to attract ongoing U.S. government support and funding for the American Centrifuge Plant, and if Enrichment Corp has sufficient liquidity to fund its own obligations, including its legacy liabilities, in the normal course. That path requires the balance sheet restructuring

15

proposed in the Plan.  If Enrichment Corp were to cease funding the operations of the Debtor, the Debtor would have no choice but to pursue a liquidation in chapter 11 or chapter 7 given its inability to fund its own operations.

H.      The Debtor's Material Obligations

36.     In addition to the convertible note debt in the principal amount of $530 million and the preferred stock obligations of approximately $113.9 million, the Debtor's material obligations include: (a) intercompany secured loans from Enrichment Corp in the approximate amount of $56.3 million; (b) intercompany unsecured loans and other funding from Enrichment Corp in the approximate amount of $274.1 million; and (c) ordinary course operating costs, including such things as (i) taxes, (ii) employee compensation, benefits and retirement programs, (ii) rent, utilities and other location costs and (iii) supply, building and other support costs associated with the American Centrifuge Project, which are estimated to be approximately $70 million as of January 31, 2014.   In addition, the Debtor has contingent liability on surety bonds held by certain of the Non-Debtor Subsidiaries in favor of the DOE and NRC, which bonds are fully cash-collateralized.  With the exception of the convertible note debt and the preferred stock obligations, which are impaired under the Plan but to be treated as negotiated under the Plan Support Agreements, all of the Debtor's other obligations are to be reinstated or otherwise unimpaired by the Plan.

37.     As mentioned above, the Debtor is a publicly-held corporation.  As of December 31, 2013, the Debtor had approximately 4,948,135 shares of common stock outstanding and approximately 30,000 beneficial holders of common stock.  Under the Plan, the common stock will be cancelled and new common stock will be issued.  Existing holders will

receive 5% of the new common stock assuming consent by the requisite majorities of the convertible note debt and the preferred stock obligations.

I.      The Debtor's Management

38.     The Debtor's Board of Directors consists of eleven members, only one of which is employed by the Debtor. The members include:  James R. Mellor (Chairman of the Board), John K. Welch (the Debtor's President and Chief Executive Officer),  Sigmund L. Cornelius, Michael Diament, Joseph T. Doyle, George Dudich, William J. Madia, Hiroshi Sakamoto, Walter E. Skowronski, M. Richard Smith and Mikel H. Williams.

39.     The Debtor's senior management team consists of the following: John K. Welch, President and Chief Executive Officer; John C. Barpoulis, Senior Vice President and Chief Financial Officer;  Peter B. Saba, Senior Vice President, General Counsel, Chief Compliance Officer and Corporate Secretary;  Philip G. Sewell, Senior Vice President and Chief Development Officer; Robert Van Namen, Senior Vice President and Chief Operating Officer; Marian K. Davis, Vice President and Chief Audit Executive;  John M.A. Donelson, Vice President, Marketing, Sales and Power; Stephen S. Greene, Vice President, Finance and Treasurer; J. Tracy Mey, Vice President and Chief Accounting Officer; E. John Neumann, Vice President, Government Relations; Steven R. Penrod, Vice President, Enrichment Operations; Richard V. Rowland, Vice President, Human Resources; and Paul E. Sullivan, Vice President, American Centrifuge and Chief Engineer.  In addition, as indicated above, I have served as the Debtor's Chief Restructuring Officer since October 2013.  I expect to continue to serve in that capacity through the pendency of the Chapter 11 Case.

17

J.      Use of Chapter 11 Process

        40.      To best position the Debtor to commercialize the American Centrifuge

Plant sometime in the future and maximize the likelihood of receiving ongoing U.S. government

funding, the Debtor needs to strengthen its balance sheet and address the impending October

2014 maturity of the convertible note debt, as well as improve its liquidity position and financial

flexibility. Each of these objectives is addressed by the filing of the Chapter 11 Case and the

balance sheet restructuring contemplated in the Plan. First, the Plan would replace the

convertible notes with a smaller quantum of new notes that have a maturity no earlier than five

years from the date of emergence (with an automatic extension to ten years if certain conditions

are satisfied). Second, the Debtor's liquidity position would be strengthened over time given the

ability to pay in kind a portion of the interest expense on the new notes, thus reducing the cash

interest burden on the Debtor.  Finally, the new note indenture would contain minimal covenants,

thus providing the Debtor with ongoing financial flexibility to continue to pursue the

development and commercialization of the American Centrifuge Plant. Implementing the

restructuring on an expeditious basis in the Chapter 11 Case also enables the Debtor to improve

its balance sheet ahead of any future decisions by the DOE and the U.S. Congress during this

government fiscal year regarding the continuation of funding under RD&D Program after April

2014.

## PART II

## FACTS IN SUPPORT OF FIRST DAY PLEADINGS

        41.      To enable the Debtor to operate effectively and to transition seamlessly

into Chapter 11, the Debtor has filed the First Day Pleadings, requesting various types of

immediate relief.  I am familiar with the contents of each of the First Day Pleadings and I believe

that the relief sought is critical to maximizing the Debtor's chapter 11 objectives. Moreover, absent the immediate ability to make certain essential payments as sought in the First Day Pleadings, I believe the Debtor's estate would suffer immediate and irreparable harm.

## A.    <u>Retention Applications</u>

42.    I believe that the retention of chapter 11 professionals is essential to the Chapter 11 Case. Accordingly, during this Chapter 11 Case, the Debtor anticipates that it will request permission to retain, among others, the following professionals: (a) Latham & Watkins LLP, as co-counsel; (b) Richards, Layton & Finger, P.A., as co-counsel; (c) Vinson & Elkins LLP, as special finance counsel; (d) AP Services, LLC, as interim management services provider; (e) Lazard Frères & Co. LLC, as investment banker; (f) Logan & Company, Inc., as claims and noticing agent and administrative advisor; (g) Deloitte Tax LLP, as tax professionals; (h) PricewaterhouseCoopers LLP, as Independent Auditor; and (i) KPMG LLP as a fresh start accounting and reporting services provider. I believe that the above professionals are well qualified to perform the services necessary for the success of the Chapter 11 Case and will do so without unnecessary duplication of efforts. I understand that the Debtor may find it necessary to seek retention of additional professionals as the Chapter 11 Case progresses.

## B.    **Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing Debtor to (A) Obtain Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105(a), 362(d), 363(b), 364(c)(1), 364(c)(2), 364(c)(3) and 364(e) and (B) Apply Cash Collateral to Prepetition Secured Claim of DIP Lender Pursuant to 11 U.S.C. § 363(b)(1) and 363(c)(2)(A) and (II) With Respect to Interim Order, Scheduling Final Hearing (the "<u>DIP Financing Motion</u>")**

43.    In the DIP Financing Motion, the Debtor has requested that the Court (a) approve the Debtor's entry into the Debtor-in-Possession Credit Agreement (the "DIP Credit Agreement") and authorize it to borrow from time to time, on an incremental basis, from Enrichment Corp (in such capacity, the "DIP Lender") up to $20 million upon entry of an interim

order and up to $50 million upon entry of a final order (together, the "DIP Orders"), (b) afford the DIP Lender the protections of Bankruptcy Code Sections 364(c)(1), 364(c)(2) and 364(c)(3), (c) confirm the DIP Lender's good faith in furnishing the DIP Loans (as defined below), (d) authorize the Debtor to use all Prepetition Collateral (as defined below) that is Cash Collateral to pay down the Prepetition Secured Debt (as defined below) of Enrichment Corp (in its capacity as prepetition lender to the Debtor, the "Prepetition Lender"), (e) modify the automatic stay imposed by Bankruptcy Code Section 362 to the extent necessary to implement and effectuate the terms and provisions of the DIP Orders and the DIP Credit Agreement, (f) waive any applicable stay and provide for immediate effectiveness of the DIP Orders, and (b) schedule the Final Hearing on the Motion to be held within forty (40) days after the Petition Date to consider entry of the Final Order, which would, if entered as proposed, grant all of the relief requested in the Motion on a final basis. I believe that obtaining the relief requested in the DIP Financing Motion is in the best interest of the Debtor, its estate and creditors and presents the best opportunity for the Debtor to maximize the value of its assets for the benefit of all stakeholders and realize its chapter 11 objectives.

44.    As noted above, the Debtor does not have any available sources of capital and financing other than as provided by Enrichment Corp. After September 2011, when Enrichment Corp ceased paying dividends, the Debtor obtained intercompany financing from Enrichment Corp on an unsecured basis. The unsecured financing provided to the Debtor by Enrichment Corp in its capacity as Prepetition Lender was (a) with respect to intercompany lending that occurred between September 30, 2011 and February 20, 2013 reflected as intercompany payables to the Prepetition Lender that were not repaid as of the Petition Date (the "Unsecured Payables") and (b) with respect to intercompany lending that took place between

20

February 21, 2013 and August 1, 2013, evidenced by the Unsecured Intercompany Note.   As of

January 31, 2014, the aggregate amount owed by the Debtor to the Prepetition Lender with

respect to the Unsecured Payables and the Unsecured Intercompany Note totaled approximately

$274 million (inclusive of interest as of January 31, 2014), plus fees, costs and expenses and

additional amounts that have accrued between January 31, 2014 and the Petition Date.

        45.     The unsecured financing continued until August 2, 2013, when the

Prepetition Lender conditioned further financing on obtaining the Secured Intercompany Note

from the Debtor.  At that time, the only security pledged to the Prepetition Lender was the

receivable from the DOE under the RD&D Cooperative Agreement.  The Secured Promissory

Note was amended and restated on January 24, 2014 (as amended and restated and together, and

with any related financing documents, the "Prepetition Credit Agreement") to reflect the addition

of equipment as a new class of collateral that would provide additional coverage to the

Prepetition Lender with respect to future loans under the Prepetition Credit Agreement.

Specifically, as amended, the liens and security interests that the Debtor granted to the

Prepetition Lender covered specific collateral including, in particular, (a) all accounts receivable

from the DOE under the RD&D Cooperative Agreement, (b) with respect to all amounts

borrowed on or after January 24, 2014, all equipment used in, related to, or destined for the

American Centrifuge Project, (c) all documents, books and records related to the foregoing, and

(d) any and all proceeds, products, rents and profits of or from any and all of the foregoing

(collectively, the "Prepetition Collateral").   Notably, certain of the Prepetition Collateral

constitutes Cash Collateral.  The amounts borrowed under the Prepetition Credit Agreement

accrued interest at an annual rate of 10.5% and interest was paid "in kind."  As of January 31,

2014, the outstanding amounts owed by the Debtor under the Prepetition Credit Agreement

approximated $56.3 million (inclusive of interest), plus fees, costs and expenses and additional amounts that have accrued between January 31, 2014 and the Petition Date (collectively, the "Prepetition Secured Debt").  The Debtor does not have any other material secured obligations, other than contingent indemnification obligations with respect to certain surety bonds held in the names of subsidiaries that are fully cash collateralized.

46.    To continue to operate, pay ordinary expenses and fund the costs of the Chapter 11 Case, the Debtor needs to continue to rely on funding from Enrichment Corp or, theoretically, a third party.  Given (a) the nature of and risks associated with the Debtor's business, (b) that the Debtor does not have material unencumbered assets and does not generate any revenue from operations, and (c) discussions with the Debtor's prior third-party working capital lender, I do not believe that third-party debtor-in-possession financing is available to the Debtor.  Indeed, I believe that Enrichment Corp represents the only realistic source of ongoing funding during and after the Chapter 11 Case.

47.    Acting with the assistance of independent counsel,[4] Enrichment Corp has agreed to continue to provide funding to the Debtor on the terms embodied in the proposed DIP Credit Agreement.  I believe that such terms are highly favorable to the Debtor; notably, there are no financing fees, interest is payable in kind, and the interest rate is equivalent to the rate historically charged to the Debtor under a prior third-party credit agreement that was secured by all of the assets of the Debtor's corporate family, including those of Enrichment Corp.

48.    Under the DIP Credit Agreement, Enrichment Corp, in its capacity as DIP Lender, has committed to lend to the Debtor from time to time, on an incremental basis, up to $50 million (the "DIP Loans").  Such commitment, however, is conditioned upon, among other

---

[4]    Enrichment Corp has retained Young Conaway Stargatt & Taylor, LLP.

things, (a) subject to the Carve-Out (described in the DIP Financing Motion), the grant of superpriority administrative claim status pursuant to Bankruptcy Code Section 364(c)(1); (b) subject to the Carve-Out (i) the grant of perfected liens on and security interests in any of the collateral under the DIP Credit Agreement (the "DIP Collateral") that is not subject to a lien or security interest on the Petition Date, but specifically excluding until entry of the Final Order any Liens upon the Debtor's claims and causes of action under Bankruptcy Code Sections 502(d), 544, 545, 547, 548, 549 550 and/or 553 or similar state law and all proceeds of any of the foregoing (collectively, the "Avoidance Actions"), pursuant to Bankruptcy Code Section 364(c)(2); and (ii) the grant of second or other junior priority perfected liens on and security interests in any of the DIP Collateral (excluding Avoidance Actions pending entry of the Final Order) that is subject to a validly existing, properly perfected and unavoidable lien or security interest on the Petition Date held by a person or entity including the Prepetition Lender pursuant to Bankruptcy Code Section 364(c)(3); and (c) the application of all Prepetition Collateral that is Cash Collateral to pay down the Prepetition Secured Debt of the Prepetition Lender.

49.     I believe that the terms and conditions of the proposed DIP Loans are reasonable under the circumstances, favorable to the Debtor, and could not be replicated in the marketplace.  In the absence of immediate access to the DIP Loans from the Prepetition Lender, I believe that the Debtor will be unable to bear the costs and expenses of the Chapter 11 Case, the value of its estate will rapidly deteriorate, and serious and irreparable harm to the Debtor, its estate and other stakeholders will occur, thus preventing the Debtor from realizing its chapter 11 objectives.  I therefore believe that the entry into the DIP Credit Agreement on the terms and conditions set forth therein represented a prudent exercise of its business judgment and ought to be approved.

C.    **Motion of Debtor for Order Pursuant to 11 U.S.C. §§ 105(a), 345 and 363, Fed. R. Bankr. P. 6003 and Del. Bankr. L.R. 2015-2 (I) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks and Business Forms, (II) Authorizing Continuation of Existing Investment and Deposit Practices and (III) Authorizing Continuation of Intercompany Transactions (the "Cash Management Motion")**

50.    In the Cash Management Motion, the Debtor seeks entry of interim and final orders authorizing, but not directing, the Debtor to continue to maintain and use its existing cash management system, including maintenance of the Debtor's existing bank accounts, checks (for a specified, limited period) and business forms; (b) granting the Debtor a waiver of certain bank account and related requirements of the United States Trustee to the extent that such requirements are inconsistent with (i) the Debtor's existing practices under the cash management system or (ii) any action taken by the Debtor in accordance with any order granting the Cash Management Motion or any other order entered in the Chapter 11 Case; (c) authorizing, but not directing, the Debtor to continue to maintain and use its existing investment and deposit practices notwithstanding the provisions of Bankruptcy Code Section 345(b); and (d) authorizing, but not directing, the Debtor to continue certain ordinary course intercompany transactions.  The Debtor has also requested that the Court authorize and direct all banks with which the Debtor maintains accounts to continue to maintain, service and administer such accounts.

i.    Overview of The Debtor's Cash Management System, USEC Bank Accounts and Related Accounts

51.    In the ordinary course of its business, the Company maintains a complex cash management system (the "Cash Management System") which includes a collection account, operating accounts, controlled disbursement accounts, checking accounts, several investment and securities accounts, certain accounts used for the administration of specific employee benefits, a "P-card" account, a "letter of credit" collateral account and other accounts.  The Cash

24

Management System is integral to the operation and administration of the Company's businesses and, thus, to the Debtor's business.  In this regard, the Cash Management System allows the Company to efficiently (a) identify the Company's cash requirements, (b) transfer cash as needed to respond to cash requirements, and (c) track all intercompany transfers.  I believe that the Cash Management System is similar to those utilized by many other companies of comparable size and complexity to collect, transfer and disburse funds in a cost-effective and efficient manner.

52.    The Cash Management System is managed by the financial personnel in the Company's Treasury Department at its headquarters in Bethesda, Maryland and at its facility in Piketon, Ohio.  The Treasury Department's control over the administration of the various bank accounts to effect the collection, disbursement and movement of cash facilitates accurate cash forecasting and reporting and enables the Company to, among other things, monitor the collection and disbursement of funds.  The Treasury Department relies upon one or more third-party providers to help manage certain aspects of its Cash Management System.

53.    As of the Petition Date, the Company maintained approximately twenty one (21) bank accounts at two (2) financial institutions.  Approximately seven (7) bank accounts were accounts held in the name of the Debtor (collectively, the "USEC Bank Accounts") and three (3) accounts were accounts as to which the Debtor regularly transferred or received funds (the "Related Accounts") (all as discussed in greater detail below).  The remaining eleven (11) accounts were used exclusively by the Debtor's subsidiaries for such purposes as checking, money market, collateral and benefits.  A diagram of the USEC Bank Accounts, the Related Accounts and two (2) additional accounts integral to the cash management process, as well as a schedule of such accounts, is annexed to the Cash Management Motion.   As reflected in such schedule, all of the Related Accounts are held in the name of either AC Manufacturing or

25

Enrichment Corp, two of the Non-Debtor Subsidiaries.  The Cash Management System is primarily organized in a way that respects the separate cash funding and operating needs of the Debtor, AC Manufacturing and Enrichment Corp.  As further reflected in such schedule, with the exception of one Bank Account maintained at Merrill Lynch, all of the USEC Bank Accounts and the Related Accounts are maintained at JPMorgan Chase Bank, N.A. ("JPM").

54.    The Flow of Funds from the Collection Account.  Funds received by Enrichment Corp on account of the services it renders to its customers are received into that certain collection account in the name of Enrichment Corp bearing Account Number XXX-XX6280 (the "Collection Account").[5]  On a daily basis, the Treasury Department transfers certain funds from the Collection Account into each of two operating accounts maintained by (a) the Debtor (Account Number XXX-XX6272) and (b) Enrichment Corp (Account Number XXX-XX4213) (collectively, the "Operating Accounts"), respectively.  The funds that the Treasury Department transfers are in an amount that is sufficient to cover the respective operating needs of both of these entities (and, additionally, in the case of the Debtor, its subsidiaries AC Manufacturing and AC Operating, including amounts to cover wire transfers (U. S. same day funds) and account debits by certain third parties (discussed below), to fund the Related Accounts and to pre fund automatic clearing house ("ACH") payments or wires initiated to transfer funds outside of the U.S. on a future date.

55.    To the extent that, on any given day, there are funds that remain in the Collection Account after satisfying the Company's designated daily operating designations, the Treasury Department typically transfers such excess funds into certain investment accounts

---

[5]    As noted above, it is Enrichment Corp's business activities that generate any cash flow for the Company. USEC, itself, has no independent means of generating cash aside from performance by American Centrifuge Demonstration, LLC under a certain research and development agreement with the Department of Energy, which provides for a cost reimbursement to USEC.

26

maintained by Enrichment Corp.[6]  Conversely, if there is ever any shortfall that exists between the amount needed to fund the Company's operating needs and the Collection Account balance, the Treasury Department will initiate a redemption from Enrichment Corp's investment accounts to ensure that additional funds are transferred from such accounts into the Collection Account.

56.     The Debtor's Operating Account and Corresponding Disbursement and Checking Account.  As noted above, the Debtor and Enrichment Corp each has its own Operating Account.[7]  Additionally, each of these two entities has at least one checking or controlled disbursement account from which such entity's accounts payable and payroll obligations are funded.  Once the required funds are transferred from the Collection Account into one of the two Operating Accounts, such funds are either (a) automatically pulled to the checking or disbursement account of the respective entity in order to satisfy the automatic debit, check clearings and other similar obligations of such entity or (b) used to satisfy other operational obligations of such entities, including wires.

57.     Amounts that are transferred to the Debtor's Operating Account (Account Number XXX-XX6272) are thereafter transferred to one of several USEC Bank Accounts or Related Accounts.  The amounts necessary to satisfy the Debtor's own accounts payable and payroll obligations are automatically transferred to Account Number XXX-XX5349, which is a controlled disbursement account maintained at JPM.  Additionally, the Debtor's Operating Account is utilized to transfer funds to AC Manufacturing's Operating Account (Account Number XXX-XX3818) which, in turn, transfers funds to a controlled disbursement account (Account Number XXX-XX3826) that AC Manufacturing utilizes to meet its own accounts

---

[6]     These investment accounts maintained by Enrichment Corp are not listed on the annexes to the Cash Management Motion since the Debtor does not transfer funds directly to or directly from such accounts.

[7]     As noted above, the two Operating Accounts consist of (a) the account of USEC (Account Number XXX-XX6272) and (b) the account of Enrichment Corp (Account Number XXX-XX4213).

DC\3143575.8

payable obligations.[8]  As noted above, AC Operating's obligations are paid directly from the USEC Bank Accounts.

58.    <u>Investment Accounts.</u>  As noted above, to the extent that, on any given day, the Treasury Department determines that the Collection Account holds funds that exceed the amounts necessary to satisfy the Company's daily operational needs, the Treasury Department will typically transfer such excess funds into one of six investment accounts.  Four of these investment accounts are money market mutual funds, two of which are maintained in the Debtor's name (the Debtor's two accounts are referred to collectively as the "Mutual Fund Accounts").[9]  One of the Mutual Fund Accounts is maintained at JPM (Account Number XXXX7309) and the other is maintained at Merrill Lynch (Account Number XXX-XXX3365).  These Mutual Fund Accounts are rated "AAAm" by Standard & Poors and are rated "Aaam" by Moodys.  Each of the Mutual Fund Accounts have different yields, which yields result from the funds' respective investing strategies and underlying investments and, thus, change daily.  In the six (6) months prior to the Petition Date, such yields have ranged from 2 to 9 basis points on an annualized basis.

59.    The Debtor also maintains a money market demand account at JPM (Account Number XXX-XX4574) (the "JPM Money Market Account" and together with the Mutual Fund Accounts, the "Investment Accounts").[10]  The JPM Money Market Account is, technically, invested in the name of JPM and, thus, there is no portfolio of underlying

---

[8]      Additionally, the USEC Operating Account is the USEC Bank Account through which funds are transferred when the Debtor elects to invest surplus funds in the money market demand account maintained at JPM (Account Number XXX-XX4574), which investments are discussed in greater detail in Paragraph 80, <u>infra</u>.

[9]      The other two investment accounts are maintained in Enrichment Corp's name.

[10]      Money market demand accounts are bank accounts that pay slightly higher interest to account for slightly lower liquidity.  They are insured by the FDIC and are generally considered safe short-term investments.   Federal Reserve Regulation D limits the number of withdrawals an account holder can make to six (6) per calendar month.

investments which dictates the credit risk associated with such account. Rather, the credit risk is solely attributable to JPM's own credit profile. There is, therefore, no separate credit rating that is provided with respect to the JPM Money Market Account but in the six (6) months prior to the Petition Date, such account has offered a yield ranging from 10 to 20 basis points on an annualized basis.

60.     As of the Petition Date, the Debtor's balances in each of the Investment Accounts were (a) $0 in the JPM Mutual Fund Account, (b) $0 in the Merrill Lynch Mutual Fund Account, and (c) approximately $5 million in the JPM Money Market Account. The Company's investment decisions with respect to the way in which funds are invested in each of the Investment Accounts are determined by senior personnel within the Treasury Department and consistent with the Company's internal investment policies.[11] To the extent that the Treasury Department determines that the Debtor's daily funding needs exceed the amounts that are available in the Collection Account, the Treasury Department will typically initiate a redemption to attempt to cover such shortfalls by directing the transfer of funds from the investment accounts maintained by Enrichment Corp to (a) the Collection Account, and (b) thereafter to the Debtor's Operating Account -- which is essentially borrowing from Enrichment Corp via an intercompany loan (prior to the Petition Date) or via the funds available under the DIP Credit Agreement (after the Petition subject to approval of the DIP Financing Motion by this Court). Upon filing, the Debtor intends to satisfy funding requirements first through use of the $5 million residing in the Investment Accounts, with any additional funding needs provided by the DIP Credit Agreement.

---

[11]     The Debtor will typically allocate funds to the JPM Money Market Account rather than one of the Mutual Fund Accounts in those instances in which the Debtor believes the funds will be held for a longer period of time (e.g., more than 1 month).

61.    <u>The "P-Card" Account.</u>  The Debtor additionally maintains an account with JPM bearing Account Number XXX-XX6241 (the "P-Card Account") which serves to cash collateralize a corporate credit card program for the Company in connection with multiple Visa cards (each a "P-Card") issued by JPM.   Specifically, the Debtor is required by JPM to maintain cash in the P-Card Account to fully cash-collateralize the P-Card program up to the amount of the credit line offered by JPM in connection with the P-Card program.  The current credit line is $175,000.  As long as any amounts charged on the cards are timely paid by the Company at the end of each billing cycle, there is no draw by JPM on the P-Card Account.[12]

62.    As of the Petition Date, there were approximately 32 employees of the Company who held a P-Card (22 of which were employed by USEC and 10 of which were employed by Enrichment Corp).  These employees used the P-Card for low-value Company obligations such as purchasing miscellaneous supplies.[13]  In the twelve (12) months prior to the Petition Date, total amounts charged on the P-Cards ranged from $28,000 to $50,000 monthly and totaled approximately $487,000 for calendar year 2013.  It is my understanding that, historically, at the end of each billing cycle, each of the Debtor and Enrichment Corp pays the bills incurred by its own respective employees.  These amounts are paid via debit from each of the two Operating Accounts.

63.    <u>Utility Account.</u>  Additionally, the Debtor has established an account for the sole purpose of holding certain deposits to provide adequate assurance of payment for the benefit of utilities with whom they will depend for various postpetition services as described in the contemporaneously-filed Utilities Motion (as defined below).

---

[12]    Prior to the Petition Date, I believe that the Company always timely paid its statement amounts and, thus, there has never been a draw on such account.

[13]    For example, a member of the Debtor's Information Technology department uses a P-Card to purchase computer cables.

64.     <u>Account Balances</u>. As noted above, the majority of the USEC Bank Accounts are zero balance accounts.  Once the initial $5 million transferred from the Investment Accounts is consumed in the Operating Accounts, none of the USEC Bank Accounts will typically hold large balances for more than a few days as they are either used for operations or function as pass-through accounts which are designed to simply provide the Company's respective business segments with the specific funds needed to operate on a daily basis.

ii.   <u>The Debtor Should be Authorized to Continue to Use Its Existing Cash Management System and Bank Accounts</u>

65.     The Cash Management System is an ordinary course, customary and essential business practice, and is similar to cash management systems employed by other large businesses.  The Cash Management System allows the Company as a whole and the Debtor in particular to efficiently identify its cash requirements, transfer cash as needed to respond to those requirements, and track all intercompany transfers.

66.     I believe that the continued use of the Cash Management System during the pendency of the Chapter 11 Case is essential to the Debtor's business operations and its goal of maximizing value for the benefit of all parties in interest.  I believe that requiring the Debtor to adopt new cash management systems at this early and critical stage would be expensive, impose needless administrative burdens and cause undue disruption.  Any such disruption would adversely (and perhaps irreparably) affect the Debtor's ability to reorganize and/or maximize estate value for the benefit of creditors and other parties in interest.  Moreover, such a disruption would be wholly unnecessary insofar as the Cash Management System provides a valuable and efficient means for the Treasury Department to address the Debtor's cash management requirements (as well as those of the Non-Debtor Subsidiaries) and, to the best of the Debtor's knowledge, the USEC Bank Accounts are in financially stable institutions that are insured by the

Federal Deposit Insurance Corporation ("FDIC") (up to an applicable limit per institution).  In

this regard, it warrants mention that JPM is an approved depository of the United States Trustee.

Consequently, maintaining the existing Cash Management System without disruption is both

essential to the Debtor's ongoing operations and in the best interests of the Debtor, its estate and

all interested parties.  Accordingly, the Debtor has requested in the Cash Management Motion

that it be allowed to maintain and continue to use the Cash Management System and the USEC

Bank Accounts.

       67.     As part of the relief requested in the Cash Management Motion, and to

ensure that its transition into Chapter 11 is as smooth as possible, the Debtor is seeking an order

authorizing the Debtor to (a) maintain and continue to use the USEC Bank Accounts and the

Related Accounts, including but not limited to those accounts that are listed on Attachment 2 to

the Cash Management Motion, in the same manner and with the same account numbers, styles

and document forms as are currently employed, (b) deposit funds in and withdraw funds from the

USEC Bank Accounts (and transfer funds to and from the Related Accounts consistent with

historical practices) by all usual means, including checks, wire transfers, ACH transfers, drafts,

electronic fund transfers or other items presented, issued or drawn on the USEC Bank Accounts,

(c) pay ordinary course bank fees in connection with the USEC Bank Accounts including

prepetition fees, (d) perform its obligations under the documents and agreements governing the

USEC Bank Accounts, (e) honor P-Card Account requirements and prepetition obligations (as

discussed in more detail below) and (f) treat the USEC Bank Accounts for all purposes as

accounts of the Debtor in its capacity as a debtor in possession.

       68.     I believe that, if the relief requested in the Cash Management Motion is

granted, the Debtor will implement appropriate mechanisms to ensure that no payments will be

made on any debts incurred by the Debtor prior to the Petition Date, other than those authorized

by this Court. To prevent the payment of prepetition claims against the Debtor, except those

otherwise authorized by the Court, the Debtor will work closely with the banks at which the

USEC Bank Accounts are maintained (the "Banks") to ensure appropriate procedures are in

place to prevent checks issued prepetition from being honored absent this Court's approval and

to ensure that no third-party with automatic debit capabilities is able to debit amounts attributable

to prepetition obligations unless authorized by separate order of this Court. However, the Debtor

has requested that no Bank that implements such handling procedures and then honors a

prepetition check or other item drawn on any account that is the subject of the Cash Management

Motion (a) at the direction of the Debtor to honor such prepetition check or item, (b) in a good

faith belief that the Court has authorized such prepetition check or item to be honored or (c) as a

result of a good faith error made despite implementation of reasonable item handling procedures,

be deemed to be liable to the Debtor or to its estate on account of such prepetition check or other

item being honored after the Petition Date. I believe that such flexibility accorded the Banks is

necessary to induce the Banks to continue providing cash management services to the Debtor.

69.     In addition, and in the interest of maintaining the continued and efficient

operation of the Cash Management System during the pendency of this Chapter 11 Case, the

Debtor has requested in the Cash Management Motion that all Banks be authorized and directed

to continue to administer, service and maintain the USEC Bank Accounts as such accounts were

administered, serviced and maintained prepetition, without interruption and in the ordinary

course (including making deductions for bank fees), and to honor any and all checks, drafts,

wires, ACH transfers, electronic fund transfers or other items presented, issued or drawn on the

USEC Bank Accounts on account of a claim arising on or after the Petition Date.

33

70.     With respect to the P-Card Account, the Debtor has requested in the Cash Management Motion that it be authorized to honor all past and future obligations arising under the P-Card program, including making payments on account of charges that were made under such program prior to the Petition Date.  Notably, JPM has a security interest in the P-Card Account, has control of such account, and retains all rights of setoff.  Accordingly, if the Debtor did not obtain authority to continue payments under the P-Card program, JPM would have the right to exercise such rights and would likely demand additional cash as a condition to keeping the program in place.

71.     The Debtor has further requested in the Cash Management Motion that it be authorized to implement such reasonable changes to the Cash Management System as the Debtor may deem necessary or appropriate, including, without limitation, closing any of the USEC Bank Accounts or opening any additional USEC Bank Accounts following the Petition Date (the "New Accounts"), wherever the Debtor deems that such accounts are needed or appropriate, provided that the banks in which the accounts are opened are designated depositories in the District of Delaware.  The Debtor has requested that the relief sought by the Cash Management Motion extend to any New Accounts and that any order approving the Cash Management Motion provide that the New Accounts are deemed to be USEC Bank Accounts and are similarly subject to the rights, obligations and relief granted in the order.  The Debtor has committed to provide the United States Trustee and any statutory committee appointed in the Chapter 11 Case with written notice of any New Accounts that are opened.  In furtherance of the foregoing, the Debtor has also requested in the Cash Management Motion that the relevant banks be authorized to honor the Debtor's requests to close or open (as the case may be) such Bank Account(s) or New Account(s).

34

iii.   The Debtor Should be Granted Authority to Continue to Use Existing Checks (for a Specified and Limited Period) and Business Forms

72.    The Debtor does not use pre-printed check stock, but rather the Treasury Department uses a template for purposes of printing checks onto check stock paper.  I have been informed that it will be possible to change this template, but that such change could take up to ten (10) days following the Petition Date to implement.  Given this temporal hurdle, the Debtor has requested in the Cash Management Motion that, until 5:00 p.m. Eastern time on the tenth (10th) day following the Petition Date, it be permitted to maintain its existing template and continue using all checks substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtor's status as debtor in possession.  The Debtor will thereafter insert the words "Debtor in Possession" on all of its checks.

73.    The Debtor, however, is seeking authority during the entire duration of the Chapter 11 Case, to use all correspondence and other business forms (including, without limitation, letterhead, purchase orders and invoices) without reference to the Debtor's status as debtor in possession as making such changes will be difficult for the Debtor to facilitate.  It is my belief that with respect to the Debtor's correspondence and other business forms (and with respect to the check stock for the proposed ten-day extension period), most parties doing business with the Debtor undoubtedly will be aware of the Debtor's status as debtor in possession as a result of the publicity of this case, the press releases issued by the Debtor and additional press coverage.  Moreover, the Debtor will provide notice of the commencement of the Chapter 11 Case to creditors and other parties in interest.  Further, in light of the fact that the Debtor's prearranged plan of reorganization provides for payment in full of the Debtor's unsecured trade creditors, I believe there is seemingly no practical benefit to altering the Debtor's current business forms.

74.    I further believe that changing the Debtor's correspondence and other business forms for the expected short duration of this case would be expensive, unnecessary and disruptive to the Debtor's business operations and would not confer any benefit upon those dealing with the Debtor, and furthermore the proposed ten-day extension for changing its check templates is entirely reasonable under the circumstances.

iv.    The Debtor Should Be Granted a Waiver of Certain
       Requirements of the United States Trustee

75.    The Debtor has further requested in the Cash Management Motion that this Court grant a waiver of certain bank account and related requirements of the United States Trustee to the extent that such requirements are inconsistent with (a) the Debtor's existing practices under the Cash Management System or (b) any action taken by the Debtor in accordance with any order granting the Cash Management Motion or any other order entered in the Chapter 11 Case.  I am aware that the United States Trustee has established certain operating guidelines for debtors in possession in order to supervise the administration of chapter 11 cases. I further understand that these requirements (each a "UST Requirement" and, collectively, the "UST Requirements") require chapter 11 debtors to, among other things: (i) close all existing bank accounts and open new debtor-in-possession bank accounts; (ii) establish one debtor-in-possession account for all estate monies required for the payment of taxes, including payroll taxes; (iii) maintain a separate debtor-in-possession account for cash collateral; and (iv) obtain checks for all debtor-in-possession accounts which bear the designation "Debtor In Possession," the bankruptcy case number and the type of accounts.  I understand that these requirements are designed to draw a clear line of demarcation between prepetition and postpetition transactions and operations and prevent the inadvertent postpetition payment of prepetition claims.  As set forth above, I believe that (i) the Debtor is able to work with its current Banks to ensure that this

36

goal of separation between the prepetition and postpetition period is observed and (ii))

enforcement of certain of these UST Requirements would disrupt the Debtor's operations and

impose a financial burden on the Debtor's estate.  As noted previously, in light of the complexity

of the Cash Management System, it will be incredibly onerous for the Debtor to meet the

requirement of closing all existing bank accounts and opening new debtor-in-possession bank

accounts.

   76.  Further, I believe that requiring the Debtor to abide by the UST

Requirement to establish specific debtor-in-possession accounts for tax payments (including

payroll taxes) and to deposit to such specific tax accounts sufficient funds to pay any tax liability

(when incurred) associated with the Debtor's payroll and other tax obligations would be

unnecessarily burdensome.  I believe that the Debtor can pay its tax obligations most efficiently

from the existing disbursement and checking accounts it maintains at JPM (which, as noted

above, consist of the Bank Account bearing Account Number XXX-XX5349) in accordance with

its existing practices, that the United States Trustee can adequately monitor the flow of funds

into and out of such accounts, and that the creation of new debtor-in-possession accounts

designated solely for tax obligations would be unnecessary and inefficient.

   77.  Additionally, it is my belief that requiring the Debtor to abide by the UST

Requirement to establish specific debtor-in-possession accounts for cash collateral will be

unnecessary.  As set forth in the DIP Financing Motion, the Debtor intends to use the prepetition

cash collateral belonging to Enrichment Corp (which, as more particularly described in the DIP

Financing Motion, provided secured financing to the Debtor prior to the Petition Date and which,

if the DIP Financing Motion is approved, will serve as the Debtor's postpetition lender) solely to

pay down Enrichment Corp's Prepetition Secured Debt.

37

78.     Finally, for the reasons noted above, I believe that compliance with the UST Requirement that requires a debtor to obtain checks for all debtor-in-possession accounts which bear the designation "Debtor In Possession," the bankruptcy case number and the type of accounts is unnecessarily burdensome in the context of this Chapter 11 Case.

v.    The Debtor Should be Authorized to Continue its Deposit and Investment Practices

79.     The Debtor has in the Cash Management Motion further requested (a) authorization to continue to deposit and invest funds in accordance with existing practices under the Cash Management System, subject to any reasonable changes to the Cash Management System that the Debtor may implement (the "Deposit and Investment Practices") and (b) a waiver of the investment and deposit requirements of Bankruptcy Code Section 345(b) to the extent that such requirements are inconsistent with the Deposit and Investment Practices.

80.     The Debtor is part of a large, sophisticated Company with a complex Cash Management System that relies on multiple Banks and bank accounts on a daily basis. The USEC Bank Accounts are in stable financial institutions that are insured by the FDIC. To the extent the Debtor has any excess cash, such funds are typically used to reduce the intercompany loan balance owed to Enrichment Corp either through (a) the Debtor's transfer of funds from the USEC Operating Account to the Collection Account or (b) the Debtor's transfer of funds from the USEC Operating Account to Enrichment Corp's Operating Account. Although the Debtor will seldom transfer excess operational funds into the Investment Accounts, it warrants mention that with respect to any funds deposited into the Investment Accounts, the Mutual Fund Accounts carry ratings of "AAAm" with S&P and "Aaam" with Moodys. As to the JPM Money Market Account, such account is a money market demand account which is generally considered in the marketplace to be a safe and prudent short-term investment which is FDIC insured.

38

Moreover, it warrants mention that JPM is, based upon my understanding, included within the United States Trustee's list of authorized depositories.

vi.    The Debtor Should be Authorized to Maintain
        and Continue Ordinary Course Intercompany Transactions

81.    In connection with the Company's daily operation, as funds are moved within the Cash Management System at any given time, there may be intercompany claims owing by the Debtor to a Non-Debtor Subsidiary or by a Non-Debtor Subsidiary to the Debtor. These obligations will generally fall into one of two broad categories: (a) amounts that the Debtor borrows from Enrichment Corp on a secured basis to meet its own operational needs and those of its Non-Debtor Subsidiaries involved in the American Centrifuge Plant (which include AC Manufacturing and AC Operating) and (b) amounts that the Debtor pays or costs that the Debtor incurs which inure to the benefit of certain of the Non-Debtor Subsidiaries and are, therefore, costs and/or expenses that are allocated to such Non-Debtor Subsidiaries as intercompany obligations.

82.    With respect to the first broad category of intercompany transactions, as noted above, it is Enrichment Corp's business activities that generate any cash flow for the Company.  In this regard, as also noted above, it is my understanding that Enrichment Corp has historically acted as a cash lender to the Debtor.  Additionally (a) certain Enrichment Corp employees perform work at the American Centrifuge Plant, and (b) certain Enrichment Corp employees handle certain payroll functions, each of which services inure to the benefit of the Debtor.[14]  As noted above in paragraph 33, (a) all of the Debtor's borrowings from Enrichment Corp prior to February 21, 2013 were Unsecured Payables, accounted for on the Debtor's books

---

[14]        A discussion of the specifics regarding the Debtor's employee programs is contained in the contemporaneously filed Employee Wages Motion.

and records but not repaid, (b) all of the Debtor's borrowings from Enrichment Corp between

February 21, 2013 and August 1, 2013 were evidenced by the Unsecured Promissory Note and

(c) all borrowings after August 1, 2013 were evidenced by the Secured Promissory Note.

83.     The Debtor has used these borrowed funds for its own operational needs

as well as for the operational needs of those of its Non-Debtor Subsidiaries involved in the

American Centrifuge Plant.  These include payroll obligations of AC Manufacturing and AC

Operating and amounts that AC Manufacturing and AC Operating need to honor obligations

owed to third-party vendors who provide such Non-Debtor Subsidiaries with goods and services.

As noted above, the Debtor will continue to borrow from Enrichment under the DIP Credit

Agreement, if approved by the Court.

84.     The second category of intercompany transactions are comprised of (a)

various corporate overhead payments that the Debtor makes on a regular basis which inure to the

benefit of both the Debtor and one or more of the Non-Debtor Subsidiaries (the "Corporate

Overhead Expenses") including, but not limited, to (i) salaries and benefits of those

"headquarters" employees who provide general corporate leadership and administrative

functions including finance, legal, human resources and information technology, (ii) payments

for certain insurance coverage that is procured for the benefit of the entire Company (such as

D&O liability insurance) but paid by the Debtor, and (iii) payments to certain professionals who

perform work that benefits the entire Company but are paid by the Debtor, and (b) certain more

discrete or isolated payments (the "Specific Intercompany Expenses" [15] and together with the

Corporate Overhead Expenses, the "Intercompany Expenses") made by the Debtor (or a Non-

Debtor Subsidiary) relating, by way of example only, to (i) specific services provided on a

---

[15]     An example of a Specified Intercompany Expense would be the cost that the Debtor incurs for cargo
insurance, which insurance  inures completely to the benefit of Enrichment Corp.  Accordingly one-hundred-percent
(100%) of such cost is allocated to Enrichment Corp.

project-by-project basis, (ii) expenses incurred for specific items such as discrete insurance

coverage that is paid by the Debtor but relates exclusively to (and, thus, is allocable exclusively

to) one of the Non-Debtor Subsidiaries, or (iii) certain amounts that the Debtor transfers to AC

Manufacturing to meet AC Manufacturing's operational costs associated with the American

Centrifuge Plant.[16]  Intercompany Expenses are generally accounted for on a monthly basis and

allocated through an entry in the Company's Oracle-based accounting system.  When the Debtor

incurs Intercompany Expenses on behalf of Enrichment Corp, the allocation for such costs is set

off against the then-outstanding amounts owed to Enrichment Corp and, thus, serves to reduce

either amounts owed by the Debtor under the Secured Intercompany Note or, following the

Petition Date and assuming this Court's approval of the DIP Financing Motion, the amounts

owed under the DIP Credit Agreement.  It is my understanding that, historically, because of the

significant role that Enrichment Corp plays with respect to, among other things, the value of the

overall corporate enterprise, the majority of Corporate Overhead Expenses that are allocated to

Enrichment Corp (including Corporate Overhead Expenses attributable to work performed by the

Debtor's professionals) have been allocated pursuant to the following allocation: eight-two

percent (82%) to Enrichment Corp and eighteen percent (18%) to the Debtor.  In contrast, one-

hundred percent (100%) of the Specific Intercompany Expenses are allocated to the applicable

Non-Debtor Subsidiary.

85.     With respect to all of the intercompany transactions undertaken by the

Debtor (collectively, the "Intercompany Transactions"), the Debtor maintains records of all fund

---

[16]     Notably, the amounts that the Debtor transfers to AC Manufacturing are transferred pursuant to that certain
Equipment Supply Agreement dated May 1, 2011 between the Debtor and AC Manufacturing pursuant to which the
Debtor is obligated to pay AC Manufacturing for the reimbursement of costs as well as certain fees associated with
AC Manufacturing's role in the American Centrifuge Project.  Once the centrifuges are completed, title thereto
passes from AC Manufacturing to the Debtor under the terms of such agreement.  Thus, the amounts transferred are
contractual obligations arising under such agreement rather than intercompany loans.

transfers and can ascertain, trace and account for Intercompany Transactions.  At the same time, however, if the Intercompany Transactions were to be discontinued, the Cash Management System and the related administrative controls would be disrupted to the Debtor's detriment. The Debtor will maintain detailed records with respect to all transfers of cash so that all transactions may be readily ascertained, traced, and recorded properly, which records shall distinguish between prepetition and postpetition Intercompany Transactions.

86.    As noted above, if this Court approves the DIP Financing Motion and enters the DIP Orders in substantially the form proposed, it is my understanding that loans and other advances that are made by Enrichment Corp to or for the benefit of the Debtor after the Petition Date will be governed by the DIP Orders and the corresponding DIP Credit Agreement.

**D.     Motion of Debtor for Order Under Fed. R. Bankr. P. 6003 (I) Authorizing Payment of Certain Prepetition Employee Obligations, Including Compensation, Benefits, Expense Reimbursements and Related Obligations, (II) Confirming Right to Continue Employee Programs on Postpetition Basis, (III) Authorizing Payment of Withholding and Payroll-Related Taxes, (IV) Authorizing Payment of Prepetition Claims Owing to Administrators of, or Third Party Providers Under, Employee Programs and (V) Directing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments (the "Employee Wages Motion")**

87.    In the Employee Wages Motion, the Debtor seeks entry of interim and final orders authorizing it, in its discretion, to pay, continue or otherwise honor, directly or indirectly, various prepetition employee-related obligations (collectively, the "Prepetition Employee Obligations") owed to or for the benefit of current, former, full-time, part-time, permanent and temporary employees, contract workers and retirees (collectively, the "Employees"), for compensation, benefits and expense reimbursements under all plans, programs and policies maintained or contributed to, and all agreements entered into, by the Debtor prior to the Petition Date (as described below, the "Employee Programs"), including any intercompany arrangements with respect to employee-related amounts that the Debtor may be

42

obligated to pay to or for the benefit of a subsidiary's Employees, or a subsidiary may be obligated to pay to or for the benefit of the Debtor's Employees (in either case subject to any intercompany reimbursement or allocation practices).[17]

88.     In addition, the Debtor has requested that the Court confirm its right to continue each of the Employee Programs in the ordinary course of business during the pendency of the Chapter 11 Case in the manner and to the extent that such Employee Programs were in effect immediately prior to the filing of such case and to make payments in connection with the costs and expenses incurred in the postpetition administration of any Employee Program, including any intercompany arrangements pursuant to which the Debtor or a subsidiary pays any employee-related amount to or for the benefit of the other's Employees, subject to reimbursement by the Debtor or the subsidiary, as applicable.[18]

89.     The Debtor also seeks authorization in the Employee Wages Motion to be permitted to pay any and all local, state and federal withholding and payroll-related or similar taxes relating to the Prepetition Employee Obligations including, but not limited to, all withholding taxes, social security taxes and Medicare taxes.  In addition, the Debtor seeks authorization to pay to third parties any and all amounts deducted from employee paychecks for payments on behalf of Employees for garnishments, charitable contributions, support payments, savings programs, benefit plans, insurance programs, union dues, contributions to political action committees and other similar programs.

---

[17]     The only subsidiary that provides such reimbursement to the Debtor is Enrichment.  As of the Petition Date, subsidiary AC Operating (as defined below) employs three (3) Employees.  Expenses in connection with the salaries and benefits of such Employees are  paid by the Debtor and are not reimbursed by AC Operating.

[18]     In the Workforce Obligations Motion, the Debtor does not seek to modify the terms of any Employee Program and does not seek to assume or reject any Employee Program to the extent that such Employee Program is deemed to be an executory contract within the meaning of Bankruptcy Code Section 365.  Moreover, the Debtor does not waive its right to modify or terminate any Employee Program to the extent that such right exists under the terms of the Employee Program or as may be required by applicable law.

90.     The Debtor has also requested that, with respect to any Prepetition Employee Obligations and Employee Programs that are administered, insured or paid through a third-party administrator, contract party, staff augmentation company or provider, or through a subsidiary, the Debtor be expressly authorized, in its discretion, to pay any prepetition claims of such administrator, contract party, staff augmentation company and provider, and to reimburse any prepetition claims of a subsidiary, in the ordinary course of business to insure the uninterrupted delivery of payments or other benefits to the Employees.

i.    Workforce Overview

91.     As of the Petition Date, the Debtor's workforce consisted of approximately 505 Employees,[19] who were employed by USEC at its corporate headquarters located in Bethesda, Maryland and government relations offices located in Washington, D.C. (collectively, the "Headquarters"), its American Centrifuge Project and AC Operating sites located in Piketon and Oak Ridge and its AC Manufacturing[20] located at its design, engineering and testing facility in Oak Ridge.  In addition, three (3) Employees are employed directly by AC Operating.[21]

92.     I have been informed that approximately 152 of the Employees at Oak Ridge are permanent, full-time, salaried Employees and thirteen (13) are part-time Employees. There are 255 full-time Employees located at Piketon.  Fifty-six (56) contract employees perform services for the Debtor at Oak Ridge, two (2) perform services at Piketon and two (2) perform services at Headquarters (collectively, the "Contract Workers").  Thirty (30) of the Contract Workers at Oak Ridge have been provided by Oak Ridge National Laboratory, which is paid a

---

[19]    This number does not include the sixty (60) Contract Workers (defined below).

[20]    A small number of the Debtor's Employees seconded to AC Manufacturing currently work at the Debtor's Piketon, Ohio location.

[21]    The Debtor pays all expenses in connection with the salaries and benefits of AC Operating Employees.

fee by the Debtor under a cooperative research and development program.  Twenty-six (26) of the Contract Workers at Oak Ridge, two (2) of the Contract Workers at Piketon and one (1) of the Contract Workers at Headquarters are employed by various staff augmentation companies, which are paid fees by the Debtor.  The approximate monthly cost to the Debtor for fees owed to Oak Ridge National Laboratory or the various staff augmentation companies is approximately $295,000, which is a reasonable proxy for the Debtor's prepetition obligations.

93.      Other than the Contract Workers at Oak Ridge, Piketon and Headquarters, it is my understanding that all of the Debtor's Employees are salaried, full-time or part-time Employees.  Seventy-three (73) of the Debtor's Employees at the ACP site in Piketon are members of the United Steelworkers Local 689 and will be covered by a collective bargaining agreement (the "CBA") that is in the process of being negotiated.

94.      I believe that the Debtor's ability to preserve its business and successfully reorganize is dependent on the expertise and continued dedication and service of its Employees.  Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, I believe that the morale and, thus, the performance of its Employees may be adversely affected.

95.      It is my belief that, if the Debtor fails to pay the Prepetition Employee Obligations in the ordinary course, its Employees will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses.  Such a result would have a highly negative impact on workforce morale and likely would result in unmanageable performance issues or turnover, thereby resulting in immediate and irreparable harm to the Debtor and its estate.  In addition, I believe that continuation of the Employee Programs is vital to preserving and rebuilding employee morale during the pendency of the Chapter 11 Case and to reducing the level of employee attrition that might otherwise occur.

96.     The Prepetition Employee Obligations include employee-related amounts that the Debtor may be obligated to pay to or for the benefit of a subsidiary's Employees (in certain cases subject to reimbursement by or allocation to the subsidiary in accordance with intercompany practices), or a subsidiary may be obligated to pay to or for the benefit of the Debtor's Employees (in certain cases subject to reimbursement by or allocation to the Debtor in accordance with intercompany practices).  For example, it is my understanding that certain Employees of Enrichment Corp provide services to the Debtor, both directly (labor charging based) and indirectly (through intercompany allocations) under intercompany service arrangements and other intercompany transactions.[22]  Alternatively, the Debtor also provides certain services directly and indirectly to Enrichment Corp.[23]  In addition, there are certain services that are procured from third party administrators or other providers by either the Debtor or Enrichment Corp that are used by both entities.  In these cases, cost allocations are generally made based on population size.  If the Debtor procures the services it will charge and be reimbursed by Enrichment Corp for its allocated share of the cost of such services.  On the other hand, if Enrichment Corp procures the services it will charge and be reimbursed by the Debtor for its allocated share of the cost of such services.  Given the interrelationships, to ensure that the Debtor is able to fully protect its own Employees as well as the Employees of a subsidiary who provide services for the Debtor's benefit, I believe it is important that the Debtor be authorized to pay or reimburse all employee-related amounts consistent with existing intercompany arrangements.

---

[22]     Examples of these services can include ACP services (direct) and payroll processing (indirect).

[23]     For example, the Debtor provides Treasury services for Enrichment.

ii.  Prepetition Employee Compensation

    *a.  Payroll and Payroll Deductions*

       97.    I have been informed that the Debtor's Employees[24] are paid bi-weekly (on Fridays, or on the preceding business day if a holiday falls on a Friday) with an average payroll each pay period of approximately $2,044,000.  All permanent full-time Employees are salaried and are paid current on each payday for their regular compensation.[25]  Part-time Employees are paid regular compensation two weeks in arrears and overtime for all Employees is also paid two weeks in arrears.  Although certain Employees were paid for all regular and overtime compensation earned through the Petition Date, other Employees are owed certain prepetition amounts.

       98.    Further, it is my understanding that, as of the Petition Date, the Debtor made deductions from its Employees' paychecks for payments to third parties on behalf of Employees for various federal, state and local income, FICA and other taxes, as well as for garnishments, support payments, United Way contributions, savings programs, union dues, credit union payments, benefit plans, flexible savings accounts, government pension programs, political action committees and other similar programs (collectively, the "Deductions").  In 2014 to date, the Debtor's average bi-weekly Deductions for Employees was approximately $333,000.

       99.    Where Employees are owed prepetition compensation amounts, I have been informed that the applicable Deductions have not yet been taken.  Additionally, the Debtor may not yet have forwarded to the various third parties noted above the payments that are attributable to the Deductions that have been withheld from employee paychecks.  I have been

---

[24]    Excluding Contract Workers paid by Oak Ridge National Laboratory or one of the staff augmentation companies.

[25]    For example, an Employee who works during the period of Monday, January 2 through Friday, January 13, is paid for that period on Friday January 13.

informed that, as of the Petition Date, the Debtor estimates that it is holding Deductions

aggregating approximately $21,000, which the Debtor seeks to pay to third parties in accordance

with its prepetition practice.

100.    I have further been informed that, as of the Petition Date, the Debtor

estimates that accrued but unpaid wages and other compensation, including the Deductions, total

approximately $128,000 (comprised of $107,000 owed to Employees and $21,000 attributable to

the Deductions).

   b.  *Vacation Days, Paid Sick Leave Days and Personal Days*

101.    As part of their overall compensation, it is my understanding that

employees are also entitled to receive a certain number of vacation days each year.  Generally,

Employees can earn up to a maximum of thirty (30) vacation days per year depending upon their

length of service with the Debtor, with those Employees who have been employed by the Debtor

for a longer period of time being entitled to a greater number of vacation days than those

Employees who have been with the Debtor for a shorter period of time.[26]

102.    Employees may carry over from one year to the next a maximum amount

of twenty (20) unused vacation days.  Upon termination or retirement, Employees receive

payments of any accrued unused vacation days.  This policy is consistent with the laws of most

states, which provide that vacation benefits are vested and must be paid upon termination of

---

[26]    Generally, Employees who have been employed by the Debtor for (a) less than five (5) years are entitled to ten (10) vacation days; (b) greater than five (5) years but less than twelve (12) years are entitled to fifteen (15) vacation days; (c) greater than twelve (12) years but less than twenty (20) years are entitled to twenty (20) vacation days; (d) greater than twenty (20) years are entitled to twenty-five (25) vacation days; and (e) employees who are grandfathered from previous plans with greater than twenty-five (25) years are entitled to thirty (30) vacation days. Notably, Employees receiving benefits under the Debtor's short-term disability plan (discussed below) will continue to earn vacation benefits.  Vacation will not accrue, however, during long-term disability.

employment.[27]  The Debtor estimates that, as of the Petition Date, the total accrued but unpaid

vacation liability is approximately $5.3 million.

103.    I have been informed that employees are entitled to take up to ten (10)

paid sick days per year, in addition to any days taken pursuant to the short-term disability policy

(as described further below).  Employees are also entitled to receive three (3) paid personal days

per year, and all Employees are entitled to receive eleven (11) paid holidays per year. Unused

sick time, personal days and holidays are not accrued or permitted to be carried over year to year

and are forfeited upon the Employee's termination or retirement.

c.  *Bonus Programs and Other Arrangements*

104.    ***Ordinary Course Incentive Plans***.  In the ordinary course of business, as

an incentive to encourage and reward outstanding performance, the Debtor has historically

offered certain full-time and part-time Employees the opportunity to earn bonuses under one of

several bonus programs.  However, effective January 1, 2013, the Debtor enacted the  Quarterly

Incentive Plan (the "QIP"), which is administered under the USEC Inc. 2009 Equity Incentive

Plan, and the USEC Quarterly Performance Incentive Program (the "QPIP"), each of which

continues for the quarters commencing January 1, 2014 (together, the "Incentive Plans").[28]  I

understand that they are currently the only[29] bonus programs in effect for the Debtor's

---

[27]    Vacation days taken before they are earned are considered a salary advance and such amounts will be
deducted from the Employee's final paycheck upon termination or retirement.

[28]    As part of the "New Management Incentive Plan" to be put in place under the Debtor's plan of
reorganization, for each full quarter prior to the effective date of the plan of reorganization, the Incentive Plans will
continue in effect in the ordinary course, but for the quarter in which such effective date occurs and each subsequent
quarter of 2014, the New Management Incentive Plan will control for the QIP only.  The QPIP will continue for the
remainder of the year.

[29]    An incentive program is also administered by AC Manufacturing (the "AC Manufacturing Program"). The
Debtor's Employees seconded to AC Manufacturing are eligible to receive awards under the AC Manufacturing
Program.  The AC Manufacturing Program is the responsibility of AC Manufacturing; however, the Debtor
reimburses AC Manufacturing for the cost of the AC Manufacturing Program through amounts paid to AC
Manufacturing in the ordinary course of business.  Two (2) of the seconded employees working at AC

employees.[30]  Permanent Employees who are employed at the Debtor's Headquarters, Piketon

and Oak Ridge[31] locations are eligible to participate in the Incentive Plans.[32]  A participating

Employee's award under the Incentive Plans is based on the specific type of position the

participant holds (i.e., managerial, executive or individual contributor), the participant's specific

employment level and the location at which the participant works.  The Incentive Plans provide

incentive awards to participating Employees who make a significant contribution towards the

Debtor's achievement of financial and other goals in their respective area.

105.    I believe the purpose of the Incentive Plans is to motivate participating

employees to make extraordinary efforts to achieve short-term target goals that are crucial to the

Debtor.  Awards under the Incentive Plans are based on performance during a three-month

period (the "Quarterly Period") and paid in cash after the end of the Quarterly Period.  A

participant's award for a Quarterly Period (the "Target Award") is a specified dollar amount

equal to (a) in the case of the QIP, the sum of their (i) Part A Target Award and (ii) Part B Target

Award and (b) in the case of the QPIP, the Part A Target Award.  In determining the Part A and

Part B target awards, the plan references the plan structure in place in 2012.  The Part A Target

---

Manufacturing also participate in the QIP, to the extent they are eligible for Target Part B Awards, which are paid
quarterly.

[30]       In 2012, the Debtor also offered eligible Employees the opportunity to earn annual cash incentive awards
and long-term stock-based incentive awards under the USEC Inc. 2009 Equity Incentive Plan.  Also in effect during
2012, but discontinued for 2013, were the American Centrifuge Performance Incentive Plan and the Marketing and
Sales Plan.  Although not in effect for 2014, the Debtor reserves the right to reinstate such bonus programs or to
implement new bonus programs in future years.

[31]       Certain of the Debtor's Employees located at the Debtor's facilities in Piketon and Oak Ridge are currently
serving a secondment at AC Manufacturing.  Two such Employees are also eligible to participate in the Part B
Target Award under the QIP.

[32]       There are currently thirty-nine (39) participants in the QIP, of which fourteen (14) are officers of the
Debtor and twenty-five (25) are designated key employees.  The number of plan participants for 2014 has been
reduced by approximately twenty percent (20%) from the 2013 participation level.  Of those twenty-five (25) key
employees, six (6) are employed by United States Enrichment Corporation.  United States Enrichment Corporation
is responsible for payment of all QIP awards to such employees, and the Debtor has no obligation with respect to
such payments.  There are currently approximately 478 rank and file Employees participating in the QPIP.

Award represents a participant's historical target annual incentive compensation opportunity.[33]

The Part B Target Award represents a reduced portion of a participant's historical "long term"

incentive compensation opportunity.  In the case of the CEO, this portion is equal to forty

percent (40%) of the 2012 long-term incentive target.[34]  For each quarter of 2014,[35] the

annualized Part A Target Award for each participant is as follows, expressed as a percentage of

base salary:  (a) for the QIP, (i) one hundred percent (100%) for the President/Chief Executive

Officer; (ii) seventy percent (70%) for Senior Vice Presidents; (iii) thirty-six percent to sixty

percent (36%-60%) for Vice Presidents; and (iv) eighteen percent to thirty-six percent (18%-

36%) for Key Managers; and (b) for the QPIP, ten percent to forty-five percent (10%-45%) for

certain other managers and key personnel.  As part of the QPIP, all other Employees, including

members of the bargaining unit at Piketon, are eligible for awards between five percent and

twenty percent (5%-20%) of their base salary.  The annualized Part B Target Award, for QIP

participants only, is as follows, expressed as a percentage of base salary: (a) one hundred percent

(100%) for the President/Chief Executive Officer; (b) seventy percent (70%) for Senior Vice

Presidents; (c) thirty-six percent to sixty percent (36%-60%) for Vice Presidents; and (d)

eighteen percent to thirty-six percent (18%-36%) for Key Managers.  Overall, these amounts

represent a significant reduction to Part B incentives for 2014.  In addition, for the 2014 QIP,

twenty-five percent (25%) of each individual's quarterly award is withheld, with the final

---

[33]     The Part A Target Award will be considered in the definition of pay used to determine, as applicable, (a)
the participant's severance benefits under the Severance Plan (as defined below) or any other severance plan in
which he or she participates, (b) the participant's severance benefits under his or her change in control agreement
with the Debtor, and (c) the participant's benefits under the SERP Plans (as defined below), the Restoration Plan (as
defined below) and the Qualified Pension Plan (as defined below).

[34]     The Part B Target Award will not be included in the definition of pay under any of the severance, change in
control or retirement agreements listed above.  The Part B Target Awards are only applicable to those Employees
who are participants in the QIP and not those who participate in the QPIP.

[35]     See footnote 28 for the treatment of the QIP under the New Management Incentive Plan for any quarter in
which occurs the effective date of the Debtor's plan of reorganization and subsequent quarters of 2014.

payment of the withheld amount being made 90-days after emergence from bankruptcy or, if so determined by the Compensation Committee (as defined below), at the end of the calendar year 2014.[36]

106.    It is my understanding that under the Incentive Plans, at the beginning of each Quarterly Period, the Compensation, Nominating and Governance Committee of the Debtor's Board of Directors (the "Compensation Committee") based on the recommendation of the Chief Executive Officer (the "CEO") in the case of the QIP, and the Debtor's senior management team in the case of the QPIP, determines one or more corporate[37] goals for the Quarterly Period (the "Quarterly Period Goals").  Each Quarterly Period Goal is then given a percentage weight, with the sum of the Quarterly Period Goals totaling one hundred percent (100%) of the participant's Target Award for the Quarterly Period for the CEO and senior vice presidents, and sixty-five percent (65%) for other QIP participants.  Quarterly Period Goals represent from twenty percent (20%) to sixty-five percent (65%) for QPIP participants, with the remainder being comprised of business unit and/or individual goals.  Target Awards are earned, if at all, based on satisfaction of the Quarterly Period Goal within a Quarterly Period.  At the end of a Quarterly Period, the CEO will rate the Debtor's performance on the following scale and make a recommendation to the Compensation Committee: (a) a rating of "goal achieved" means that the Debtor achieved the Quarterly Period Goal during the Quarterly Period and a whole or partial payout is warranted; (b) a rating of "incomplete/in process" means that the Debtor did not achieve the Quarterly Period Goal within the Quarterly Period but, because the underlying

---

[36]    The foregoing only applies to quarters that are completed prior to the effective date of the Debtor's plan of reorganization.  See footnote 29 for the treatment of any quarter in which occurs such effective date and subsequent quarters of 2014.

[37]    As discussed above, "corporate" goals take into account the performance of USEC Inc. and United States Enrichment Corporation.

objective remains important and capable of being achieved, the Compensation Committee and the CEO may determine to reaffirm the Target Award opportunity for the next Quarterly Period;[38] (c) a rating of "goal not achieved" means that the Quarterly Period Goal was not achieved during the Quarterly Period and no  payout is warranted.   The results of corporate performance on the Quarterly Period Goals are then applied to both the QIP and the QPIP.  For participants in the Incentive Plans other than the CEO and the senior vice presidents, the achievement of additional quarterly goals that are comprised of division or individual objectives established by the CEO (or by the manager of such participant as directed by the CEO) are also factored into performance.  These additional quarterly goals are reviewed and determined by the CEO, who takes into account the opinion of the manager of such participant.  For each additional quarterly goal that is satisfied, the participant will be credited with the percentage of the Target Award attributable to those additional goals, with the total of Quarterly Period Goals and the division and/or individual goals totaling one hundred percent (100%).

107.    For 2013, the Debtor paid 525 participants in the Incentive Plans (including six (6) Enrichment Corp employees participating in the QIP)[39] cash in the aggregate amount of $3,332,934 with respect to the first Quarterly Period, $2,430,696 with respect to the second Quarterly Period, $3,016,293 with respect to the third Quarterly Period, and $3,164,178 with respect to the fourth Quarterly Period.  The Debtor anticipates that the Incentive Plan payouts for the first Quarterly Period of 2014 will be in the range of $2 million to $3.5 million, a portion of which will be based on performance rendered by participants prior to the Petition

---

[38]      In the event that the Compensation Committee reaffirms a Target Award opportunity for Quarterly Period Goals set in prior Quarterly Periods that have not yet been achieved  (such carried over Quarterly Period Goal, a "Carry Forward Goal"), the value of such Carry Forward Goal may be retained or may be reduced up to one hundred percent (100%) to reflect that the goal was not achieved in accordance with its original terms, with the amount of such reduction determined at the discretion of the Compensation Committee.

[39]      As noted above in footnote 32,United States Enrichment Corporation is responsible for payment of all QIP awards to these six (6) employees, and the Debtor has no obligation with respect to such payments.

Date.  I have been informed that the payouts for subsequent quarters of 2014 are expected to be comparable.[40]  In the Employee Wages Motion, the Debtor has sought to honor all obligations that have accrued and will continue to accrue under the Incentive Plans as and when they become due in accordance with the commitments made to participating Employees.

108.    ***Special Retention Arrangements***.  I have been informed that in 2012, the Debtor entered into retention agreements with three (3) key managers located at the Debtor's Headquarters and at ACP.  Under the retention agreements, the managers are eligible for a retention payment should they remain employed by the Debtor through a fixed date in 2014.  Each of these managers is a non-insider who provides specialized expertise in his or her field and whose continued employment with the Debtor is essential to the Debtor's ongoing business operations.  Payments under these three (3) retention arrangements total $75,000 in the aggregate and will become payable in 2014.  The Debtor seeks authorization to make any such retention payments that come due during the pendency of the Chapter 11 Case.

109.    ***Stock Program***.  In addition, it is my understanding that the Debtor also operates a restricted stock program (the "Stock Program") pursuant to which it issues shares in USEC Inc. to officers and selected member of management.  As of the Petition Date, approximately thirty-one (31) Employees were participating in this Stock Program.  Under the Stock Program, Employees have the option to transfer shares of stock back to the Debtor and, as consideration, the Debtor pays the taxes associated with the vesting of the Employee's shares.  As of the Petition Date, accrued but unpaid taxes associated with vested shares of USEC Inc. stock is approximately $16,000.  The Debtor has requested authority, in its discretion, to pay such prepetition amounts in connection with the Stock Program.

---

[40]        See footnote 28 for the treatment of the QIP under the New Management Incentive Plan for any quarter in which occurs the effective date of the Debtor's plan of reorganization and subsequent quarters of 2014.

iii.  Prepetition Employee Reimbursements

    a.  *Business Expenses*

       110.    The Debtor, in the ordinary course of its business, reimburses Employees for a variety of ordinary, necessary and reasonable business related expenses that Employees incur.  These include expenses for travel, including lodging, automobile rentals, meals, business-related entertainment expenses, internet charges when traveling, taxi, mileage and incidental expenses such as parking and tolls.  In addition, the Debtor reimburses Employees for professional expenses such as bar association and other membership dues, conference fees and professional publication subscriptions.  I believe it is essential to the continued operation of the Debtor's business that the Debtor be permitted to continue reimbursing Employees for such business expenses.

       111.    It is my understanding that a software expense reimbursement program referred to as "Concur" is used to track employee reimbursable expenses.  For those Employees who have been issued a company credit card through American Express, for travel, entertainment and other business-related expenses,[41] charges to the American Express card are automatically submitted into an expense report in the Concur system.  The Employee is then responsible for properly categorizing and explaining each expense.  Those Employees who have not been issued an American Express card must manually enter the details of any expenses incurred into the Concur expense report.  In each case (i.e., whether related to the American Express card or not), the Employee is reimbursed for the expense via a separate check or direct deposit issued by the Debtor immediately after the expense report is submitted and approved by the applicable manager and accounting staff.  Those Employees with American Express cards are

---

[41]    The expenses include the costs that certain Employees incur for gasoline and maintenance expenses on automobiles the Employee owns and use for business purposes or automobiles which have been leased by the Debtor for use by certain sales and technical Employees.

DC\3143575.8

then responsible for payment of the American Express bill.[42]  The Debtor pays Concur a fee of

approximately $4,000 per month for such services.

112.    Because the Employees are not always prompt in entering expense

reimbursement data into the Concur system, it is difficult for the Debtor to determine the exact

amount outstanding at any particular time.  I have been informed that the Debtor believes that, on

average, Employees take two weeks to submit their expense data.  Taking into account this two-

week lag period, the Debtor estimates that, as of the Petition Date, its obligation to Employees

for accrued, reimbursable expenses (submitted and unsubmitted) aggregate approximately

$48,555, inclusive of amounts for travel, entertainment and other business-related expenses.

b.  *Relocation Expenses*

113.    Additionally, in order to maximize the effectiveness of its work-force

through recruiting of new Employees or relocation of existing Employees, it is my understanding

that the Debtor has in place two relocation policies, depending on the business unit for which the

particular Employee works or will work.  First, the Debtor has in place a relocation policy for

those Employees who are employed at the Headquarters (the "Headquarters Relocation Policy").

In order to be eligible for benefits under the Headquarters Relocation Policy, full-time

Employees or newly hired Employees to be employed at the Headquarters, who either rent or

own a home, must: (a) have been requested to move by the Debtor at least a distance of fifty (50)

miles, (b) relocate and incur expenses in connection therewith within twelve (12) months of the

effective date of transfer or hire, (c) remain employed with the Debtor for a period of at least one

(1) year following the effective date in the new position, (d) sign a moving authorization contract

as required by the Debtor and (e) be designated by the Debtor as eligible for benefits under the

---

[42]    The Debtor has no liability in connection with the Employees' American Express credit cards.

Headquarters Relocation Policy.  Under the Headquarters Relocation Policy, consistent with the

Debtor's ordinary practice, certain costs associated with the relocation are reimbursed by the

Debtor.  Reimbursable expenses include, but are not limited to, travel expenses incurred in

connection with "home finding trips," new home purchase closing costs up to five percent (5%)

of the amount mortgaged, miscellaneous expenses equal to up to one month's salary for

homeowners or one half month's salary for renters, temporary living expenses in the event a new

residence is not available for occupancy at the time of the relocation and moving and travel

expenses.  Enrichment Corp additionally employs a moving company, Brookfield Relocation

Inc. ("Brookfield"), to assist in the relocation of both the Debtor's and Enrichment Corp's

employees' household goods.   I understand that additional benefits are provided to the

employees with respect to the sale of the participating employee's existing home.[43]  Notably, the

Debtor directly pays Brookfield to provide these home sale services to the newly-hired or

existing Debtor Employee at a rate of $4,500 per relocation.[44]

114.    The Debtor also has in place a relocation policy for certain "exempt"[45]

salaried Employees employed at the Piketon and Oak Ridge sites (the "Piketon/Oak Ridge

Relocation Policy").  The Piketon/Oak Ridge Relocation Policy provides those Employees who

have expressed a need for relocation assistance with certain benefits, such as assistance with the

---

[43]       The relocation policy does not cover certain types of homes.  For example, mobile homes, boats, cooperative apartments, vacation homes and property located out of the United States, among others, are not covered under the relocation policy.

[44]       Specifically, under the relocation policy for existing Employees, in the event the Employee is unable to sell his or her home, under certain circumstances, Brookfield will offer to purchase the home from the Employee based upon the average of several appraisals obtained, and then assume the burden of selling the home.  All payments made in connection with the sale of the home are made directly to Brookfield.  In the event that Brookfield is unable to resell the house within a certain period of time, the Debtor may be obligated to reimburse Brookfield for expenses incurred in connection with the sale process.  Employees who successfully sell their own home within six (6) months are eligible for a bonus of three percent (3%) of the sale price.  Currently, there are no pending home sales.

[45]       The terms "exempt" and "non-exempt" are designations under the Fair Labor Standards Act that refer to entitlement to overtime pay.  Exempt Employees are not entitled to overtime pay, whereas non-exempt Employees are entitled to overtime pay.

purchase of a new home, transportation to the new work location, moving services, assistance with the sale of their existing home, relocation income tax "gross-ups", temporary housing, costs of home finding and selling trips, a 1.5% incentive for sale of their existing home and cancellation of lease payments of up to three (3) month's rent, if the position has been identified by the Debtor as eligible for relocation and relocation is part of the hiring agreement and accepted offer letter.  Once the Employee is identified as eligible to participate in the Piketon/Oak Ridge Relocation Policy, it is my understanding that a member of the Debtor's human resources department will evaluate the needs of such Employee and develop a customized relocation package unique to that individual.

115.    I understand that the Debtor estimates that its total prepetition liability for relocation-related expenses incurred pursuant to the Headquarters Relocation Policy and the Piketon/Oak Ridge Relocation Policy is $0.  It is imperative that the Debtor continues to reimburse newly hired and existing Employees who are asked to relocate and to pay Brookfield Relocation, Inc.  in the ordinary course of the Debtor's business.

c.  *Tuition Program*

116.    Additionally, the Debtor offers full-time Employees the ability to participate in an educational assistance program (the "Tuition Program").  I have been informed that the Tuition Program is designed to enable an eligible Employee to contribute to the Debtor's success by increasing knowledge and skills through professional development.  Under the Tuition Program, the Debtor provides reimbursement for one hundred percent (100%) of the eligible tuition and fees for job-related courses and eighty percent (80%) of eligible tuition and fees for non-job related courses, up to a maximum of twelve (12) credit hours and fifty percent (50%) of the cost of books.  Reimbursement under the Tuition Program is, however, subject to

required management approvals and is only provided for courses in pursuit of a degree that is directly related to the participating Employee's present or prospective role with the Debtor. Furthermore, Employees must earn a grade of "C" or better and remain employed by the Debtor for a period of twelve (12) months after any tuition reimbursement is made.  It is my understanding that the Debtor estimates that its total prepetition liability on account of the Tuition Program is approximately $121,268.

        *d.   Miscellaneous Reimbursements*

117.   I understand that the Debtor also provides certain senior Employees with miscellaneous reimbursement benefits for expenses incurred for an annual physical, business club and/or country club memberships (for the CEO and VP Government Relations only) and first class air travel (limited to flights exceeding six (6) hours) (the "Miscellaneous Programs"). In addition, approximately fifty (50) officers and certain key managers are entitled to participate in the Financial Counseling Benefit Program, which provides reimbursement amounts to the CEO of up to $20,000, senior executive officers of up to $7,500 and other participating Employees of up to $5,000 per calendar year for expenses incurred in obtaining financial counseling services.  Such expenses are reimbursed in the same manner as all other expenses. As of the Petition Date, there were no unpaid obligations on account of the Miscellaneous Programs and the Financial Counseling Benefit Program.

118.   With the addition of approximately $48,555 in estimated outstanding reimbursable expenses, $0 in estimated relocation-related expenses, $121,268 in reimbursements associated with the Tuition Program, and $0 in reimbursements associated with the Miscellaneous Programs and the Financial Counseling Benefit Program, the total prepetition

obligations in respect of reimbursements is estimated at $169,882 as of the Petition Date (the "Reimbursement Obligations").

iv.   Employee Benefits

119.    Prior to the Petition Date, the Debtor offered Employees and their eligible spouses and dependents various standard employee benefits, including, without limitation, (a) medical and dental coverage, (b) coverage continuation under COBRA, (c) pre-tax contribution flexible spending accounts, (d) basic term life, supplemental life, accidental death and dismemberment and business travel accident insurance, (e) short-term and long-term disability insurance, (f) employee assistance, (g) retirement, savings, pension and related types of benefits, (h) workers' compensation, (i) severance and (j) miscellaneous other benefits provided to the Employees in the ordinary course of business (collectively, the "Employee Benefits").  As of the Petition Date, the Debtor was obligated to pay certain contributions to or provide benefits under such plans, programs and policies.

a.  *Medical and Dental Programs*

120.    ***Employees at Headquarters***.  All full-time and part-time Employees at the Debtor's Headquarters working greater than thirty (30) hours per week are eligible to participate in one of several medical plans administered by CareFirst BlueCross Blue Shield ("CareFirst"). Specifically, such Employees have the ability to choose between two plans, each of which provides for the same types of medical, vision[46] and prescription drug coverage.  The first medical plan option is referred to as the "PPO" option, under which Employees and their family members have the choice to use providers within the network or to use providers outside the network (the latter option being subject to higher costs).  The second option is referred to as the

---

[46]    Vision insurance is included within the Debtor's medical plan, but is administered by Davis Vision Incorporated.  The Debtor remits all payments to CareFirst, which then pays Davis Vision Incorporated all amounts owed on account of vision insurance.

"HMO" option, under which Employees and their family members typically choose to use a provider within a broad network, but may have the option of using out of network providers if the Employee is referred to such provider by a network provider or CareFirst.  It is my understanding that the cost of such out of network providers may be reimbursed in whole or in part by CareFirst.  Each of the foregoing medical plans have different associated premiums, deductibles and coverage benefits.

121.    Regardless of which plan is selected, it is my understanding that Employees pay twenty percent to twenty-two percent (20-22%) of the premium for their medical benefits coverage through pre-tax contributions from their paychecks, which is remitted monthly to CareFirst.

122.    The Debtor also offers Employees at the Headquarters dental benefits through a dental plan with CareFirst Dental.  Such Employees pay twenty percent to twenty-two percent (20-22%) of the premium for their dental benefits coverage through pre-tax contributions from their paychecks, which is remitted to CareFirst Dental.

123.    I understand that the Debtor pays a single monthly payment directly to CareFirst for seventy-eight percent to eighty percent (78-80%) of the premium cost of all medical and dental premiums of the Employees and the Debtor, which approximates $110,061 per month.

124.    ***Employees at Piketon and Oak Ridge Sites***.  All full-time and part-time permanent Employees at the Debtor's Piketon and Oak Ridge sites working greater than 30 hours per week are eligible to participate in one of several medical plans administered by Anthem Blue Cross Blue Shield.  Specifically, such Employees have the ability to choose between three plans, the "Core Plan" option, the "Buy-Up" option, or a health savings account option (the "HSA

61

Eligible Plan"), all of which provide for the same types of medical, vision[47] and prescription drug coverage.  Employees who choose the Buy-Up option pay a larger premium, but have lower deductibles and co-insurance than those Employees who participate in the Core Plan.  Employees who choose the HSA Eligible Plan pay a lesser premium, but have higher deductibles and co-insurance than those Employees who participate in the Core Plan.  Under all of these options, Employees and their family members have the choice to use providers within the network or to use providers outside the network (the latter option being subject to higher costs).  Employees pay twenty percent to twenty-two percent (20-22%) of the premium of the Core Plan and, should they choose the Buy-Up option, one hundred percent 100% the difference between the cost of the Core Plan and the Buy-Up option, for their medical benefits coverage through pre-tax contributions from their paychecks, which is remitted to Anthem Blue Access.  The Debtor pays the remaining seventy-eight percent to eighty percent (78-80%) of the Core Plan premium, which approximates $460,690 per month.  I have been informed that the Debtor pays the Employees' share and  its share of the premiums in one aggregate payment directly to Anthem Blue Cross Blue Shield.[48]  With respect to the HSA Eligible Plan, the Debtor pays seventy-eight percent to eighty percent (78-80%) of the premium and the Employee pays the remaining twenty percent to twenty two percent (20-22%).  As of the Petition Date, eight (8) Employees have elected the HSA Eligible Plan.

125.    The Debtor also offers eligible Employees at the Piketon and Oak Ridge sites dental benefits through a dental plan with MetLife Dental.  Such Employees pay twenty

---

[47]      Vision insurance is included within the Debtor's medical plan, but is administered by an entity named Anthem Blue Vision.  The Debtor remits all payments to Anthem Blue Cross Blue Shield, which then pays Anthem Blue Vision all amounts owed on account of vision insurance.

[48]      Anthem Blue Cross Blue Shield automatically debits such amounts from the Debtor's checking account on a monthly basis.

percent to twenty-two percent (20-22%) of the premium for their dental benefits coverage through pre-tax contributions from their paychecks, which are remitted monthly to MetLife Dental.  The Debtor pays the remaining seventy-eight percent to eighty percent (78-80%), which approximates $27,287 per month.

126.    It is my understanding that the estimated monthly cost to the Debtor under all medical, vision, prescription drug and dental plans (including premiums and claims, but not including any administrator fees) is approximately $598,038, which amount is a reasonable proxy for the Debtor's prepetition obligations under such plans.

### b. Pre-Tax Contribution Flexible Spending Accounts

127.    The Debtor additionally offers all of its full-time Employees the opportunity to contribute, through pre-tax payroll deductions, to flexible spending accounts ("FSAs") to be used for healthcare related expenses and dependent care expenses.[49]  FSA funds are withheld from the Employee's paycheck and remitted by the Debtor to WageWorks, Inc. ("WageWorks"),[50] which administers the claims of participating Employees under the FSAs and remits reimbursements to the Employees.  As of the Petition Date, the Debtor estimates that it is holding FSA deductions to be remitted to WageWorks of approximately $36,990.  As discussed in Section F below, the Debtor pays a fee to WageWorks of $5.41 for each Employee participating in the FSA program.

### c. Life Insurance and Accidental Death and Dismemberment Insurance

128.    I have been informed that the Debtor provides, at its own cost, certain basic life insurance and accidental death and dismemberment ("AD&D") insurance for its

---

[49]    Those Employees utilizing the HSA are not eligible to contribute to the FSA.

[50]    The Debtor remits such amounts to WageWorks after WageWorks processes the funds for reimbursement to the applicable Employee.

Employees under policies administered by UNUM Life Insurance Company of America ("UNUM"). Non-executive Employees receive basic life insurance in an amount equal to the Employee's annual earnings, up to a maximum of $300,000.[51] Certain executive and senior Employees receive basic life under an executive and key employee life insurance plan (the "Executive Life Insurance Plan"). Under the Executive Life Insurance Plan, basic life insurance is provided (at the Debtor's cost) to Employees in Class 1[52] in an amount equal to twice the applicable Employee's total annual compensation (base earnings plus bonus) up to a maximum of $2,500,000,[53] and to Employees in Class 2[54] in an amount equal to the applicable Employee's annual base earnings, up to a maximum of $300,000. Employees in Class 1 and Class 2 are also entitled to purchase group variable universal life insurance ("GVULI") (at the Employee's expense) in the following amounts: for Employees in Class 1, twice the applicable Employee's total compensation (base earnings plus bonus), up to a maximum of $2,500,000 and for Employees in Class 2, one times the applicable Employee's base compensation, up to a maximum amount of $300,000.[55]

---

[51] Employees may purchase supplemental life insurance, at their own cost, for a minimum of $10,000 and up to five times their annual earnings, with a maximum of $500,000. In addition, Employees may purchase supplemental life insurance coverage for their spouses (in amounts ranging from $10,000 to 100% of such Employee's election, not to exceed $500,000) or supplemental AD&D coverage for their spouses (in amounts ranging from $5,000 to 100% of such Employee's election, not to exceed $500,000). Employees may also purchase supplemental life insurance coverage and AD&D coverage for their children (in amounts ranging from $2,000 to 100% of such Employee's election, not to exceed $10,000).

[52] The designation "Class 1" refers to all Employees who are executive officers, Vice Presidents and Senior Vice Presidents of the Debtor, as well as the President and the CEO of the Debtor.

[53] Employees in Class 1 may purchase supplemental life insurance in an amount equal to such Employee's total annual compensation (base earnings plus bonus), up to a maximum of $4,725,000, including basic life insurance benefits.

[54] Class 2 Employees include those Employees, other than executives in Class 1, who earn between $125,000 and $300,000 (base earnings plus bonus).

[55] Employees in Classes 1 and 2 may also purchase (at their own cost) GVULI for their spouses (in amounts ranging from $5,000 to $250,000) and their dependents (in amounts ranging from $2,000 to $10,000).

129.    Additionally, I understand that AD&D insurance is provided to both executive and non-executive Employees.  In cases involving the loss of life or the dismemberment of an Employee (such as the loss of a hand, a foot or the total loss of sight in an eye), an AD&D benefit equal to the Employee's annual earnings, up to a maximum of $300,000 is payable.

130.    The Debtor's average monthly expense attributable to life insurance programs and AD&D insurance for executive and non-executive Employees is approximately $17,437 per month, which is a reasonable proxy for the estimated amount that the Debtor owes as of the Petition Date.

d.  *Travel-Related Insurance Benefits*

131.    It is my understanding that the Debtor also provides business travel and accident insurance as well as emergency medical coverage to all Employees who are required to travel for business purposes through a plan administered by Zurich.  The plan provides life insurance protection for accidental death equal to five (5) times an Employee's annual earnings up to a maximum benefit of $500,000.  Coverage is also provided for certain disabling injuries, such as loss of sight, speech, hearing or limb; or permanent and total disability.  In addition, coverage is provided for emergency medical services and repatriation benefits.[56]  The premium for such travel-related insurance is $6,450, which amount was paid by the Debtor  for the period of June 1, 2011 to January 1, 2015.  There is, thus, no estimated outstanding liability due as of the Petition Date.

---

[56]    Repatriation benefits include, among other things, the costs of transporting an Employee back to the United States for treatment if he/she is injured or becomes ill overseas.

65

e.  *Short-Term and Long-Term Disability Programs*

132.    The Debtor provides, at its own cost, short-term disability ("STD") coverage to eligible[57] non-executive Employees who are unable to work due to serious illness or injury.  The STD benefit results in the continuation of the Employee's weekly earnings at sixty-six and two-thirds percent (66 2/3%) of such earnings, up to a maximum weekly benefit of $2,000 for a period of up to twenty-five (25) weeks.[58]  The Debtor also provides, at its own cost, long-term disability ("LTD") coverage to eligible non-executive Employees who have been disabled for at least one-hundred-eighty (180) days.  It is my understanding that there is no minimum length of service that is required for Employees to be eligible for this benefit.  The LTD coverage is equal to sixty percent (60%) of the Employee's monthly earnings (offset by sources of income such as social security and other disability benefits) up to a maximum monthly benefit of $10,000.  Such LTD benefits are generally paid until the Employee reaches age sixty-five (65) or until his/her disability ends, if earlier.

133.    The Debtor also provides, at the Employees' cost, benefits under the Individual Supplemental Income Protection plan (the "ISIP Plan"), which provides non-executive Employees with additional disability coverage to replace up to seventy-five percent (75%) of gross monthly compensation.  The ISIP Plan includes a catastrophic disability benefit, which provides the applicable Employee with an additional twenty-five percent (25%) of income in the event such Employee suffers a catastrophic disability.

---

[57]    Non-temporary, non-executive Employees who work a minimum of forty (40) hours per week are eligible for non-executive short-term and long-term disability coverage.  Non-executive employees are those Employees that are not executive officers, Vice Presidents, Senior Vice Presidents, the President or the CEO of the Debtor.

[58]    Employees' short-term disability benefits begin after an Employee has missed seven (7) days of work due to disability or illness.

134.    In addition, I understand that eligible[59] executive Employees are entitled to STD benefits resulting in the continuation of 100% of the Employee's annual base salary, with no maximum, for a period of up to twenty-five (25) weeks.[60]  The Debtor also provides certain executive Employees who have been disabled for at least one-hundred-eighty (180) days with LTD benefits equal to forty percent (40%) of the Employee's monthly base salary, up to a maximum of $15,000 per month.  Executive Employees are also provided additional individual LTD coverage equal to seventy-five percent (75%) of such Employee's monthly base salary, less any group LTD benefits, up to a combined maximum of $25,000 per month for both programs.

135.    The STD and LTD coverage for executive and non-executive Employees is administered by UNUM.  As of the Petition Date, the average monthly premium for STD coverage for all Employees is $26,407 and the average monthly premium for LTD coverage for all Employees is $33,719, which the Debtor believes is a reasonable proxy of the amounts they owe as of the Petition Date.

   f.   *Employee Assistance Program*

136.    The Debtor additionally offers all Employees services to help resolve personal issues, as well as assistance with challenges (including, but not limited to drug abuse, marital difficulties, alcoholism or alcohol abuse, financial and legal pressures, concerns about children, depression or divorce) that may arise in the Employees' lives (the "Employee

---

[59]    Non-temporary Employees in executive positions who work a minimum of forty (40) hours per week are eligible for executive short-term and long-term disability coverage.  Executive employees are those Employees that are executive officers, Vice Presidents, Senior Vice Presidents, the President or the CEO of the Debtor.

[60]    Employees' short-term disability benefits begin after an Employee has missed seven (7) days of work due to disability or illness.

Assistance Program"). The Debtor utilizes Magellan Behavioral Services to administer the
Employee Assistance Program for all Employees.[61]

g. *Savings and Retirement Plans*

137. ***401(k) Retirement Plans***. I understand that the Debtor maintains the
USEC Saving Program (the "USEC Savings Program") for eligible Employees. The USEC
Savings Program is a tax-qualified 401(k) retirement savings plan. Under the USEC Savings
Program, an eligible Employee (which includes certain full-time and part-time Employees) may
contribute a portion of his or her compensation on a pre-tax basis, through voluntary payroll
deductions, to the USEC Savings Program.[62] The USEC Savings Program also permits
participating Employees to contribute a portion of eligible compensation to the USEC Savings
Program on an after-tax basis.[63] Currently, approximately 467 of the Employees (92%)
participate in the USEC Savings Program.

138. The Debtor is permitted to make matching contributions to the USEC
Savings Program. The Debtor provides (a) a matching contribution of two hundred percent
(200%) on the first two percent (2%) of eligible pay that the participating Employee contributes
to the USEC Savings Program and (b) as to amounts that the participating Employee contributes
above two percent (2%), a match equal to one hundred percent (100%) of the next two percent
(2%) that the participating Employee contributes and (c) as to amounts that the participating
Employee contributes above four percent (4%), a match equal to fifty percent (50%) of the next

---

[61]     The Debtor pays Magellan Behavior Services a fee of $1.52 per month per Employee participating in the
Employee Assistance Program. Such fee is addressed in further detail in Section F below.

[62]     An Employee is eligible to participate in the USEC Savings Program on the date he or she first completes
an hour of service as an Eligible Employee.

[63]     The total contributions made by an participating Employee for any payroll period (a) must be no less than
one percent (1%) of his or her eligible earnings for such period, (b) must be made in one-half percent (½%)
increments and (c) may be contributed either before-tax or after-tax, or a combination of both; provided that the total
contribution for any payroll period cannot exceed fifty percent (50%) of such Employee's eligible earnings.

two percent (2%) that the participating Employee contributes.  The Debtor's matching contribution is limited to a total of $17,500 per Employee per year.  Matching contributions are paid into the USEC Savings Program on a current basis.  I have been informed that, as of the Petition Date, the Debtor owes approximately $0 on account of its matching obligations under the USEC Savings Program.

139.    ***Qualified Pension Plan***.  In addition, the Debtor currently maintains the Employees' Retirement Plan of USEC Inc., a tax-qualified pension plan that is available for certain of its Employees[64] (the "Qualified Pension Plan").  The Qualified Pension Plan was previously closed to new participants and, effective August 5, 2013, the Debtor froze all accrued benefits for active Employees under the Qualified Pension Plan.  The Qualified Pension Plan is a defined benefit pension plan that provides eligible retired Employees with monthly income and which is funded through a pension trust.  Under the Qualified Pension Plan, participating Employees may retire: (a) at age sixty-five (65) or later, regardless of service credit, (b) at age sixty-two (62) or later, with at least ten (10) years of service credit, or (c) when the participating Employee's age and years of service credit total eighty-five (85) or more.[65]  Pensions under the Qualified Pension Plan are calculated under three different formulas and participating Employees are entitled to receive the greatest of the three pension benefits.  The "regular formula" provides a monthly benefit of one and two-tenths percent (1.2%) of the participating Employee's average eligible monthly earnings multiplied by his or her years and months of service credit, plus a flat

---

[64]    Eligible Employees include all full time and part time Employees hired before September 1, 2008, unless the Employee elects to opt out of participation in the Qualified Pension Plan or is in an ineligible class.  Ineligible classes include the following: individuals classified as leased Employees, independent contractors or non-resident aliens with no U.S. source income, Employees represented and/or covered by a CBA that does not provide for participation in the Qualified Pension Plan, and Federal Employees as of July 27, 1998 who elected to continue coverage under the Federal Employees Retirement System or the Civil Service Retirement System and are actively accruing benefits under one of these retirement systems.

[65]    Eligible Employees are entitled to retire with a reduced pension under the Qualified Pension Plan at age 50, with at least ten (10) years of service credit.

amount of $110. The "alternate formula" provides a monthly benefit of one and one-half percent (1.5%) of the participating Employee's average eligible monthly earnings multiplied by his or her years and months of service credit, less one and one-half percent (1.5%) of his or her monthly primary social security benefit, multiplied by his or her years and months of service credit.[66] The "minimum formula" provides a monthly benefit of $5.00 for each of the first ten (10) years of service credit, <u>plus</u> $7.00 for each of the 11th through 20th years of service, <u>plus</u> $9.00 for each year in excess of twenty (20) years of service, <u>plus</u> ten percent (10%) of the participating Employee's average eligible monthly earnings,[67] <u>plus</u> the flat amount of $110.[68] Employees are entitled to include bonuses in the calculation of their average eligible monthly earnings for purposes of the above formulas.[69]

140.    I have been informed that, as of the Petition Date, there were (a) approximately 148 <u>current</u> Employees with a vested benefit in the Qualified Pension Plan upon reaching the age of retirement, (b) approximately 53 <u>former</u> Employees with a vested benefit in the Qualified Pension Plan who had not yet reached the required retirement age necessary to begin receiving benefits thereunder[70] and (c) approximately 122 <u>retired</u> Employees currently

---

[66]    Under this formula, no more than fifty percent (50%) of the Employee's primary social security benefit will be used to offset his or her earnings. By way of example, an Employee who earned an average of $1,000 per month with a service credit of ten years and a primary social security benefit of $120 would receive a monthly pension benefit of $132.

[67]    For Employees with less than eight (8) years of service, this amount will be reduced one percent (1%) for each year less than eight (8).

[68]    By way of example, an Employee who earned an average of $1,000 per month with a service credit or 15 years would receive a monthly pension benefit of $295.

[69]    Additionally, certain of the Debtor's employees who previously worked at United States Enrichment Corporation have a vested benefit in two qualified pension plans of United States Enrichment Corporation: the Employees' Retirement Plan Program of the Unites States Enrichment Corporation and the Retiree Welfare Plan of United States Enrichment Corporation. United States Enrichment Corporation, not the Debtor, is liable for such benefits.

[70]    Thirty (30) other former Employees with a vested benefit in the Qualified Pension Plan who had not yet reached the required retirement age necessary to begin receiving benefits thereunder were offered, and accepted, a

receiving benefits under the Qualified Pension Plan.  It is my understanding that all lump sum payments will be made from the pension trust.  The Debtor's funding obligations under the Qualified Pension Plan are monitored by the Debtor and an outside actuary and contributions are made as required.  As of the Petition Date, the Debtor anticipates that there will be minimum required contributions totaling approximately $4.5 million during 2014.

141.    ***Non-Qualified Plans***.  In addition to the aforementioned plans, the Debtor has also historically offered certain Employees the ability to participate in additional non-qualified retirement-related programs (collectively, the "Retirement Programs").  For example, the Debtor maintains the USEC Inc. 1999 Supplemental Executive Retirement Plan (the "1999 SERP") and the USEC Inc. 2006 Supplemental Executive Retirement Plan (the "2006 SERP," and, together with the 1999 SERP, the "SERP Plans"), the purpose of which is to provide certain designated Employees with retirement benefits in excess of those provided under the Qualified Pension Plan.

142.    The 1999 SERP was approved by the Compensation Committee in 1999 and there is currently only one (1) active participant.  The Compensation Committee did not add any additional participants after 2001.[71]  Benefits under the SERP Plans are based on the average compensation paid to the participating Employee for three consecutive years immediately preceding the termination date (the "Final Average Compensation").  The benefit payable under the 1999 SERP to participating Employees who retire after the age of 62 is equal to the actuarial equivalent of the monthly benefit for life.  Such monthly benefit is calculated as one-twelfth

---

one-time opportunity to receive the current lump sum value of their future annuity, which opportunity expired on December 31, 2013.

[71]    In general, the 1999 SERP was closed to new participants as of December 31, 2005.  However, senior executives hired prior to such date were eligible to participate upon obtaining approval of the Board of Directors. The 2006 SERP replaced the 1999 SERP as of April 24, 2006.  The 2006 SERP was closed to new participants in 2012.

(1/12) of the benefit objective ("Benefit Objective"),[72] less (a) one hundred percent (100%) of the participating Employee's monthly social security benefit and (b) one hundred percent (100%) of the actuarial equivalent of the participating Employee's monthly benefit under the Qualified Pension Plans.[73] Participating Employees who retire between the age of fifty-five (55) and sixty-two (62) are eligible for an early retirement benefit, which is calculated in the same manner as above, except that the Benefit Objective is reduced by three percent (3%) for each year that the 1999 SERP benefit is paid prior to the participating Employee's achievement of age sixty-two (62).[74] Benefits for all participants under the 1999 SERP, except one active participant,[75] are payable in the form of an annuity. It is my understanding that, as of the Petition Date, one (1) active Employee is participating in the 1999 SERP and one (1) retired Employee is receiving a monthly annuity under the 1999 SERP. No additional Employees may participate in the 1999 SERP at this time.

143.   I have been informed that the 2006 SERP was approved by the Compensation Committee effective April 24, 2006 and was available to Senior Vice Presidents,

---

[72]   With respect to all participating Employees other than the CEO of USEC Inc., the Benefit Objective is an amount equal to fifty-five percent (55%) of the Final Average Compensation.

[73]   Certain participating Employees may have elected to participate in certain government pension plans in lieu of coverage under the Qualified Pension Plan. In such instances, the 1999 SERP benefit will be adjusted by the monthly benefit of the government pension plan, rather than the Qualified Pension Plan.

[74]   By way of example, under the 1999 SERP, a participating Employee retiring after reaching the age of sixty-two (62) would receive fifty-five percent (55%) of his or her Final Average Compensation, less one hundred percent (100%) of the participant's primary social security benefit and one hundred percent (100%) of the benefit from any other qualified pension plan to which the Debtor contributed on his or her behalf. Accordingly, if the participant's Final Average Compensation was $600,000, $330,000 (55%) would be offset by a $30,000 primary social security benefit and a pension plan benefit of $50,000, for a final annual 1999 SERP benefit of $250,000. A participating Employee retiring prior to reaching the age of sixty-two (62) with a Final Average Compensation of $600,000 would have a Benefit Objective of fifty-five percent (55%) of his or her Final Average Compensation, less three percent (3%) for each year of retirement prior to age sixty-two (62). Accordingly, if an Employee retires at the age of fifty-eight (58), the Benefit Objective would be reduced by twelve percent (12%) to forty-three percent (43%), or $258,000. The same social security and pension plan offsets would then be applied in order to reach the final benefit amount of $178,000 ($258,000 less $30,000, less $50,000).

[75]   Benefits for such participant that accrued prior to January 1, 2005 are payable in the form of an annuity, and benefits that accrued after December 31, 2004 are payable as a lump sum.

the President and the CEO,[76] as selected by the Compensation Committee.  Except with respect

to the CEO, the benefit payable under the 2006 SERP to participating Employees who retire after

the age of sixty-two (62) is equal to the actuarial equivalent of such Employee's final Benefit

Objective, which accrues at the rate of five twenty-fourths of one percent (5/24ths of 1%) of his

or her final average pay per month of service,[77] up to a maximum of two-hundred-forty (240)

months of service, less amounts payable to the participating Employee under the Qualified

Pension Plans, the Restoration Plan (as defined below) and social security.  Notwithstanding the

foregoing formula, each participating Employee receives a benefit of a minimum of ten percent

(10%) of his or her Final Average Compensation under the 2006 SERP.  For participating

Employees who retire prior to the age of sixty-two (62), such Employee's final Benefit Objective

is reduced by one-half of one percent (0.5%)[78] for each full month that the 2006 SERP is paid

prior to the participating Employee's achievement of age sixty-two (62).[79]  The CEO is eligible

---

[76]      The 2006 SERP incorporates the terms of a SERP agreed to by the Debtor in September 2005 in connection with the CEO's initial terms of employment.

[77]      Final average pay is the average monthly amount determined by dividing the participating Employee's total pay during the thirty-six (36) consecutive calendar months immediately preceding the month of termination of employment, by thirty-six (36).  However, for periods beginning January 1, 2013, each executive's Part A target award under the QIP is used in calculating final average pay.

[78]      In the event that the CEO retires prior to the age of sixty-two (62), his final Benefit Objective will be reduced by three percent (3%) for each year of early retirement.

[79]      By way of example, under the 2006 SERP, a participating Employee retiring after reaching the age of sixty-two (62) would receive two and one half percent (2.5%) of his or her Final Average Compensation for each year of service up to a maximum of fifty percent (50%) of Final Average Compensation, less one hundred percent (100%) of his or her primary social security benefit and less one hundred percent (100%) of any qualified or non-qualified benefit plan to which the Debtor contributed on his or her behalf.  Accordingly, an Employee with fifteen (15) years of service would have a Benefit Objective equal to thirty-seven and one half percent (37.5%) of his or her Final Average Compensation, less offsets.  Thus, if an Employee with fifteen (15) years of service has a Final Average Compensation of $600,000,  $225,000 (37.5%) would be offset by a primary social security benefit of $30,000 and a qualified plan benefit of $50,000, for a final annual 2006 SERP benefit of $145,000.  Under the 2006 SERP, a participating Employee retiring prior to reaching the age of sixty-two (62) would receive two and one half percent (2.5%) of Final Average Compensation for each year of service, less six percent (6%) for each year of retirement prior to age sixty-two (62).  Accordingly, if an Employee retires at the age of fifty-eight (58) with fifteen (15) years' service when he or she retires, the thirty-seven and one half percent (37.5%) Benefit Objective would be reduced by twenty-four percent (24%) to thirteen and one half percent (13.5%), or $81,000.  The same social security and pension plan offsets would then be applied to reach the final benefit amount of $1,000 ($81,000 less $30,000, less $50,000).

73

to receive forty percent (40%) of the his Final Average Compensation, increasing to fifty percent (50%) after ten (10) years of service.  It is my understanding that, as of the Petition Date, four (4) active Employees are participating in the 2006 SERP, one (1) inactive Employee has a vested benefit and no retirees are receiving ongoing payments.  No additional Employees may participate in the 2006 SERP at this time.

144.    As of the Petition Date, there was one (1) active participant, no terminated vested participants and one (1) retired participant currently receiving a benefit under the 1999 SERP Plan; and four (4) active participants, one (1) terminated vested participant and no retired participants currently receiving benefits under the 2006 SERP Plan.  The Debtor seeks authority in this Workforce Obligations Motion, subject to entry of a final order, to continue making monthly benefit payments to the one (1) retiree under the 1999 SERP Plan.  I understand that the benefit payments to such retiree currently approximate $6,123 per month.

145.    Another of the Retirement Programs maintained by the Debtor is the USEC Inc. Pension Restoration Plan (the "Restoration Plan") for the benefit of certain officers selected by the Compensation Committee and three (3) other retirees who were participants in a legacy plan administered by Lockheed Martin at the time of privatization.[80]  All officers who were eligible for the Qualified Pension Plan and whose compensation exceeded the Qualified Pension Plan limits were automatically enrolled in the Restoration Plan.  The Restoration Plan was closed to new participants effective September 1, 2008.  In addition, in connection with the freezing of the Qualified Pension Plan effective August 5, 2013, the Board of Directors of the Debtor froze benefit accruals under the Restoration Plan, also effective as of August 5, 2013. The Restoration Plan is a non-qualified plan that is designed to provide covered Employees who

---

[80]    Certain participating Employees' benefits under the Restoration Plan may have accrued and vested on or before December 31, 2004.  Such benefits have been "grandfathered" and, therefore, are not modified by the terms of the Restoration Plan, as amended and restated on January 1, 2008 and August 1, 2008.

74

participate in the Qualified Pension Plan with savings plan benefits[81] in excess of those provided under the Qualified Pension Plan.  Specifically, the benefit payable to the participating Employee (or the Employee's beneficiary after the Employee's death) under the Restoration Plan is equal to the difference between (a) the amount of the retirement benefit that would be payable under the Qualified Pension Plan in the form of a single life annuity beginning at the participating Employee's retirement, if Section 401 and Section 415 of the Internal Revenue Code were disregarded, and using the definition of compensation provided in the Restoration Plan and (b) the benefit actually payable under the Qualified Pension Plan commencing at the participating Employee's retirement in the form of a single life annuity.[82]  The Restoration Plan is administered by the Compensation Committee.

146.     I have been informed that, as of the Petition Date there were ten (10) active participants and two (2) terminated and vested participants in the Restoration Plan and seven (7) retired participants currently receiving benefits under the Restoration Plan.  Benefits under the Restoration Plan are paid by the Debtor from its general assets in the form of either a lump sum, if accrued after December 31, 2004, or a life annuity, as elected by the applicable Employee.  Life annuity benefits are paid in the same manner as benefits under the Qualified Pension Plan.  The Debtor seeks authority in the Workforce Obligations Motion, subject to entry of a final order, to continue making monthly benefit payments to the seven (7) retirees under the Restoration Plan.  Benefit payments to such retirees currently approximate $8,620 per month in the aggregate.

---

[81]     The Restoration Plan applies to benefits payable to eligible Employees commencing on or after January 1, 2008.

[82]     Essentially, the benefit provided to the Employee is equal to the amount that Debtor would have matched under the Qualified Pension Plan if the Employee had not been subjected to certain compensation limits imposed by the Internal Revenue Code.  It does not, however, require any additional underlying contribution by the Employee.

147.    Additionally, although currently suspended, I have been informed that the Debtor has in the past offered the USEC Inc. Executive Deferred Compensation Plan (the "Deferred Compensation Plan"), for the benefit of certain management or highly compensated Employees selected by the USEC Inc. Benefit Plan Administrative Committee established by the Board of Directors of the Debtor to administer the Deferred Compensation Plan.  The Deferred Compensation Plan is managed by a rabbi trust administered through Wells Fargo Institutional Retirement Trust ("Wells Fargo").  The trust employs and pays a broker, Mullin TBG, in connection with the Deferred Compensation Plan.

148.    The Deferred Compensation Plan is a non-qualified plan that is designed to provide covered Employees with a tax deferred savings opportunity as well as savings plan benefits in excess of those provided under the USEC Savings Program.  Under the Deferred Compensation Plan, participating Employees could elect to defer compensation of between five percent (5%) and ninety percent (90%) of base salary, or a whole percentage or a percentage above a specified dollar amount of between five percent (5%) and one hundred percent (100%) of bonuses, as specified by the committee.  The Debtor made a matching contribution to the Employee's Deferred Compensation Plan each year to the extent that the Employee made a deferral under the Deferred Compensation Plan equal to (a) the maximum matching contributions that would have been provided to the Employee under the USEC Savings Program, taking into account actual deferrals under the USEC Savings Program and under the Deferred Compensation Plan for that year, without regard to any statutory or regulatory limitations on salary reduction, had the Employee's total compensation, including deferrals under the Deferred Compensation Plan, been included in the Employees' includable compensation under the USEC

76

Savings Program, <u>less</u> (b) the amount of matching contributions actually credited to the Employee under the USEC Savings Program for such year.

149.    Because the Deferred Compensation Plan is currently suspended, it is my understanding that there are no new deferrals into the Deferred Compensation Plan and no new participants are allowed.  However, current balances in the Deferred Compensation Plan, which approximate $2,757,246, must be maintained until the elected distribution date under such Plan. Benefit payments under the Deferred Compensation Plan are not anticipated through December 31, 2014.  The next scheduled distributions will be made in January 2015.  The Debtor does not currently seek authorization to make any distributions under the Deferred Compensation Plan.

150.    The SERP Plans, the Restoration Plan and the Deferred Compensation Plan are unfunded plans and thus the rights to benefits thereunder are general unsecured claims in the Chapter 11 Case.  In view of the fact that general unsecured claims will be paid in full or reinstated under the terms of the Debtor's prearranged plan of reorganization, the Debtor seeks authority, upon entry of a final order, to make any payments or honor any benefits that come due during the pendency of the Chapter 11 Case under the SERP Plans and the Restoration Plan to, or for the benefit of, current retirees as of the Petition Date only.  As stated above, however, the Debtor does not seek current authorization with respect to the Deferred Compensation Plan.

151.    ***Government Pension Plan***.  In addition to the above plans, two (2) of the Debtor's Employees located at the Headquarters participate in a government pension plan (the "Government Pension Plan"), which is maintained by the federal government for federal employees and which was open to participation by certain of the Debtor's former federal government employees who were hired prior to the privatization of the Debtor in 1998.  The Government Pension Plan with respect to these Employees remains active.  As noted above,

certain deductions are made from the participating Employees' paycheck in connection with the Government Pension Plan. In addition, the Debtor makes payments on behalf of such Employees. On average, the Debtor pays approximately $2,084 on behalf of such Employees each month. As of the Petition Date, $0 was due and owing in connection with the Government Pension Plan.

    *h.  Workers' Compensation*

    152.    Under the laws of the various states in which it operates, it is my understanding that the Debtor is required to maintain workers' compensation policies and programs, or participate in workers' compensation programs administered by state governments, to provide its employees with workers' compensation coverage for claims arising from or related to their employment with the Debtor.

    153.    Employees at the Debtor's Headquarters and Employees at Oak Ridge in Tennessee are covered under a workers' compensation policy issued by Insurance Company of the State of Pennsylvania ("ICPA"). Under the ICPA policy, upon the filing of a claim by an eligible Employee or medical provider, ICPA pays the claim amount directly to the Employee or medical provider. The Debtor is not responsible for reimbursing ICPA. The Debtor pays ICPA an annual premium of $169,454.

    154.    I have been informed that the Debtor is also insured, with no deductible, for workers' compensation coverage in connection with the Piketon, Ohio plant. The Debtor pays a semi-annual premium in the amount of approximately $97,000 in connection with such insurance directly to the Ohio Bureau of Workers' Compensation, which then pays any claims directly to the applicable Employee or medical provider.

155.    As of the Petition Date, there is one (1) Employee receiving workers' compensation medical benefits.  I have been informed that the Debtor averages less than one (1) new workers' compensation claim per month.  The aggregate amount of open claims is approximately $10,692.  That amount varies little month to month.  The Debtor's annual insurance premiums in connection with both of the workers' compensation policies total approximately $364,000.

156.    It is critical that the Debtor be permitted to continue its workers' compensation programs and to pay outstanding prepetition claims, taxes, charges, assessments, and premiums in the ordinary course of business because alternative arrangements for workers' compensation coverage would most certainly be more costly, and the failure to provide coverage may, in some states, subject the Debtor and/or its officers to severe penalties.  To facilitate the ordinary course handling of workers' compensation claims, the Debtor has further requested authority, in its sole discretion, to lift the automatic stay of Bankruptcy Code Section 362, to allow workers' compensation claimants to proceed with their claims under the applicable insurance policy or program and to allow the Debtor or its insurance providers to negotiate, settle and/or litigate workers' compensation claims, and pay resulting amounts, whether such claims arose before or after the Petition Date.

i.  *Severance*

157.    The Debtor provides severance benefits under a severance plan that applies to all permanent non-executive Employees employed at the Debtor's Headquarters and at the ACP facilities in Piketon and Oak Ridge (the "Employee Severance Plan"), a severance plan that applies to certain executive Employees (the "Executive Severance Plan"), a severance plan that applies to certain key Employees (the "Key Employee Severance Plan") and change in

79

control agreements with certain executive and key Employees (the "Change in Control Agreements").

158.    Under the Employee Severance Plan, I understand that participating Employees may be entitled to severance benefits if they are terminated due to (a) staff reduction, (b) job elimination or (c) position restructuring.  Severance pay under the Employee Severance Plan varies based on the "salary band" of the Employee at the time of termination as follows: Employees in salary bands A and B may receive two (2) weeks of base pay per year of service, with a minimum of eight (8) weeks and a maximum of fourteen (14) weeks; Employees in salary band C may receive three (3) weeks of base pay per year of service, with a minimum of eight (8) weeks and a maximum of twenty-two (22) weeks; and Employees in salary band D and E may receive three (3) weeks of base pay per year of service, with a minimum of ten (10) weeks and a maximum of thirty-two (32) weeks for those Employees in salary band D, and a minimum of twelve (12) weeks and a maximum of thirty-eight (38) weeks for those Employees in salary band E.[83]  Severance pay under the Employee Severance Plan is paid in one lump sum payment, less all applicable taxes and withholdings, at the time provided for in the notice of separation.

159.    In addition, eligible Employees' participation and elected coverage under certain benefits programs[84] may continue for a period of time equal to the equivalent number of weeks of base pay that the amount of severance represents or three (3) months, whichever is longer.[85]  Under the Employee Severance Plan, the Debtor will pay the full premium costs

---

[83]    Any partial year of service is counted as a full year for purposes of determining severance pay.

[84]    Such benefits programs include medical, dental, flexible spending accounts and the employee assistance program.  In addition, eligible Employees who, at the time that notice of termination is received, are taking courses previously approved under the Tuition Reimbursement Program, will be reimbursed in accordance with the terms of the program, provided the courses are successfully completed within four (4) months of the date of termination.

[85]    In the event an Employee becomes eligible for benefits through re-employment during this time, eligibility for participation in the Debtor's benefit programs will cease.

associated with the Employee's participation in the benefits plans, including any premium costs traditionally paid by the Employee.

160.    In addition, certain key Employees (including certain key managers, supervisors and key personnel) are eligible to receive a fixed number of weeks of severance as a retention incentive under the Key Employee Severance Plan.  It is my understanding that under the Key Employee Severance Plan, approximately forty-three (43) such key Employees are entitled to severance pay ranging from twenty-six (26) weeks to fifty-two (52) weeks' pay, plus a bonus equal to the target annualized Part A award opportunity under the Incentive Plans.

161.    Under the Executive Severance Plan, if a participating executive Employee is terminated without cause, the executive is eligible to receive: (a) a prorated share of his or her current quarterly incentive (payable at the end of the performance period based on actual performance) up to the date of termination; (b) a lump sum cash severance equal to two times the sum of (i) the annual base salary plus (ii) a bonus equal to the target annualized Part A award opportunity under the Incentive Plans or, if higher, the average of the three most recent annual bonuses paid to the participant prior to the date of termination; and (c) continuation of medical and dental coverage as well as life insurance paid for by the Debtor for two years after termination (or until similar coverage is received from a subsequent employer, whichever occurs first), and outplacement assistance services.

162.    Under the Change in Control Agreements, participating Employees will receive certain benefits if there is a change in control _and_ within a protected period beginning three months before and ending three years after that change in control the Debtor terminates his or her employment for any reason other than cause, or the participant terminates his or her employment for good reason.  The benefits include: (a) a cash payment of unpaid base salary

through the date of termination plus all other amounts earned under any compensation or benefit plan, (b) a cash lump sum payment equal to two times the sum of annual base salary and bonus for officers and one times base salary and bonus for other key employees and (c) continuation of life, accident and health insurance benefits for one or two years following such termination of employment (or, if sooner, until covered by comparable programs of a subsequent employer). It is my understanding that in order to receive benefits under the Change in Control Agreements, participating Employees must comply with certain non-competition, non-solicitation, and confidentiality provisions. These benefits are in lieu of any severance benefits under the Executive Severance Plan or any other severance plan.  The Debtor does not anticipate that benefits under the Change in Control Agreements would be triggered during the Chapter 11 Case and, in any event, such benefits as to insiders would be limited by Bankruptcy Code Section 503(c)(3).

163.    In 2013, one (1) Employee received severance payments in the amount of $35,000.  All severance payments were paid to the former Employees on a separate check via direct deposit.  No Employees were subject to a prepetition notice of termination with a postpetition termination date.   Accordingly, as of the Petition Date, the Debtor has no outstanding severance obligations.

164.    The Debtor seeks authorization in the Employee Wages Motion to continue to provide ordinary course severance benefits under the Employee Severance Plan, the Key Employee Severance Plan and the Executive Severance Plan to participating Employees who may be subject to postpetition terminations during the pendency of this case, with the exception of insiders, but does not seek current authorization with respect to the Change in Control Agreements.  The Debtor will defer issues with respect to insider severance benefits for

82

later determination pursuant to separate motion or for disposition in accordance with the terms of the plan of reorganization.

v.   Honoring of Prepetition Benefits

165.    As described above, certain of the Employee Benefits remained unpaid or unprovided as of the Petition Date because certain obligations of the Debtor under the applicable plan, program or policy accrued either in whole or in part prior to the commencement of the Chapter 11 Case, but will not be required to be paid or provided in the ordinary course of the Debtor's business until a later date.  In the Employee Wages Motion, the Debtor seeks authority to pay or provide as they become due all prepetition Employee Benefits that have already accrued and that are described above.  The Debtor estimates that the aggregate amount of such prepetition Employee Benefits is approximately $5.4 million.[86]

vi.   Continuation of Employee Programs Postpetition

166.    Through the Employee Wages Motion, the Debtor has also requested confirmation of its right to continue to perform its obligations with respect to all Employee Programs.  The Employee Programs are essential to the Debtor's efforts to maintain employee morale and minimize attrition.  I believe that the expenses associated with the Employee Programs are reasonable and cost-efficient in light of the potential attrition, loss of morale and loss of productivity that would occur if the Employee Benefits were discontinued.

167.    Notwithstanding the foregoing, it is my understanding that the Debtor reserves the right to evaluate all Employee Programs and to make such modifications, including

---

[86]    The aggregate amount of prepetition Employee Benefits includes approximately $4.5 million on account of minimum required contributions under the Qualified Pension Plan, which are payable in 2014.   A portion of such required contributions may have accrued prepetition in connection with certain underfunding of the Qualified Pension Plan.  The aggregate amount of prepetition Employee Benefits does not include contingent liabilities that have accrued in connection with severance or non-qualified pension plans but are not yet payable as of the Petition Date.  As to non-qualified pension plans, the aggregate amount of prepetition Employee Benefits does include the aggregate amount of monthly payments for current retirees payable in 2014.

terminating any particular plan, program or policy, as may be necessary or appropriate during the pendency of the Chapter 11 Case.  The Debtor is not at this time requesting assumption of any plan, program, policy or related agreement under Bankruptcy Code Section 365(a) and has, in the Employee Wages Motion, reserved all rights with respect for disposition in accordance with the Plan.

vii.   Payments to Administrators

168.    With respect to the employee compensation and benefits described above, the Debtor contracts with several vendors to administer and deliver payments or other benefits to Employees (the "Administrators").  The Debtor pays these Administrators fees and expenses incurred in connection with providing such services.  In certain cases, disbursements made in the ordinary course are paid by the Administrators, which, in turn, invoice the Debtor for reimbursement of payments made.

169.    For example, I understand that the Debtor, in the ordinary course of business, pays amounts to the following third party administrators: (a) WageWorks, in connection with the flexible spending accounts, (b) Brookfield, in connection with relocation expenses, (c) Magellan Behavioral Services, in connection with the employee assistance benefits, (d) UNUM Life Insurance Co. of America, in connection with administration of the Family Medical Leave Act (FMLA), (e) USI Consulting Group, in connection with the third party administration of healthcare benefits, and (f) Concur, in connection with reimbursement of business-related expenses to Employees, all of which total approximately $15,228 per month. The rabbi trust employs Wells Fargo in connection with the Deferred Compensation Plan. Further, I understand that the Debtor, in the ordinary course of business, contracts with Ceridian Benefit Services to administer the COBRA continuation benefits for terminated Employees, at a

rate of $30.75 per eligible former employee. Currently, the average number of terminated Employees is two (2) per month, for a total cost of $61.50. The Debtor may also from time to time incur obligations for actuarial, accounting, trustee or administrative fees in connection with special projects related to the USEC Savings Program, the Qualified Pension Plan, the Retirement Programs, and the Deferred Compensation program when the costs of such projects are not payable out of plan assets. The Debtor estimates that, as of the Petition Date, the total aggregate amount due and owing to third party administrators is $0.

170.    In conjunction with the Debtor's payment of Prepetition Employee Obligations and continued performance under Employee Programs, the Debtor has requested specific authorization to pay any claims of the Administrators on a postpetition basis, including prepetition claims to the extent necessary to ensure uninterrupted delivery of certain benefits to Employees. The Debtor has concerns (which I share) that the Administrators may fail to adequately and timely perform or may terminate their services to the Debtor unless the Debtor pays the Administrators' prepetition claims for administrative services rendered and expenses incurred. A need to engage replacement Administrators postpetition likely would cause significant disruption to the payment of benefits and other obligations to the Employees. Accordingly, I believe that the payment of claims owed to the Administrators is in the best interest of the Debtor's estate.

viii.   Honoring of Prepetition Checks

171.    Prior to the Petition Date, it is my understanding that the Debtor paid certain of its Prepetition Employee Obligations with checks that had not been presented for payment as of the Petition Date. In order to ensure the orderly payment of the Prepetition Employee Obligations, the Debtor has requested in the Employee Wages Motion that the Court

85

enter an order requiring the Debtor's banks to honor any such checks which are drawn on the

Debtor's accounts, and authorizing the banks to rely on the representations of the Debtor as to

which checks are subject to the Workforce Obligations Motion.  To the extent that any such

checks are nevertheless refused payment, the Debtor has additionally requested authority to issue

replacement checks and to reimburse its Employees or other payees for any loss resulting from

the dishonoring.

**E.      Motion of Debtor for Order Under 11 U.S.C. §§ 105(a) and 366 (I) Prohibiting Utility Providers From Altering or Discontinuing Service on Account of Prepetition Invoices, (II) Approving Deposit As Adequate Assurance of Payment, and (II) Approving Deposit As Adequate Assurance of Payment, and (III) Establishing Procedures for Resolving Requests for Additional Assurance of Payment Utilities Motion (the "Utilities Motion")**

172.      In the Utilities Motion, the Debtor has requested entry of interim and final

orders approving procedures that would provide adequate assurance of payment to utility service

providers (the "Utility Providers")[87] (which I understand to be required by the Bankruptcy

Code), while allowing the Debtor to avoid the threat of imminent termination of electricity,

water, natural gas, telephone, telecommunications, and similar utility products and services

(collectively, the "Utility Services") from those Utility Providers.[88]  Specifically, the Debtor has

requested entry of orders (a) approving the Debtor's deposit of $50,000 (which is approximately

---

[87]      The Utility Providers known to and identified by the Debtor to date are listed on Exhibit A to the Utilities Motion.  While the Debtor has used its best efforts to list all of its Utility Providers on Exhibit A, it is possible that certain Utility Providers may have been inadvertently omitted from this list.  Accordingly, the Debtor has reserved the right, under the terms and conditions of the Utilities Motion and without further order of the Court, to amend Exhibit A to the Utilities Motion to add any Utility Providers that were omitted therefrom and to request that the relief requested herein apply to all such entities as well.  Additionally, the Debtor has reserved the right to argue that any of the other entities now or hereafter listed on Exhibit A to the Utilities Motion is not a "utility" within the meaning of Bankruptcy Code Section 366(a).

[88]      In addition to payments made to Utility Providers, the Debtor also makes payments to certain of  its landlords under real property leases on account of Utility Services used by the Debtor at the leased properties (the "Leased Properties").  The Debtor is not directly billed by the utilities providing the Utility Services at the Leased Properties and, thus, (a) the Debtor does not believe that Bankruptcy Code Section 366 is applicable to such payments and (b) for the avoidance of doubt, the term Utility Providers does not include the utilities providing the Utility Services at the Leased Properties.  The Debtor intends to honor its postpetition obligations with respect to the Leased Properties consistent with the requirements of the Bankruptcy Code.

50% of the estimated monthly cost of the Utility Services, based on historical averages over the prior twelve (12) months) into a newly-created segregated, interest-bearing account (the "Adequate Assurance Deposit"), as adequate assurance of postpetition payment to the Utility Providers, (b) approving the additional adequate assurance procedures set forth in the Utilities Motion as the method for resolving disputes regarding adequate assurance of payment to such Utility Providers (the "Additional Adequate Assurance Procedures") and (c) prohibiting the Utility Providers from altering, refusing or discontinuing services to or discriminating against the Debtor except as may be permitted by the proposed procedures below.

173.    As of the Petition Date, the Debtor obtained Utility Services, or was obligated to pay for Utility Services received by certain of its non-debtor subsidiaries, from approximately twenty (20) Utility Providers at facilities located in Piketon, Ohio and Oak Ridge, Tennessee.  Notably, other than a few internet and telephone service providers, the Utility Providers do not service the Debtor's corporate headquarters in Bethesda, Maryland or government relations office in Washington, D.C., as the utility obligations for such locations are paid to the Debtor's landlords pursuant to the terms of the commercial leases applicable to such premises.

174.    On average, prior to the Petition Date, the Debtor spent approximately $100,000 each month on utility costs and had a history of timely payment of utility costs.  I have been informed that the Debtor is not currently aware of any past due amounts owed to any of the Utility Providers; however, because of the timing of the filing in relationship to the billing cycles of the Utility Providers, there may be prepetition utility costs that have been invoiced to the Debtor for which payment is not yet due and utility costs for services provided since the end of the last billing cycle that have not yet been invoiced to the Debtor.

175.     I believe the Utility Services are crucial to the continued operation of the Debtor's business.  If the Utility Providers refuse or discontinue service, even for a brief period, the Debtor's business operations would be severely disrupted, and the Debtor could be forced to cease operations.

176.     I believe that the Adequate Assurance Deposit, in conjunction with the Debtor's ability to pay for future Utility Services in the ordinary course of business, constitutes sufficient adequate assurance to the Utility Providers.  If any Utility Provider believes that additional assurance is required, they may request such assurance pursuant to the Additional Adequate Assurance Procedures described in the Utilities Motion.

**F.      Motion of Debtor for Order Under 11 U.S.C. §§ 105, 363, 1107 and 1108 and Fed. R. Bankr. P. 6003 Authorizing Debtor to Pay Prepetition Insurance Obligations and Maintain Postpetition Insurance Coverage (the "Insurance Motion")**

177.     In the Insurance Motion, the Debtor seeks entry of an order authorizing the Debtor (a) to pay all prepetition premiums, taxes, charges, fees and other obligations, including broker's fees (the "Insurance Obligations"), owed under or with respect to its existing insurance policies (collectively, the "Insurance Policies") and (b) to maintain necessary insurance coverage by (i) honoring its postpetition obligations under the Insurance Policies, (ii) obtaining renewal coverage or new insurance arrangements as and when required.

i.      Overview of Insurance Policies of the Debtor

178.     In connection with the operation of its business and management of its property, and on behalf of certain of its non-debtor subsidiaries, I have been informed that the Debtor has procured  coverage under various Insurance Policies provided by third-party insurance carriers (collectively, the "Insurance Carriers").

88

179.     As set forth on Exhibit A to the Insurance Motion, the Insurance Policies include coverage for worker's compensation and excess worker's compensation,[89] business automobile, general liability, umbrella liability, fiduciary liability, medical malpractice,[90] directors' and officers' liability, kidnap/ransom, employment practices liability, commercial crime, environmental liability, all risk property, nuclear liability, cargo/transit, and "company owned" life insurance policies ("COLI Policies") that are maintained in connection with the Debtor's non-qualified retirement plans.  The Insurance Policies provide coverage that is typical in scope and amount for business operations within the Debtor's industry.

180.     Notably, the Debtor is the obligor on the Insurance Policies whether or not the coverage thereunder applies only to the Debtor or extends to its non-debtor subsidiaries. Accordingly, the Debtor pays all of the Insurance Obligations in the first instance and then allocates the cost among its applicable non-debtor subsidiaries.  It is my understanding that if the amount paid by the Debtor relates solely to a particular non-debtor subsidiary, 100% of the premium is allocated to such non-debtor subsidiary.  Premiums associated with certain policies are allocated based upon a particular non-debtor subsidiary's exposure (e.g., the automobile policy is allocated among the non-debtor operating subsidiaries on a pro rata basis based upon the  number of vehicles that such non-debtor subsidiary has in the overall fleet).  Amounts allocated to a non-debtor subsidiary are tracked through intercompany accounts as payables owed to the Debtor.

---

[89]     The Debtor has separately sought authorization to honor its obligations under its workers' compensation programs (including making prepetition payments associated with insurance premiums) as part of the contemporaneously filed Workforce Obligations Motion.  The Debtor, however, has additionally included hereunder reference to workers' compensation insurance and the attendant premiums associated with such coverage out of an abundance of caution.

[90]     Because of the Debtor's involvement with nuclear materials,  there are certain regulations which require the Debtor to employ, among others, health professionals at certain of its facilities.  As a result, the Debtor has elected to maintain medical malpractice insurance to cover the services provided by such employees.

ii.   Payment of Insurance Premiums and Broker's Fees

181.   I believe that maintenance of insurance coverage under the various Insurance Policies is essential to the continued operation of the Debtor's business and is required under the United States Trustee's Operating Guidelines for Chapter 11 Cases (the "Operating Guidelines"), the federal laws and regulations applicable to the Debtor's business, the laws of the various states in which the Debtor operates and the Debtor's various contractual commitments. Such coverage, which has been procured by the Debtor on behalf of its non-debtor subsidiaries, is also necessary to protect the value of the Debtor's non-debtor subsidiaries, which benefits the Debtor. Thus, I believe that the Debtor should be authorized to continue to pay premiums, taxes, charges, fees and other obligations, including broker fees, owed under or with respect to the Insurance Policies as such obligations come due in the ordinary course of the Debtor's business.

182.   To the extent that the Insurance Obligations may be attributed to prepetition insurance coverage, I believe that payment of such obligations is necessary to ensure continued coverage under the Insurance Policies, and to maintain good relationships with the Insurance Carriers. I further believe that the Debtor's maintenance of its relationships with the Insurance Carriers is critical to ensuring the continued availability of insurance coverage and reasonable pricing of such coverage for future policy periods.

183.   The total annual premium obligations associated with all of the Insurance Policies approximates $7.6 million, excluding COLI Policies.[91] The Debtor generally pays the premiums to the Insurance Carriers on an annual basis in advance, primarily through its insurance brokers (discussed below), but occasionally directly. Accordingly, as of the date

---

[91]    The COLI Policies are technically owned by a rabbi trust administered through Wells Fargo Institutional Retirement Trust. The premiums with respect to the COLI Policies are paid by the trust and do not require any ongoing funding by the Debtor. Additionally, the trust employs and pays a broker, Mullin TBG, in connection with such Insurance Policies.

hereof, the premium payments to the Insurance Carriers have been paid in full and I have been informed that the Debtor is not aware of any pending requests for payment of other obligations owed to the Insurance Carriers under the Insurance Policies.  However, requests for payment of amounts attributable to the period prior to the Petition Date may be received from the Insurance Carriers from time to time hereafter, in accordance with the terms of the Insurance Policies.

184.    Aon Risk Services Northeast, Inc. ("Aon") serves as the Debtor's primary insurance broker, and also manages the Debtor's relationships with the Insurance Carriers under the majority of the Insurance Policies.  Among other things, Aon represents the Debtor in various ongoing negotiations with the majority of the Debtor's Insurance Carriers.  Marsh USA ("Marsh" and together with Aon and/or any subsequently retained brokers, the "Brokers") serves as the Debtor's insurance broker with respect to its nuclear liability policies.  The employment of Aon and Marsh as Brokers has allowed the Debtor to obtain the insurance coverage necessary to operate its business in a reasonable and prudent manner and to realize savings in the procurement of such policies.

185.    Aon is compensated through commissions paid directly by the respective Insurance Carriers.  Therefore, I have been informed that the Debtor does not expect to make any direct payments to Aon for its services.  As to Marsh, I have been informed that the Debtor expects to pay Marsh an annual fee of approximately $16,000 per year for procuring nuclear liability insurance policies.

186.    I believe that it is in the best interests of the Debtor's creditors and its estate to continue its business relationship, or to enter into new brokerage arrangements on a postpetition basis, with the Brokers.  Accordingly, the Debtor has sought the Court's

91

authorization in the Insurance Motion to continue its prepetition practice of paying brokerage fees to Marsh and honoring other compensation arrangements with any Brokers.

iii.   Maintenance of Insurance Coverage

187.   The Insurance Policies maintained by the Debtor will all eventually expire under their annual terms, beginning with policies due to expire in June, 2014.  I have been informed that the majority of the Debtor's Insurance Policies will expire on July 28, 2014. Renewal of the Insurance Policies or entry into new insurance arrangements is necessary to comply with the Operating Guidelines, various applicable federal and state laws, contractual commitments and prudent business practices.  Therefore, in an abundance of caution, the Debtor has, through the Insurance Motion, requested authorization to continue its prepetition practice of renewing the Insurance Policies or entering into new insurance arrangements in the ordinary course of business as the annual terms of the Insurance Policies expire.  In addition, the Debtor has requested authorization to enter into new agreements (to the extent any are required) with the Brokers to ensure the continuation of the valuable services received from each Broker.

**G.   Motion of Debtor for Order Under 11 U.S.C. §§ 105(a), 506(a), 507(a)(8) and 541 and Fed. R. Bankr. P. 6003 Authorizing Payment of Prepetition Taxes and Fees (the "Tax Motion")**

188.   In the Tax Motion, the Debtor seeks entry of an order authorizing it to pay, in its sole discretion (subject to the terms and provisions of any postpetition financing order entered by the Court), any prepetition tax and fee obligations including, without limitation, sales, use and excise taxes; income or gross receipts taxes; franchise taxes; property taxes; business license, registration, commercial activity or other business, occupation or regulatory taxes or

fees; escheat or unclaimed property taxes; payments in lieu of taxes ("PILOT");[92] any other

types of taxes, fees or charges; and any penalty, interest or similar charges (collectively, the

"Taxes and Fees"),[93] owing to certain federal, state and local governmental entities (the

"Governmental Units").[94]

189.   As set forth in the Tax Motion, the Taxes and Fees at issue are appropriate

for payment to the extent that they are priority or secured claims that are payable in full or,

alternatively, under the personal liability theory or the doctrine of necessity.  It is my belief that

by paying the Taxes and Fees in the ordinary course of business, as and when due, the Debtor

will avoid unnecessary disputes with Governmental Units -- and expenditures of time and money

resulting from such disputes -- over myriad issues that are typically raised by such units as they

attempt to enforce their rights to collect Taxes and Fees.

190.   Prior to the Petition Date, it is my understanding that the Debtor incurred

obligations to federal, state and local governments for Taxes and Fees.  Although as of the

Petition Date the Debtor was substantially current in the payment of assessed and undisputed

Taxes and Fees, certain Taxes and Fees attributable to the prepetition period were not yet due.

Certain prepetition Taxes and Fees will not be due until the applicable monthly, quarterly or

---

[92]   PILOT payments may occur when a local government waives or defers property taxes for a certain organization, and to offset the government's loss of such property taxes, the local government and the organization may negotiate PILOT payments in place of property taxes.

[93]   The Debtor incurs various taxes related to its employees and is separately required to withhold certain amounts from each employee's paycheck on account of things such as social security and FICA.  Such payroll, withholding and other employee-related tax obligations are separately addressed in the Workforce Obligations Motion which is contemporaneously filed with the Tax Motion.

[94]   In addition to the Debtor's payment of the Taxes and Fees it incurs, the Debtor has historically paid certain Taxes and Fees on behalf of two of its non-debtor subsidiaries, Enrichment Corp and AC Manufacturing, and one former subsidiary, NAC International, Inc. ("NAC").  The funds used to pay the applicable Taxes and Fees of Enrichment Corp and AC Manufacturing are provided to the Debtor by Enrichment Corp by means of intercompany loans, as more fully described in the Cash Management Motion, filed contemporaneously with the Tax Motion.  AC Manufacturing and Enrichment Corp do not reimburse the Debtor for their respective Taxes and Fees, except to the extent that any amounts owed by Enrichment Corp to the Debtor are offset by application of the intercompany loan system.

annual payment dates -- in some cases immediately and in others not until next year.  The Debtor

estimates that, as of the Petition Date, its accrued and unpaid liabilities for Taxes and Fees were

approximately $905,000.

191.    I believe the continued payment of the Taxes and Fees on their normal due

dates will ultimately preserve the resources of the Debtor's estate, thereby promoting its

prospects for a successful Chapter 11 process.  I further believe that if such obligations are not

timely paid, the Debtor will be required to expend time and incur attorneys' fees and other costs

to resolve a multitude of issues related to such obligations, each turning on the particular terms

of each Governmental Unit's applicable laws, including whether (a) the obligations are priority,

secured or unsecured in nature, (b) they are proratable or fully prepetition or postpetition and (c)

penalties, interest, attorneys' fees and costs can continue to accrue on a postpetition basis, and, if

so, whether such penalties, interest, attorneys' fees and costs are priority, secured or unsecured in

nature.

192.    It is my understanding that nonpayment or delayed payment of Taxes and

Fees may also subject the Debtor to efforts by certain Governmental Units, whether or not

permissible under the Bankruptcy Code, to revoke the Debtor's licenses and other privileges

either on a postpetition or postconfirmation basis.  Moreover, certain of the Taxes and Fees may

be considered to be obligations as to which the Debtor's officers and directors may be held

directly or personally liable in the event of nonpayment.  In such events, I believe that collection

efforts by the Governmental Units would provide obvious distractions to the Debtor and its

officers and directors in their efforts to bring the Chapter 11 Case to an expeditious conclusion.

193.    Certain of the Governmental Units have not been paid or have been sent

checks and/or fund transfers for Taxes and Fees that may or may not have been presented or

94

cleared as of the Petition Date.  Similarly, in other cases, Taxes and Fees have accrued or are

accruing, or are subject to audit or review, but have not yet become due and payable and, thus,

any checks or fund transfers will be issued on a postpetition basis.

**H.    Motion of Debtor for Order (I) Requiring Information From Persons or Other Entities Holding or Acquiring Specified Note Amounts, (II) Limiting Purchase, Sale or Transfer of Notes to Specified Amounts and (III) Establishing Notification and Hearing Procedures for Relief From Limitations on Purchase, Sale or Transfer of Notes (the "<u>Trading Procedures Motion</u>")**

194.    In the Trading Procedures Motion, the Debtor has requested entry of an

order (a) requiring any person or other entity who holds or acquires five percent (5%) of the

aggregate principal amount of the Notes (i.e. $26.5 million) to provide information as to foreign

ownership or control (the "Information Requirement'), with the exception of those Consenting

Noteholders who have previously provided such information, provided such information has not

changed, (b) limiting the purchase, sale or transfer of any of the Debtor's Notes during the

Chapter 11 Case to the extent the purchase, sale or transfer of such Notes could result in any

person or other entity holding more than the greater of either (i) $26.5 million or (ii) an amount

equal to one hundred and ten percent (110%) of the total amount of Notes owned by the relevant

person or other entity (x) in the case of the Consenting Noteholders, as of June 27, 2013

consistent with their agreement in the Noteholder Plan Support Agreement, or (y) in the case of

all other parties, as of the Petition Date (such amount, the "Maximum Notes Holdings" and such

limitations, the "Trading Limitations") and (c) establishing notification and hearing procedures

to request relief from the Trading Limitations.

195.    As stated previously, the Debtor is the parent of a corporate family that is

a heavily-regulated global energy company.  As a result of the activities of its subsidiaries, who

hold licenses or certificates issued by the NRC, it is my understanding that the Debtor is subject

to regulations that limit foreign ownership or control of its equity securities and requires consent

of the NRC prior to the direct or indirect transfer of control of the licensees and certificate

holders who are wholly owned subsidiaries of the Debtor.  Specifically, such regulations (a)

prohibit the NRC from issuing any license or certificate to a company if it determines that (i) the

company is owned, controlled, or dominated by an alien, a foreign corporation, or a foreign

government; or (ii) the issuance of such a license or certificate of compliance would be inimical

to the common defense and security of the United States or the maintenance of a reliable and

economical domestic source of enrichment services; (b) prevent a company from gaining access

to classified information if it is under foreign ownership, control or influence; and (c) require

prior consent of the NRC before any direct or indirect transfer of control of a licensee or

certificate holder.

   i.   <u>Necessity for Information Requirement</u>

        196.   Since its formation, it is my understanding that the Debtor's certificate of

incorporation has contained provisions intended to facilitate its compliance with such

regulations.  Such provisions give the Debtor's board of directors certain rights in the event,

among others, that a foreign person or other entity acquires beneficial ownership of (a) 5% or

more of the issued and outstanding shares of any class of equity securities, (b) 5% or more in

voting power of the issued and outstanding shares of all classes of equity securities, or (c) less

than 5% of the issued and outstanding shares of any class of equity securities or less than 5% of

the voting power of the issued and outstanding shares of all classes of equity securities, if such

foreign person or other entity is entitled to control the appointment and tenure of any of the

Debtor's management positions or any director.  I understand that the board's rights include

requesting information from holders (or proposed holders) of securities, refusing to permit the

transfer of securities by such holders, suspending or limiting voting rights of such holders, redeeming or exchanging shares of stock owned by such holders, and taking other actions that the Debtor deems necessary or appropriate to ensure compliance with the foreign ownership restrictions.  Identical provisions will carry forward in the new certificate of compliance to be put in effect under the Plan upon the Debtor's emergence from Chapter 11.

197.    In contemplation of the restructuring, which as proposed will result in a new set of equity holders, and the continuing need to guard against foreign ownership of its equity securities, the Debtor required those holders of the Notes with which it was negotiating the Noteholder Plan Support Agreement and who held five percent (5%) of the aggregate principal amount of the Notes, to provide certain information that would enable it to determine whether the holder was foreign owned, controlled, influenced or dominated.  Those holders, now among the Consenting Noteholders, complied.  The Debtor requires the same information from other holders who own or acquire five percent (5%) of the aggregate principal amount of the Notes.

ii.  Necessity for Trading Limitations

198.    I have been informed that certain NRC regulations prohibit the issuance of a license or certificate of compliance to Enrichment Corp, if such corporation is owned, controlled, or dominated by an alien, a foreign corporation, or a foreign government.  Further, the Debtor and its subsidiaries have possession of and access to information that is classified, including restricted data as defined certain NRC regulations, that are important to their continued operations.  Access to such information is authorized for facilities owned or operated by the Debtor and its subsidiaries upon a finding that it would not be inconsistent with the national interest, including a finding that they are not under foreign ownership, control or influence and

97

may be terminated in the event it is determined that it is no longer in the interest of national

security.

199.    Further, I have been informed that Section 184 of the AES (42 U.S.C. §

2234) provides "No license granted . . . and no right to utilize or produce special nuclear material

granted . . . shall be transferred, assigned or in any manner disposed of, either voluntarily or

involuntarily, directly or indirectly, through transfer of control of any license to any person"

unless consented to by the NRC.  It is my understanding that the NRC's regulations require that a

direct or indirect transfer of control of a certificate or license holder receive advance written

consent from the NRC.  Because of the nature of the restructuring transactions contemplated by

the Plan, including the cancellation of the Debtor's equity securities and the issuance of new

common stock to the holders of the Notes (among others), the Debtor contacted the NRC by

letter on June 27, 2013, requesting a determination as to whether the restructuring would be

viewed as a direct or indirect transfer of control.  On July 31, 2013, the NRC notified the Debtor

that, so long as the restructuring was consistent with the representations made by the Debtor, it

would not be viewed as a direct or indirect transfer of control requiring advance written consent

from the NRC.

200.    It is my understanding that certain of the representations made by the

Debtor to the NRC included information as to the ownership of the Notes, in view of the fact that

ownership of the Notes will result in ownership of the Debtor's new common stock under the

Plan, and representations regarding restrictions imposed on trading, which were included in the

Noteholder Plan Support Agreement The information was provided, in part, by the Consenting

Noteholders.  In order to maintain the accuracy of the information during the pendency of the

Chapter 11 Case, the Consenting Noteholders agreed in the Noteholder Plan Support Agreement

DC\3143575.8

to limit their trading in the Notes to ensure that they would not hold more than the Maximum

Note Holdings.  However, other current and prospective holders of the Notes are not subject to

any such limitations.

201.    Should any person or other entity acquire an amount of Notes such that it

holds more than the Maximum Notes Holdings, as defined in the Trading Procedures Motion, the

representations made by the Debtor to the NRC could prove to no longer be accurate and, as a

result, the NRC could alter its conclusion that the restructuring would not be viewed as a direct

or indirect transfer of control.  In that event, the restructuring would require advance written

consent from the NRC, which would delay the Debtor's objective of emerging from Chapter 11

on an expedited basis and add to the administrative costs of the Chapter 11 Case.

202.    To ensure compliance with the Trading Limitations, the Debtor has

requested that the Court establish the procedures set forth in the Trading Procedures Motion,

which procedures will allow the Debtor to monitor trading and avoid issues that could jeopardize

its regulatory status.

I.    **Motion of Debtor for Order (I) Requiring Information From Persons or Other Entities Holding or Acquiring Specified Note Amounts, (II) Limiting Purchase, Sale or Transfer of Notes to Specified Amounts and (III) Establishing Notification and Hearing Procedures for Relief From Limitations on Purchase, Sale or Transfer of Notes (the "Logan 156(c) Application")**

203.    The Logan Section 156(c) Application seeks an order appointing Logan &

Company, Inc. ("Logan") to act as the claims and noticing agent in order to assume full

responsibility for the distribution of notices and, to the extent any proofs of claim are filed

notwithstanding the prearranged nature of the Chapter 11 Case and the applicable terms of the

Plan, the maintenance, processing and docketing of such proofs of claim filed in the Chapter 11 Case.[95]

204.    I have been informed that the Debtor's selection of Logan to act as the claims and noticing agent has satisfied the Court's *Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c)* (the "*Protocol*"), in that the Debtor obtained and reviewed engagement proposals from at least two (2) other court-approved claims and noticing agents to ensure selection through a competitive process.  Moreover, I can confirm, based on all engagement proposals obtained and reviewed, that Logan's rates are competitive and reasonable given Logan's quality of services and expertise.

205.    In addition, it is my understanding that the Logan 156(c) Application complies with the *Protocol* and conforms to the standard Section 156(c) Application in use in this District.

206.    The proposed terms of retention are set forth in the Agreement for Services dated March 9, 2012, annexed to the Logan 156(c) Motion (the "Logan Agreement"); provided, however, that the Debtor is seeking approval solely with respect to services and terms and provisions that are consistent with the Section 156(c) Application and the Retention Order.[96]

207.    Although the Debtor has not yet filed its schedules of liabilities, it anticipates that there will be in excess of 30,000 entities to be noticed.  In view of the number of anticipated claimants and other notice parties and the complexity of the Debtor's business, the

---

[95]    The Debtor does not intend to seek an order establishing a general bar date for the filing of proofs of claim. Certain creditors may be subject to specific bar dates imposed by orders of the Bankruptcy Court, specifically parties to any rejected contracts or leases.  Creditors who are not subject to a specific bar date will not need to file a proof of claim, although some may nevertheless do so.

[96]    The Debtor intends to file the Application of Debtor for Order Under 11 U.S.C. §§ 327 and 328 Authorizing Employment and Retention of Logan & Company, Inc. as Administrative Advisor Nunc Pro Tunc to the Petition Date (the "Section 327 Application").  Pursuant to the Section 327 Application, the Debtor will seek to retain Logan to perform additional services outside the ambit of those services covered under the Section 156(c) Application.

DC\3143575.8

Debtor submits that the appointment of a claims and noticing agent is both necessary and in the best interests of both the Debtor's estate and its creditors.

208.    By appointing Logan as the claims and noticing agent in the Chapter 11 Case, I believe the distribution of notices and the processing of claims (to the extent necessary) will be expedited, and the office of the Clerk of the Bankruptcy Court for the District of Delaware (the "Clerk") will be relieved of the administrative burden of processing what may be a large number of claims, notwithstanding the anticipated absence of a formal claims process in this prearranged case.

209.    The Debtor has proposed to compensate Logan on substantially the terms and conditions set forth in the Logan Agreement, upon receipt of reasonably detailed invoices setting forth the services provided by Logan during the prior month and the rates charged for such services performed, but subject to the *Protocol*.

**J.      Motion of Debtor for Order (I) Approving Combined Notice of Commencement of Case, Initial Meeting of Creditors and Disclosure Statement Hearing and (II) Setting Date of Disclosure Statement Hearing and Establishing Deadline and Procedures for Objecting to Disclosure Statement (the "<u>Combined Notice Motion</u>")**

210.    In the Combined Notice Motion, the Debtor seeks entry of an order (a) approving a combined notice of the commencement of the case, the initial meeting of creditors and other preliminary matters, along with notice of the hearing to consider the adequacy of the Disclosure Statement and (b) setting the date for the hearing to consider the adequacy of, and establishing a deadline and procedures for objecting to, the Disclosure Statement.

    i.   <u>Approval of Combined Notice of Commencement of Chapter 11 Case, Initial Meeting of Creditors and Disclosure Statement Hearing</u>

211.    I have been informed that notice of the order for relief must be given to all creditors, indenture trustees and equity interest holders.  In addition, notice of the meeting of

creditors held pursuant to Bankruptcy Code Section 341(a) must be given to all creditors and indenture trustees. Such notices, together with other preliminary information, is typically given during the first few weeks of the case. I further understand that all creditors, indenture trustees, equity interest holders and certain other parties in interest receive notice of the time set for filing objections to, and the hearing to consider approval of, a disclosure statement.

212.    Because the Debtor has already filed the Disclosure Statement, the Debtor will be providing the required notice of the hearing and objection deadline for the Disclosure Statement on the same timeframe as it will be providing notice of the commencement of the case and notice of the meeting of creditors. Therefore, because such notices are provided to the same large group of parties, in an effort to preserve resources, the Debtor seeks to combine all of the required notices into one form (the "Combined Notice") and obtain authorization from the Court to use the combined notice in lieu of separate notices.

213.    I am advised that the Combined Notice is substantially consistent with the notice of commencement typically used in chapter 11 cases in this District, tailored as necessary to conform to the particulars of the Debtor's case. For example, the Combined Notice makes clear that, consistent with the terms of the proposed Plan, the Debtor does not intend to seek the establishment of a general bar date for filing proofs of claims.[97] In addition, the Combined Notice sets the hearing date and objection deadline for the Disclosure Statement, as well as requirements for filing any objections, as more particularly described below.

---

[97]    The Debtor does contemplate special bar dates for any claims held by past or present holders of the Debtor's debt or equity securities that are subject to Bankruptcy Code Section 510(b) and for any claims arising from the rejection of an executory contract or unexpired lease, as explained in the Combined Notice.

DC\3143575.8

ii.  Scheduling Date for the Disclosure Statement Hearing and Establishing Disclosure
Statement Objection Deadline and Procedures

214.    I have been informed that twenty-eight (28) days' notice must be given by

mail to all creditors of the time fixed for filing objections to approval of a disclosure statement,

and that the hearing on the adequacy of a disclosure statement should be at least thirty-five (35)

days following the service of the disclosure statement.

215.    The Debtor has requested that the hearing to consider approval of the

Disclosure Statement (the "Disclosure Statement Hearing") be scheduled for a date that is at least

thirty-five (35) days after the proposed date of mailing of the Combined Notice, which, as set forth

above, will be no later than five (5) business days after entry of the proposed form of Order submitted

with the Combined Notice Motion.  The Debtor has further requested that the deadline to object to the

Disclosure Statement (the "Disclosure Statement Objection Deadline") be set for a date that is at least

seven (7) days before the date of the Disclosure Statement Hearing.  Finally, the Debtor has requested

that its deadline to reply to any timely-filed objection be set for the same date and time as the agenda is

due for the Disclosure Statement Hearing will be 12:00 noon Eastern Time on the date that is two (2)

business days before the Disclosure Statement Hearing (the "Reply Deadline").

216.    I believe that setting the Disclosure Statement Hearing, the Disclosure

Statement Objection Deadline and the Reply Deadline for the dates requested above, and

establishing the Disclosure Statement Objection Procedures as outlined above, will satisfy the

temporal requirements of the Bankruptcy Rules and the Local Rules (as such requirements have

been explained to me) and provide sufficient time for parties in interest to determine whether to

file objections to the Disclosure Statement, for the Debtor to address any objections, and for the

Court to consider any objections and replies in advance of the Disclosure Statement Hearing.

Moreover, proceeding as requested will enable the Debtor to obtain approval of the Disclosure

DC\3143575.8

Statement on an appropriate timeframe and to move thereafter to solicitation, confirmation and consummation of the Plan.

## CONCLUSION

Accordingly, for the reasons states herein and in each of the First Day Pleadings, I believe that the relief sought in the First Day Pleadings should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: March 5, 2014

John R. Castellano
Chief Restructuring Officer
USEC Inc.

DC\3143575.8