### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------- x
                                                        :   Chapter 11
In re:                                                  :
                                                        :   Case No. 14-_____ (_____)
USEC INC.,                                              :
                                                        :
                Debtor. ¹                               :
------------------------------------------------------- x
```

### MOTION OF DEBTOR FOR ENTRY OF
### INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTOR TO (A) OBTAIN
### POSTPETITION SECURED FINANCING PURSUANT TO 11 U.S.C. §§ 105(a), 362(d),
### 363(b), 364(c)(1), 364(c)(2), 364(c)(3) AND 364(e) AND (B) APPLY CASH
### COLLATERAL TO PREPETITION SECURED CLAIM OF DIP LENDER
### PURSUANT TO 11 U.S.C. § 363(b)(1) AND 363(c)(2)(A) AND (II) WITH RESPECT
### TO INTERIM ORDER, SCHEDULING FINAL HEARING

USEC Inc., the debtor and debtor in possession in the above-captioned case (the

"Debtor"), hereby moves (the "Motion") pursuant to Sections 105(a), 362(d), 363(b), 363(c),

364(c)(1), 364(c)(2), 364(c)(3) and 364(e) of Title 11 of the United States Code (the

"Bankruptcy Code"), Rules 2002, 4001 and 6004 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules") and Rules 2002-1 and 4001-2 of the Local Rules for the United States

Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of (i) an interim

order (the "Interim Order") substantially in the form attached hereto as Exhibit A and a final

order to be filed with the Court in advance of the final hearing hereon (the "Final Order" and

together with the Interim Order, the "DIP Orders") (a) authorizing the Debtor to obtain

postpetition financing on a secured and superpriority basis, as more particularly described below,

from its subsidiary United States Enrichment Corporation ("Enrichment Corp" and in such

capacity the "DIP Lender") pursuant to the terms of the Debtor-In-Possession Credit Agreement

---

¹       The Debtor's federal tax identification number is 52-2107911.  The Debtor's mailing address is 6903
Rockledge Drive, Suite 400, Bethesda, Maryland 20817.

(the "DIP Credit Agreement") attached hereto as <u>Exhibit B</u>; (b) confirming the DIP Lender's good faith in furnishing the loans under the DIP Credit Agreement; (c) authorizing the Debtor to apply all receivables and cash proceeds in which Enrichment Corp asserts an interest (the "Cash Collateral") to pay down the prepetition secured loans provided by Enrichment Corp; (d) modifying the automatic stay imposed by Bankruptcy Code Section 362 to the extent necessary to implement and effectuate the terms and provisions of the DIP Credit Agreement and the DIP Orders; and (e) waiving any applicable stay (including under Bankruptcy Rule 6004 and any applicable Local Rules) and providing for immediate effectiveness of the DIP Orders; and (ii) as part of the Interim Order only, scheduling a final hearing (the "Final Hearing") to consider approval of the relief sought in the Motion on a final basis pursuant to the Final Order.  In support of the Motion, the Debtor relies upon and incorporates by reference the Declaration of John R. Castellano, Chief Restructuring Officer of USEC Inc., in Support of Chapter 11 Petition and First Day Pleadings (the "Castellano Declaration"), which has been filed with the Court concurrently herewith.[2]  In further support of the Motion, the Debtor, by and through its undersigned counsel, respectfully represents:

<b>JURISDICTION</b>

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Notwithstanding the foregoing, the Debtor consents to the entry of an order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such order absent the consent of the parties.  Venue of this case and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief requested herein are Bankruptcy Code Sections 105(a), 362(d),

---

[2]      Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to such terms in the Castellano Declaration or the DIP Credit Agreement, as applicable.

363(b), 363(c), 364(c)(1), 364(c)(2), 364(c)(3) and 364(e), Bankruptcy Rules 2002, 4001 and

6004 and Local Rules 2002-1 and 4001-2.

## BACKGROUND

### A.    General Background

2.    On the date hereof (the "Petition Date"), the Debtor filed a voluntary

petition in this Court commencing a case for relief under Chapter 11 of the Bankruptcy Code (the

"Chapter 11 Case").

3.    The factual background regarding the Debtor, including its business

operations, its capital and debt structures and the events leading to the filing of the Chapter 11

Case, is set forth in detail in the Castellano Declaration.

4.    The Debtor continues to manage and operate its business as a debtor in

possession pursuant to Bankruptcy Code Sections 1107 and 1108.  No trustee or examiner has

been requested in the Chapter 11 Case and no committee has yet been appointed.

5.    The Chapter 11 Case is a "prearranged" case which was commenced for

the purpose of implementing a restructuring of the Debtor's convertible note debt and preferred

stock interests.  A plan of reorganization (the "Plan") reflecting the agreed restructuring has been

filed, along with a disclosure statement and a motion for approval of solicitation procedures.

The Debtor seeks to obtain approval of the disclosure statement, authorization to solicit votes

from the holders of impaired claims and interests, and then confirmation of the Plan as quickly as

the Court's schedule and requisite notice periods will permit.

### B.    The Debtor's Relationship with and Prepetition Obligations to Enrichment Corp

6.    As noted in the Castellano Declaration, Enrichment Corp is a direct,

wholly-owned subsidiary of the Debtor.  A substantial majority of the assets of the Debtor's

corporate family (which includes the Debtor, Enrichment Corp and several other non-Debtor

subsidiaries) are owned by Enrichment Corp. The Debtor does not have any revenue-generating operations. The Debtor, therefore, has historically been dependent on support from Enrichment Corp, either through intercompany financing or through credit enhancement as a co borrower and pledgor with respect to previous third-party lending.

7.    Although the Debtor receives certain funds from the U.S. Department of Energy (the "DOE") under that certain RD&D Cooperative Agreement dated as of June 12, 2012 between the DOE, the Debtor and American Centrifuge Demonstration, LLC[3] (the "Cooperative Agreement"), as reimbursement for expenditures under the cooperative cost-sharing research, development and demonstration program (the "RD&D Program"), which expenditures themselves were made from intercompany borrowings, such funds are pledged to secure intercompany financing provided by Enrichment Corp, as described below. Thus, the Debtor has not had any available sources of capital and financing other than as provided by Enrichment Corp.

8.    After September 2011, when Enrichment Corp ceased paying dividends, the Debtor was able to obtain intercompany financing from Enrichment Corp on an unsecured basis. The unsecured financing provided to the Debtor by Enrichment Corp (in its capacity as the prepetition lender to the Debtor, the "Prepetition Lender") was (a) with respect to intercompany lending that occurred between September 30, 2011 and February 20, 2013 reflected as intercompany payables to the Prepetition Lender that were not repaid as of the Petition Date (the "Unsecured Payables") and (b) with respect to intercompany lending that took place between February 21, 2013 and August 1, 2013, evidenced by a certain Demand Note dated as of May 28, 2013 (the amounts arising thereunder, the "Unsecured Note Debt"). As of

---

[3]    American Centrifuge Demonstration, LLC is another of the Debtor's non-debtor subsidiaries.

January 31, 2014, the aggregate amount owed by the Debtor to the Prepetition Lender with respect to the Unsecured Payables and the Unsecured Demand Note totaled approximately $274 million (inclusive of interest as of January 31, 2014), plus fees, costs and expenses and additional amounts that have accrued between January 31, 2014 and the Petition Date (collectively, the "Prepetition Unsecured Debt").[4]

9.      The unsecured financing continued until August 2, 2013, when the Prepetition Lender conditioned further financing on obtaining a secured demand note and corresponding pledge and security agreement from the Debtor.  At that time, the only security pledged to the Prepetition Lender was the receivable from the DOE under the Cooperative Agreement.  Both the secured demand note and corresponding pledge and security agreement were amended and restated on January 24, 2014 (as amended and restated and together, and with any related financing documents, the "Prepetition Credit Agreement") to reflect the addition of equipment as a new class of collateral that would provide additional coverage to the Prepetition Lender with respect to future loans under the Prepetition Credit Agreement. Specifically, as amended, the liens and security interests that the Debtor granted to the Prepetition Lender covered specific collateral including, in particular, (a) all accounts receivable from the DOE under the Cooperative Agreement, (b) with respect to all amounts borrowed on or after January 24, 2014, all equipment used in, related to, or destined for the American Centrifuge Project (as defined in the Prepetition Credit Agreement), (c) all documents, books and records related to the foregoing, and (d) any and all proceeds, products, rents and profits of or from any and all of the foregoing (collectively, the "Prepetition Collateral").   Notably, certain of the Prepetition Collateral constitutes Cash Collateral.  The amounts borrowed under the Prepetition Credit

---

[4]      As of January 31, 2014, the Unsecured Payables were $202,085,688.04 and the amount outstanding under the Unsecured Note Debt totaled $71,974,162.43.

Agreement accrued interest at an annual rate of 10.5% and interest was paid "in kind."  As of

January 31, 2014, the outstanding amounts owed by the Debtor under the Prepetition Credit

Agreement approximated $56.3 million (inclusive of interest), plus fees, costs and expenses and

additional amounts that have accrued between January 31, 2014 and the Petition Date

(collectively, the "Prepetition Secured Debt").  The Debtor does not have any other material

secured obligations, other than contingent indemnification obligations with respect to certain

surety bonds held in the names of subsidiaries that are fully cash collateralized.

**C.**    **The Debtor's Determinations Regarding and Efforts to Obtain Postpetition Financing**

10.    As set forth in greater detail in the Castellano Declaration, on December

13, 2013, the Debtor entered into a plan support agreement with certain holders of the Debtor's

convertible note debt and thereafter entered into plan support agreements with each of the two

holders of the Debtor's preferred stock interests (collectively, the "Plan Support Agreements").

Each of the Plan Support Agreements reflected the willingness of the respective signatories

thereto to support the Plan, subject to the various, respective, terms and conditions contained

therein.

11.    To continue to operate, pay ordinary expenses and fund the costs of the

Chapter 11 Case, the Debtor needs to continue to rely on funding from Enrichment Corp or,

theoretically, a third party.  Given (a) the nature of and risks associated with the Debtor's

business, (b) that the Debtor does not have material unencumbered assets and does not generate

any revenue from operations, and (c) discussions with the Debtor's prior third-party working

capital lender, the Debtor does not believe that third-party debtor-in-possession financing is

available to the Debtor.  As a result, the Plan contemplates ongoing funding during and after the

6

Chapter 11 Case from Enrichment Corp and Enrichment Corp agreed to continue providing intercompany financing to the Debtor through a debtor-in-possession financing facility.

12.     Acting with the assistance of independent counsel,[5] Enrichment Corp agreed to continue to provide funding to the Debtor on the terms embodied in the proposed DIP Credit Agreement.  The Debtor believes that such terms are highly favorable to the Debtor; notably, there are no financing fees, interest is payable in kind, and the interest rate is equivalent to the rate historically charged to the Debtor under a prior third-party credit agreement that was secured by all of the assets of the Debtor's corporate family, including those of Enrichment Corp.

13.     Under the DIP Credit Agreement, Enrichment Corp acting as the DIP Lender is committed to lend to the Debtor from time to time, on an incremental basis, up to $50 million (the "DIP Loans").

14.     The DIP Lender's commitment to make the DIP Loans (the "Commitment"), however, is conditioned upon, among other things, (a) subject to the Carve-Out (described below), the grant of superpriority administrative claim status pursuant to Bankruptcy Code Section 364(c)(1); (b) subject to the Carve-Out (i) the grant of perfected liens on and security interests in any of the collateral under the DIP Credit Agreement (the "DIP Collateral") that is not subject to a lien or security interest on the Petition Date, but specifically excluding until entry of the Final Order any Liens upon the Debtor's claims and causes of action under Bankruptcy Code Sections 502(d), 544, 545, 547, 548, 549 550 and/or 553 or similar state law and all proceeds of any of the foregoing (collectively, the "Avoidance Actions"), pursuant to Bankruptcy Code Section 364(c)(2); and (ii) the grant of second or other junior priority perfected

---

[5]     Enrichment Corp has retained Young Conaway Stargatt & Taylor, LLP.

liens on and security interests in any of the DIP Collateral (excluding Avoidance Actions pending entry of the Final Order) that is subject to a validly existing, properly perfected and unavoidable lien or security interest on the Petition Date held by a person or entity including the Prepetition Lender pursuant to Bankruptcy Code Section 364(c)(3); and (c) the application of all Prepetition Collateral that is Cash Collateral to pay down the Prepetition Secured Debt of the Prepetition Lender.

15.     In sum, the Debtor believes that the terms and conditions of the proposed DIP Loans are reasonable under the circumstances, favorable to the Debtor, and could not be replicated in the marketplace.  In the absence of immediate access to the DIP Loans from the Prepetition Lender, the Debtor will be unable to bear the costs and expenses of the Chapter 11 Case, the value of its estate will rapidly deteriorate, and serious and irreparable harm to the Debtor, its estate and other stakeholders will occur, thus preventing the Debtor from realizing its chapter 11 objectives.  The Debtor, thus, submits that the entry into the DIP Credit Agreement on the terms and conditions set forth therein represented a prudent exercise of its business judgment and ought to be approved.

## RELIEF REQUESTED

16.     By this Motion, the Debtor requests that this Court (a) approve the Debtor's entry into the DIP Credit Agreement and authorize it to borrow from time to time, on an incremental basis, from the DIP Lender up to $20 million upon entry of the Interim DIP Order and up to $50 million upon entry of the Final DIP Order, (b) afford the DIP Lender the protections of Bankruptcy Code Sections 364(c)(1), 364(c)(2) and 364(c)(3), (c) confirm the DIP Lender's good faith in furnishing the DIP Loans and the attendant applicability of Bankruptcy Code Section 364(e), (d) authorize the Debtor to use all Prepetition Collateral that is Cash Collateral to pay down the Prepetition Secured Debt of the Prepetition Lender, (e) modify the

8

automatic stay imposed by Bankruptcy Code Section 362 to the extent necessary to implement and effectuate the terms and provisions of the DIP Orders and the DIP Credit Agreement, (f) waive any applicable stay (including under Bankruptcy Rule 6004 and any applicable Local Rules) and provide for immediate effectiveness of the DIP Orders, and (b)  schedule the Final Hearing on the Motion to be held within forty (40) days after the Petition Date to consider entry of the Final Order, which would, if entered as proposed, grant all of the relief requested in the Motion on a final basis.  The Debtor submits that obtaining the relief here requested is in the best interest of the Debtor, its estate and creditors and presents the best opportunity for the Debtor to maximize the value of its assets for the benefit of all stakeholders and realize its chapter 11 objectives.

### TERMS AND CONDITIONS OF POSTPETITION EXTENSION OF CREDIT

17.    The following table sets forth the most notable provisions of the DIP Credit Agreement and the DIP Orders[6], including those that are expressly required to be identified in accordance with Bankruptcy Rule 4001(c)(i)(B)[7] and Local Rule 4001-2(a)(i)[8]:

---

[6]    The Debtor anticipates that the proposed Final Order will be substantially similar in all material substantive respects to the proposed Interim Order, other than the fact that only the Final Order will provide that the DIP Liens will extend to Avoidance Actions.  The proposed Final Order will be filed in advance of the Final Hearing and served on the Initial Notice Parties (as defined below), all parties that have requested notice pursuant to Bankruptcy Rule 2002(i) and any other parties as may be ordered.  Accordingly, all of the references in the following table cite to the provisions in the Interim Order rather than the Final Order.

[7]    Certain provisions referenced in Bankruptcy Rule 4001 are not applicable here: (i) a determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or any lien securing the claim, Bankruptcy Rule 4001(c)(i)(B)(iii); (ii) waiver or modification of authority to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, Bankruptcy Rule 4001(c)(i)(B)(v); (iii) a release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action, Bankruptcy Rule 4001(c)(i)(B)(viii), and (iv) prepayment premiums, Bankruptcy Rule 4001(c)(i)(B)(xii).

[8]    Certain provisions referenced in Local Rule 4001-2 are not applicable here: (i) grant of cross-collateralization protection, Local Rule 4001-2(a)(i)(A); (ii) provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor, Local Rule 4001-2(a)(i)(B); (iii) "roll-up" provisions, Local Rule 4001-2(a)(i)(E), (iv) provisions that prime any secured lien of that lienor, Local Rule 4001-2(a)(i)(G); and (v) provisions that seek to affect the Court's power to consider the equities of the case under 11 U.S.C. § 552(b)(1), Local Rule 4001-2(a)(i)(H).

| Bankruptcy Rule/Local Rule | Type of Provision | Summary | Location of Provision in Relevant Document(s) |
|---|---|---|---|
| N/A | Borrower | USEC Inc. | DIP Credit Agreement: Preamble<br><br>Interim Order: Introductory paragraph (a) |
| N/A | Lender | United States Enrichment Corporation | DIP Credit Agreement: Preamble<br><br>Interim Order: Introductory paragraph (a) |
| Bankruptcy Rule 4001(c)(i)(B) | Size of postpetition facility | Maximum availability of up to $50 million, provided that the aggregate amount of DIP Loans outstanding will not be greater than the amount authorized to be borrowed under the DIP Orders. The DIP Lender has agreed to make the DIP Loans to the Borrower from time to time, on an incremental basis. | DIP Credit Agreement: § 2.01<br><br>Interim Order: Introductory paragraph (a) |
| N/A | Use of proceeds | The proceeds of the DIP Loans will be used for working capital needs and for general corporate purposes of the Debtor (including "Capital Expenditures," "ACP Expenditures" and the administrative expenses of the Chapter 11 Case) in accordance with the Budget included in the DIP Credit Agreement and the variance permitted by Section 7.09 of the DIP Credit Agreement (the "Variance"). | DIP Credit Agreement: § 4.11<br>Interim Order: ¶ 3 |
| Bankruptcy Rule 4001(c)(i)(B) | Interest rate | Each DIP Loan will bear interest for each day on which any principal of such DIP Loan remains outstanding at the Applicable Rate for such day. Under the DIP Credit Agreement, "Applicable Rate" means, for any day, a rate per annum equal to the sum of (a) the greater of (i) the Prime Rate in effect on such day and (ii) the Federal Funds Effective Rate in effect on such day plus 0.50%, plus (b) 7.25% per annum.  Any change in the Applicable Rate due to a change in the Prime Rate or the Federal Funds Effective Rate will be effective from and including the effective date of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.<br><br>Notwithstanding the foregoing, if any Event of Default occurs and is continuing, following written notice delivered to the Debtor by the DIP Lender, (a) all DIP Loans shall bear interest at 2% plus the rate otherwise applicable to such DIP Loans | DIP Credit Agreement: §§ 1.01, 2.07(a), 2.07(b), 2.07(c) and 2.07(d) |

DC\2959900.26

| Bankruptcy Rule/Local Rule | Type of Provision | Summary | Location of Provision in Relevant Document(s) |
|---|---|---|---|
| | | during the period beginning on the date such Event of Default first occurred and ending on the date such Event of Default is cured or waived and (b) any other amount outstanding under the DIP Credit Agreement shall accrue at 2% plus the rate applicable to such fee or other obligation as provided during the period beginning on the date such Event of Default first occurred and ending on the date such Event of Default is cured or waived.<br><br>The DIP Credit Agreement further provides that accrued interest on each DIP Loan will be payable in arrears on the last Business Day of each month, on the Maturity Date and, upon termination of the Commitment.  On the last Business Day of each month, the accrued interest will be paid by adding such amount to the principal amount of the outstanding DIP Loans.<br><br>Lastly, the DIP Credit Agreement provides that all interest shall be computed on the basis of a year of 365/366 days, and will be payable for the actual number of days elapsed (including the first day but excluding the last day). | |
| Bankruptcy Rule 4001(c)(i)(B) | Term/Maturity date | Unless previously, terminated, the DIP Loans will terminate on the Maturity Date, which is the earlier of (a) the date that a Bankruptcy Plan becomes effective pursuant to its terms and (b) 120 days after the Petition Date (which 120-day period may be extended by the DIP Lender in its sole discretion). | DIP Credit Agreement: §§ 1.01, 2.04<br><br>Interim Order: ¶ 17 |
| N/A | Fees | The DIP Lender has agreed to forego any customary fees on the Commitment, itself.  The fees payable to the DIP Lender under the DIP Credit Agreement are, thus, limited to (a) all reasonable and documented out-of-pocket expenses incurred by the DIP Lender, including the reasonable fees, charges and disbursements of counsel for the DIP Lender, in connection with the preparation and negotiation of the "Financing Documents," (b) all reasonable and documented out-of-pocket expenses incurred by the DIP Lender and its affiliates, including the reasonable and documented fees, charges and disbursements of counsel for the DIP Lender, in connection with the administration of the Financing Documents or any amendments, modifications or waivers of the provisions of such documents, (c) all reasonable and documented out-of-pocket expenses incurred by the DIP Lender, including the reasonable fees, charges and disbursements of counsel for the DIP Lender, in connection with the Chapter 11 Case, | DIP Credit Agreement: § 9.03 |

| Bankruptcy Rule/Local Rule | Type of Provision | Summary | Location of Provision in Relevant Document(s) |
|---|---|---|---|
| | | and (d) all out-of-pocket expenses incurred by the DIP Lender, including the fees, charges and disbursements of any counsel for the DIP Lender, in connection with the enforcement, collection or protection of its rights in connection with the Financing Documents, or in connection with the DIP Loans, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of the DIP Loans. | |
| N/A | Payments/Prepayments | The Debtor has promised to pay to the DIP Lender the then unpaid principal amount of, and all accrued and unpaid interest on, each DIP Loan on the Maturity Date, except to the extent otherwise agreed by the DIP Lender.<br><br>The Debtor has the right at any time and from time to time to voluntarily prepay the DIP Loans in whole or in part, subject to the requirements of the DIP Credit Agreement.<br><br>As more fully set forth in Section 2.06 of the DIP Credit Agreement, the Debtor is <u>required</u> to prepay the DIP Loans (a) if at any time, Availability under the DIP Credit Agreement is less than $0, in which case, the Debtor will immediately prepay DIP Loans in an aggregate amount necessary to cause the Availability to be greater than or equal to $0, (b) if the Debtor receives any "Asset Sale Proceeds" or "Casualty Proceeds", in which case the Debtor is required to make a mandatory prepayment equal to 100% of such proceeds (other than certain Asset Sale Proceeds excluded under the DIP Credit Agreement), (c) if the Debtor receives any "Net Proceeds" from the issuance of any Equity Interests of the Debtor, (d) if the Debtor receives any "Net Proceeds" from the issuance of any debt securities or other Indebtedness for borrowed money of the Debtor (other than certain Net Proceeds from Indebtedness expressly excluded under the DIP Credit Agreement), (e) upon receipt of "fair value: from the DOE in respect of any "DOE Transfer Event" (whereupon the Debtor is required to convert such fair value into cash in a reasonably prudent amount of time and apply 100% of such cash to repay the DIP Loans), and (f) upon the Debtor's receipt of an "ACP Cost Reimbursement" from the DOE that is the proceeds of expenditures made from the DIP Loans (whereupon the Debtor is required to make a mandatory prepayment of the | DIP Credit Agreement: §§ 2.05, 2.06 |

| Bankruptcy Rule/Local Rule | Type of Provision | Summary | Location of Provision in Relevant Document(s) |
|---|---|---|---|
| | | DIP Loans in an amount equal to 100% of such reimbursement).  Notably, the aforementioned clauses (b) through (f) require that the mandatory prepayments be made within three (3) business days of the Debtor's receipt of the cash/proceeds and any mandatory prepayment pursuant to the aforementioned clauses (b), (d) or (e) shall result in a reduction of the DIP Lender's commitment to make DIP Loans in the amount of such prepayment.<br><br>The DIP Credit Agreement further provides that, in the event of any of the foregoing mandatory prepayments, such prepayment must be accompanied by accrued interest to the extent required by the DIP Credit Agreement and must be applied, (a) first, as a payment of accrued and unpaid interest on the DIP Loans, (b) second, as a payment of the outstanding principal amount of the DIP Loans, and (c) third, to the repayment of any other Obligations of the Debtor to the DIP Lender which are then due and outstanding in respect of the DIP Loans and the Commitment. | |
| Bankruptcy Rule 4001(c)(i)(B)(i);<br><br>Bankruptcy Rule 4001(c)(i)(B)(ii);<br><br>Bankruptcy Rule 4001 (c)(i)(B)(xi);<br><br>Local Rule 4001-2(a)(i)(D)[9] | Priority and Security | Upon entry of the DIP Orders, the DIP Lender will be granted:<br><br>(a) pursuant to Bankruptcy Code Section 364(c)(1), superpriority administrative claims having priority over any and all administrative expenses of the kind specified in Bankruptcy Code Section 105, 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113 or 1114, subject and subordinate only to, upon the occurrence and during the continuance of an Event of Default, the payment of the Carve-Out.<br><br>(b) subject to the Carve-Out, the following Liens:<br><br>(i) pursuant to Bankruptcy Code Section 364(c)(2), first priority perfected Liens on and security interests in any of the DIP Collateral (excluding Avoidance Actions pending entry of the Final Order) that is not subject to a Lien or security interest on the | DIP Credit Agreement: §§ 3.01, 7.02<br><br>Interim Order: ¶¶ preamble (b)(i) and (ii), 4, 10 |

---

[9]    The Debtor has cited to this Local Rule out of an abundance of caution but would note that such Local Rule is seemingly here inapplicable.  The Debtor believes that the Local Rule seeks to address provisions that "immediately" grant to a prepetition lender secured creditor liens on avoidance actions.  Here, the lien on Avoidance Actions would only be granted upon entry of the Final Order.

13

| Bankruptcy Rule/Local Rule | Type of Provision | Summary | Location of Provision in Relevant Document(s) |
|---|---|---|---|
| | | Petition Date; and<br><br>(ii) pursuant to Bankruptcy Code Section 364(c)(3), second or other junior priority perfected Liens on and security interests in any of the DIP Collateral (excluding Avoidance Actions pending entry of the Final Order) that is subject to a validly existing, properly perfected and unavoidable Lien or security interest on the Petition Date held by a person or entity including the Prepetition Lender.<br><br>All Prepetition Collateral that is Cash Collateral is to be used to pay down the Prepetition Secured Debt of the Prepetition Lender.<br><br>The DIP Collateral consists of all of the Debtor's right, title and interest in and to the following, in each case, whether now owned or existing or hereafter created, acquired or arising (irrespective of whether the same existed on or was created or acquired after the Petition Date):<br><br>(a) all Accounts;<br><br>(b) all Chattel Paper;<br><br>(c) all Documents;<br><br>(d) all Instruments;<br><br>(e) all Inventory;<br><br>(f) all Equipment;<br><br>(g) all Investment Property representing Permitted Investments that are not Deposit Accounts;<br><br>(h) all cash which is not in a Deposit Account and all Money;<br><br>(i) all General Intangibles (including all Intellectual Property);<br><br>(j) all Securities Accounts;<br><br>(k) all Avoidance Claims (which, as noted above, the Debtor recognizes will not be the subject to the DIP Collateral that is covered by the Interim Order, but will only be covered following entry of the Final Order);<br><br>(l) all Equity Interests in the Debtor's direct subsidiaries other than | |

| Bankruptcy Rule/Local Rule | Type of Provision | Summary | Location of Provision in Relevant Document(s) |
|---|---|---|---|
| | | Enrichment Corp; | |
| | | (m)  all cash and non-cash proceeds of (a) through (l) above, including proceeds of and unearned premiums with respect to insurance policies insuring any of the Collateral; | |
| | | (n)  all books and records of the Borrower pertaining to any of (a) through (l) above. | |
| | | As additional security, the Debtor will grant to the DIP Lender a continuing security interest in and Lien upon, and collaterally assigned to the DIP Lender, all of the Debtor's right, title and interest in and to all Deposit Accounts and any deposits or other sums at any time credited to such Deposit Accounts. | |
| | | The DIP Credit Agreement provides, however, that notwithstanding anything else contained therein, in no event will the DIP Collateral include, and the Debtor will not be deemed to have granted any Lien in, any of the Debtor's rights or interests in (i) any DOE Collateral, (ii) any ACP RD&D Program Purchased Property, (iii) the Equity Interests in Enrichment Corp, (iv) the proceeds of any of the foregoing set forth in the immediately preceding clauses (i) through (iv), or (v) any license, contract or agreement to which the Debtor is a party or any of its interests thereunder to the extent, but only to the extent, that such a grant would, under the terms of such license, contract or agreement or otherwise, result in a breach of the terms of, or constitute a default under, such license, contract or agreement (other than to the extent that any such term would be rendered ineffective pursuant to any applicable law (including the Bankruptcy Code) or principles of equity. | |
| Local Rule 4001-2(a)(i)(F)[10] | Carve-out and, in particular, provisions that provide | The Interim Order provides for a "Carve-Out" of specified amounts from the aforementioned superpriority claims and Liens granted to the DIP Lender.  Specifically, the Interim Order defines | Interim Order:  ¶7 |

---

[10]      Notably, in In re Ames Dep't Stores, 115 B.R. 34 (Bankr. S.D.N.Y. 1990), the court found that "carve-outs" are not only reasonable, but are necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel. Id. at 40.  The Debtor submits that the terms of the Carve-Out (including the disparity that exists between the amount recoverable by professionals of the Debtor on the one hand and any statutory committee on the other) are reasonable under the circumstances.

| Bankruptcy Rule/Local Rule | Type of Provision | Summary | Location of Provision in Relevant Document(s) |
|---|---|---|---|
| | disparate treatment for professionals retained by a creditors' committee from those professionals retained by the debtor with respect to same. | "Carve-Out" as (a) all fees required to be paid to the U.S. Trustee and to the Clerk of the Bankruptcy Court pursuant to Section 1930(a) of Title 28 of the United States Code; *plus* (b) the unpaid fees and expenses of retained professionals of the Debtor employed pursuant to Bankruptcy Code Sections 327, 328, and 363 (including approved ordinary course professionals) (the "Debtor's Professionals") that are incurred prior to the Carve-Out Trigger Date (as defined herein), and including amounts incurred but not invoiced or approved prior to the Carve-Out Trigger Date, but not exceeding the amounts therefor contained in the Budget (subject to the Variance) (provided that all such fees and expenses are payable under Bankruptcy Code Sections 330 and 331 and pursuant to an order of the Court); *plus* (c) without duplication of the amounts described in clause (b) above, the fees and expenses of the Debtor's Professionals to be incurred after the Carve-Out Trigger Date and that remain unsatisfied after the application of any retainers, which application is hereby approved (subject to disgorgement as provided below), in the aggregate amount not to exceed $1 million (provided that all such fees and expenses are payable under Bankruptcy Code Sections 330 and 331 and pursuant to an order of the Court, and any fees and expenses satisfied by application of retainers shall nevertheless be subject to approval by the Court and if not approved the amount of the retainers applied thereto shall be subject to disgorgement); *plus* (d) unpaid fees and expenses of the Debtor's claims and noticing agent not to exceed $20,000; *plus* (e) unpaid fees and expenses of committee members and of any retained professionals of any statutory committee appointed in this case (a "Statutory Committee") that are incurred prior to the Carve-Out Trigger Date and invoiced and payable under Bankruptcy Code Sections 330 and 331 (but only to the extent that such fees and expenses and committee member expenses are payable pursuant to an order of the Court) but not exceeding the amounts therefore contained in the Budget (subject to the Variance); *provided* that nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement or compensation described in this paragraph. [11] | |

---

[11]    Professionals and members of a Statutory Committee are included in the Carve-Out on the same basis as the Debtor's professionals prior to the Carve-Out Trigger Date.  They are not included after the Carve-Out Trigger

| Bankruptcy Rule/Local Rule | Type of Provision | Summary | Location of Provision in Relevant Document(s) |
|---|---|---|---|
| | | As used in the Interim Order, "Carve-Out Trigger Date" means the date on which the DIP Lender provides written notice to the Debtor and counsel to the Debtor, with a copy of such notice to counsel for any Statutory Committee (if appointed), that the Carve-Out is invoked, which notice shall be delivered only (a) on or after and during the continuation of an Event of Default or (b) upon the occurrence of an event which would result in the Borrower being unable to satisfy any condition set forth in Sections 5.02(g) through (j) of the DIP Credit Agreement. | |
| Bankruptcy Rule 4001(c)(i)(B)(x)

Local Rule 4001-2(a)(i)(C) | 506(c) waiver | No costs or expenses of administration or other charge, lien, assessment or claim incurred on or after the Petition Date of any Person or entity shall be imposed against the DIP Lender, its claims or the DIP Collateral under Bankruptcy Code Section 506(c) or otherwise, and the Debtor hereby irrevocably waives any and all such rights, remedies and benefits under Bankruptcy Code Section 506(c) as to the DIP Lender, its claims or the DIP Collateral. | DIP Credit Agreement: § 8.01(l)

Interim Order: ¶ 8 |
| Bankruptcy Rule 4001(c)(i)(B)(i x) | The indemnification of any entity. | The Debtor has agreed to indemnify the DIP Lender and each "Related Party" of the DIP Lender (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the reasonable fees, charges and disbursements of any counsel for any Indemnitee (other than "Indemnified Taxes" and "Other Taxes" for which indemnification shall be made pursuant to Section 2.08 of the DIP Credit Agreement and "Excluded Taxes"), incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (a) the execution or delivery of the DIP Credit Agreement or any agreement or instrument contemplated thereby, the performance by the parties thereto of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated thereby, (b) any DIP Loan or the use of the proceeds there from, (c) any actual or alleged presence or release of "Hazardous Materials" on or from any property owned or operated by the Debtor, or any "Environmental Liability" related in any way to the Debtor or (d) | DIP Credit Agreement: § 9.03 |

Date on the basis that there is no justification for a Statutory Committee to continue to incur fees and expenses when the Debtor has lost funding and would likely be preparing for a conversion to Chapter 7.

DC\2959900.26

| Bankruptcy Rule/Local Rule | Type of Provision | Summary | Location of Provision in Relevant Document(s) |
|---|---|---|---|
| | | any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claim, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.<br><br>The DIP Credit Agreement further provides that, to the extent permitted by applicable law, the Debtor will not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, the DIP Credit Agreement or any agreement or instrument contemplated thereby, the Transactions or any DIP Loan or the use of the proceeds thereof.<br><br>The DIP Credit Agreement defines "Related Party" as a Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.  The DIP Credit Agreement, in turn, defines "Affiliate" as another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. | |
| Bankruptcy Rule 4001 (c)(i)(B)(iv) | Waiver or modification of the automatic stay | The automatic stay is deemed modified and vacated to the extent necessary to permit the DIP Lender to take a variety of actions including (a) terminating the Commitment; (b) declaring the DIP Loans then outstanding to be due and payable in whole (or in in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable); and/or (c) exercising any other right or remedy permitted to the DIP Lender under the DIP Credit Agreement, the Interim Order or by operation of law; provided, however, the DIP Lender may take the actions described in clause (c) above only after providing five (5) business days' prior written notice to the Court, the Debtor, counsel to certain holders of the Debtor's convertible notes who have entered into a plan support agreement with the Debtor (the "Consenting Noteholders") and | Interim Order: ¶ 12 |

| Bankruptcy Rule/Local Rule | Type of Provision | Summary | Location of Provision in Relevant Document(s) |
|---|---|---|---|
| | | counsel to and any Statutory Committee appointed in the Chapter 11 Case. | |
| Bankruptcy Rule 4001(c)(i)(B)(vii) | Waiver or modification of applicability of non-bankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien | The DIP Liens granted pursuant to the DIP Orders are deemed to constitute valid, enforceable, unavoidable and duly perfected security interests and liens, and the DIP Lender is not required to file or serve financing statements, notices of lien or similar instruments which otherwise may be required under federal or state law in any jurisdiction, or take any action, including taking possession, to validate and perfect such security interests and liens; and the failure by the Debtor to execute any documentation relating to the DIP Liens does not affect the validity, enforceability, unavoidability, perfection or priority of the DIP Liens. | DIP Credit Agreement: § 4.16<br><br>Interim Order:  ¶ 5 |
| N/A | Representations and Warranties | The DIP Credit Agreement contains usual representations and warranties, including, but not limited to, organization and good standing; power and authorization to execute the Financing Documents; no violation of the Debtor's organizational documents and material agreements; validity and binding nature of the DIP Credit Agreement and the other Financing Documents; compliance with applicable laws and agreements including certain foreign asset control regulations; accuracy of information; filing of required tax documentation; and maintenance of adequate insurance. | DIP Credit Agreement: §§ 4.01-4.16 |
| N/A | Affirmative Covenants | The DIP Credit Agreement contains usual affirmative covenants, including but not limited to, the Debtor's agreement to provide the DIP Lender with certain reporting information (every two weeks) related to cash receipts and disbursements and updates to the Budget; maintenance of properties and insurance, compliance with laws; keeping of records and books of account; use of proceeds; payment of taxes; disclosure of litigation relating to the Debtor; notice of certain other material events; and notification of Events of Default. | DIP Credit Agreement:  §§ 6.01-6.09 |
| N/A | Negative Covenants | The DIP Credit Agreement contains usual negative covenants, including but not limited to, limitations on: the incurrence of indebtedness and liens (other than certain permitted encumbrances), sales, mergers, certain types of payments and investments, and transactions with Affiliates.<br><br>As to bankruptcy matters, the negative covenants provide that no proceeds of the DIP Loans or the | DIP Credit Agreement: §§ 7.01-7.10<br><br>Interim Order: ¶ 19 |

| Bankruptcy Rule/Local Rule | Type of Provision | Summary | Location of Provision in Relevant Document(s) |
|---|---|---|---|
| | | DIP Collateral will be used for purposes of funding any objection, proceeding or other litigation (i) against the DIP Lender, (ii) challenging the validity, perfection, priority, extent or enforceability of the Liens or security interests granted to the DIP Lender, either prior to or after the Petition Date, or (iii) challenging, disputing or objecting to the claims of the DIP Lender. | |
| Bankruptcy Rule 4001(c)(i)(B)(vi) | Events of Default | The DIP Credit Agreement contains usual Events of Default including, but not limited to, nonpayment of amounts due; breach of representations and warranties; the Debtor's failure to observe or perform any covenant, condition or agreement of the Debtor contained in the DIP Credit Agreement (subject to certain limitations); the termination of any Plan Support Agreement prior to entry of an order by the Court confirming a Bankruptcy Plan; the termination of the Debtor's exclusivity periods under Bankruptcy Code Section 1121 without the consent of the DIP Lender; the Debtor files a Bankruptcy Plan (other than the Plan of Reorganization of USEC Inc. filed on the Petition Date) that has not been consented to by the DIP Lender; an order is entered, without the consent of the DIP Lender, authorizing the payment of any prepetition claim that is not provided for in the Budget; the Debtor's failure to comply with any of the provisions of the DIP Orders in any material respect; the appointment of a trustee in the Chapter 11 Case; the appointment (subject to certain limitations) of an examiner in the Chapter 11 Case; the dismissal or conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code without the prior written consent of the DIP Lender; the failure to obtain entry of the Final Order within 40 days after the Petition Date; any claim, motion or application is brought against the DIP Lender by the Debtor under Bankruptcy Code Sections 506(c) or 552(b) or under the "equities of the case" doctrine or a final order is entered granting such a claim, motion or application brought by any person other than the Debtor; the Debtor applies to the Court for authority to (i) take any action that is prohibited by the terms of any of the Financing Documents or (ii) refrain from taking any action that is required to be taken by the terms of any of the Financing Documents or the DIP Orders; or the Debtor seeks or consents to any amendment, supplement or any other modification of any of the terms of the DIP Orders without the consent of the DIP Lender. | DIP Credit Agreement: § 8.01 |

| Bankruptcy Rule/Local Rule | Type of Provision | Summary | Location of Provision in Relevant Document(s) |
|---|---|---|---|
| N/A | Termination and Remedies | Upon the occurrence of any Event of Default, the DIP Lender may, by notice to the Debtor and counsel to the Consenting Noteholders, take any one or more of the following actions, at the same or different times: (a) terminate the Commitment, (b) declare the DIP Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the DIP Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Debtor accrued thereunder, will become due and payable immediately, without presentment, demand, protest or other notice of any kind, or (c) exercise any other rights or remedies available under the Financing Documents or applicable law, provided, that prior to the exercise of any other rights or remedies, the DIP Lender will provide the Debtor, counsel to the Consenting Noteholders and any Statutory Committee with five (5) Business Days' prior written notice.<br><br>The DIP Credit Agreement further provides that, subject to the DIP Orders, if an Event of Default occurs and is continuing, the DIP Lender will be entitled to exercise in respect of the DIP Collateral all of its rights, powers and remedies provided for therein or otherwise available to it by law, in equity or otherwise, including all rights and remedies of a secured party under the UCC (including, without limitation, the specific rights set forth in Section 8.02(b) of the DIP Credit Agreement).. | DIP Credit Agreement: § 8.02.<br><br>Interim Order ¶ 12 |
| Bankruptcy Rule 4001(c)(i)(B)(vi) | Conditions Precedent to Loans | The DIP Lender's obligation to make the DIP Loans is subject to various conditions including but not limited to (a) receipt of certain information and fee/expense reimbursements from the Debtor; and (b) evidence that the Interim Order (and, thereafter, the Final Order) has been entered by the Bankruptcy Court in form and substance satisfactory to the DIP Lender, is in full force and effect, and has not been vacated, reversed, modified or stayed in any respect, and (c) the veracity and accuracy of the Debtor's representations and warranties in the DIP Credit Agreement.<br><br>Additionally, the DIP Credit Agreement provides that the obligation of the DIP Lender to make a DIP Loan on the date of any Borrowing, is subject | DIP Credit Agreement: §§ 5.01, 5.02 |

DC\2959900.26

| Bankruptcy Rule/Local Rule | Type of Provision | Summary | Location of Provision in Relevant Document(s) |
|---|---|---|---|
| | | to the satisfaction on such date of the following conditions (a) after giving effect to any Borrowing, Availability is not less than $0; (b) the Debtor shall not have failed to (i) commence solicitation of acceptances of a Bankruptcy Plan within 50 days of the Petition Date or (ii) obtain confirmation of a Bankruptcy Plan within 100 days of the Petition Date; (c) such Borrowing shall not be in an amount greater than is necessary to allow the Borrower to maintain a cash reserve of $2,000,000 and make the expenditures set forth in the Budget (subject to the variances permitted by Section 7.09) through the date which is fourteen (14) days following the date of such Borrowing; (d) an ACP Demobilization will not have occurred; (e) the DOE will not have terminated or suspended funding for 80% of the cost of the RD&D Program; (f) the DOE will not have terminated or suspended the RD&D Program; and (g) a DOE Transfer Event will not have occurred. | |

## APPLICABLE AUTHORITY AND BASIS FOR RELIEF

### A.    The DIP Credit Agreement Should Be Approved

18.    As described above, it is essential that the Debtor immediately obtain access to financing in order to continue operating its business in the ordinary course and preserve estate assets.  The Debtor has proposed to obtain financing under the DIP Credit Agreement by providing the DIP Lender with protections pursuant to Bankruptcy Code Section 364(c).  More specifically, the Debtor is proposing that the Court, through entry of the DIP Orders, afford the DIP Lender (a) pursuant to Bankruptcy Code Section 364(c)(1), superpriority claims having priority over any and all administrative expenses of the kind specified in Bankruptcy Code Section 105, 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113 or 1114, subject and subordinate only to, upon the occurrence and during the continuance of an Event of Default, the payment of the Carve-Out; (b) pursuant to Bankruptcy Code Section 364(c)(2) and subject to the

Carve-Out, first priority perfected Liens on and security interests in any of the DIP Collateral

that is not subject to a Lien or security interest on the Petition Date (excluding, however, for

purposes of the Interim Order, Avoidance Actions), and (c) pursuant to Bankruptcy Code

Section 364(c)(3) and subject to the Carve-Out, second or other junior priority perfected Liens

on and security interests in any of the DIP Collateral that is subject to a validly existing, properly

perfected and unavoidable Lien or security interest on the Petition Date held by a person or entity

including the Prepetition Lender (excluding, however, for purposes of the Interim Order,

Avoidance Actions).

       (i)      Approval of Postpetition Financing Under Bankruptcy Code Section 364(c)

       19.      Bankruptcy Code Section 364 distinguishes among (a) obtaining

unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the

ordinary course of business and (c) obtaining credit with specialized priority or with security.  If

a debtor in possession cannot obtain postpetition credit on an unsecured administrative basis,

then pursuant to Bankruptcy Code Section 364(c), a court may authorize the obtaining of credit

or the incurring of debt, repayment of which is entitled to superpriority administrative expense

status or is secured by a senior lien on unencumbered property or a junior lien on encumbered

property, or a combination of the foregoing.

       20.      Specifically, the statutory requirement for obtaining postpetition credit

under Bankruptcy Code Section 364(c) is a finding, made after notice and hearing, that a debtor

is "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy

Code] as an administrative expense." 11 U.S.C. § 364(c). See In re Ames Dep't Stores, Inc.,

115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made reasonable effort

to seek other sources of financing under Bankruptcy Code Sections 364(a) and (b)); In re Crouse

Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under Bankruptcy Code

Section 364(c)(2) is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

21.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under Bankruptcy Code Section 364(c).  Specifically, courts look to whether:

    a)   the debtor is unable to obtain unsecured credit under Bankruptcy Code Section 364(b), i.e., by allowing a lender only an administrative claim;

    b)   the credit transaction is necessary to preserve the assets of the estate; and

    c)   the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Ames Dep't Stores, 115 B.R. at 37-39; see also In re Aqua Assoc., 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying three factors in making a determination under Bankruptcy Code Section 364(c)); In re St. Mary Hospital, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988) (same); In re Crouse Group, Inc., 71 B.R. 544 (Bankr. E.D. Pa. 1987) (same).

22.     Each of these elements are here satisfied.  Specifically, the Debtor has determined (in consultation with its advisors) that its current capital structure and business condition, as described in the Castellano Declaration, renders it unable to obtain adequate postpetition financing on an unsecured administrative basis.  Notably, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); see also In re Stanley Hotel, Inc., 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

24

23.     The Debtor has also satisfied the second prong of the aforementioned test, which looks to whether the credit transaction is necessary to preserve the assets of the estate. Here, in the absence of the financing, the Debtor would be unable to meet its ordinary course operational obligations, much less bear the costs of the chapter 11 process, forcing the Debtor into an immediate liquidation, with the attendant damage to employees, stakeholders and other parties in interest.

24.     Finally, the Debtor submits that the proposed terms of the DIP Credit Agreement are fair, reasonable and adequate given today's market and the facts of this case.  As stated above, the Debtor does not have material, tangible assets, does not generate any revenue from operations and has never obtained any third-party financing that was not premised on credit support from Enrichment Corp.  Thus, the DIP Loans from the Prepetition Lender not only represent a reasonable financing source on their face, they likely represent the only financing source available to the Debtor.

25.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. In re Farmland Indus., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co.  (In re Ellingsen MacLean Oil Co.), 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds). The appropriateness of a proposed financing facility should also be considered in light of current market conditions. See Transcript of Record  at 740:4-6, In re Lyondell Chem. Co., No. 09-10023 (REG) (Bankr S D N Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions [of a DIP that included a roll-up of prepetition secured debt] reasonable here and now.").

(ii)    <u>Entry Into the DIP Credit Agreement Reflects an Exercise of the Debtor's Reasonable Business Judgment</u>

26.    A debtor's decision to enter into a postpetition lending facility under Bankruptcy Code Section 364 is governed by the business judgment standard. <u>See</u> <u>In re Trans World Airlines, Inc.</u>, 163 B.R. 964, 974 (Bankr. D. Del 1994) (noting that the interim loan, receivable facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment [were] reasonable under the circumstances and in the best interests of TWA and its creditors"); <u>In re Ames Dep't Stores, Inc.</u>, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); <u>Group of Institutional Holdings v. Chicago Mil. St. P. & Pac. Ry.</u>, 318 U.S. 523, 550 (1943); <u>In re  Simasko Prod. Co.</u>, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); <u>In re Lifeguard Indus., Inc.</u>, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).

27.    Bankruptcy courts typically defer to a debtor's business judgment on the decision to borrow money unless such decision is arbitrary and capricious. <u>See</u> <u>In re Trans World Airlines, Inc.</u>, 163 B.R. at 974. In fact, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially." <u>Richmond Leasing Co. v. Capital Bank, N.A.</u>, 762 F.2d 1303, 1311 (5th Cir. 1985).

28.    For the reasons set forth above, the Debtor submits that the entry into the DIP Facility is a decision that represents the exercise of the Debtor's reasonable business

judgment.  Further, the Debtor has satisfied the respective requirements of Bankruptcy Code

Section 364(c) and the approval sought with respect to those aspects of the DIP Orders which

seek to afford the DIP Lender the protections of these provisions should be approved.

**B.      Approval of Application of Cash Collateral is Appropriate**

29.     Bankruptcy Code Section 363(c)(2) provides that a debtor may not use,

sell or lease cash collateral unless "(a) each entity that has an interest in such cash collateral

consents; or (b) the court, after notice and hearing, authorizes such use, sale, or lease in

accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).

30.     Enrichment Corp has conditioned its willingness to provide postpetition

financing on the application of the Prepetition Collateral that is Cash Collateral to pay down the

Prepetition Secured Debt.  To the extent that Bankruptcy Code Section 363(c)(2) applies to the

Debtor's request for authorization to comply with such condition, the consent required by such

section has been provided by Enrichment Corp.  To the extent Bankruptcy Code Section

363(b)(1) applies to the Debtor's request, the Debtor submits that the use of the Cash Collateral

represents the sound exercise of its business judgment.  Moreover, the Debtor would note that

under the Plan, all secured claims and intercompany claims will be unimpaired, so the earlier pay

down of the Prepetition Secured Debt does not give the Prepetition Lender greater rights, other

than timing, than will be provided to it under the Plan.  Therefore, the Debtor submits that it

should be authorized to use the Cash Collateral on the terms set forth in the DIP Credit

Agreement.

**C.      The Automatic Stay Should be Modified**

31.     The DIP Orders contemplate a modification of the automatic stay of

Bankruptcy Code Section 362(d) to the extent applicable and necessary, to permit the parties to

implement the terms of the DIP Orders and the DIP Credit Agreement.  Provisions of this kind

are standard in debtor-in-possession financings and are reasonable under the circumstances.

**D.     The DIP Lender Should be Protected by Bankruptcy Code Section 364(e)**

32.     Bankruptcy Code Section 364(e) provides that "[t]he reversal or

modification on appeal of an authorization under this section to obtain credit or incur debt, or of

a grant under this section of a priority or a lien, does not affect the validity of any debt so

incurred, or any priority or lien so granted, to an entity that extended such credit in good faith,

whether or not such entity knew of the pendency of the appeal, unless such authorization and the

incurring of such debt, or the granting of such priority or lien, were stayed pending appeal."

11 U.S.C. § 364(e).  The terms and conditions of the DIP Credit Agreement were negotiated by

the parties in good faith and at arm's length, and are fair and reasonable under the circumstances.

Accordingly, the DIP Lender should be afforded the benefits of Bankruptcy Code Section 364(e)

in respect of the DIP Loans.

**E.     Interim Approval Should Be Granted**

33.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a

motion to obtain credit pursuant to Bankruptcy Code Section 364 may not be commenced earlier

than fifteen (15) days after the service of such motion.  Upon request, however, the Court is

empowered to conduct a preliminary expedited hearing on the motion and to authorize the

obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's

estate.

34.     The Debtor requests that the Court hold and conduct an interim hearing to

consider entry of the Interim Order authorizing the Debtor from and after entry of the Interim

Order until the Final Hearing to receive the DIP Loans contemplated by the DIP Credit

Agreement, in an amount not to exceed $20 million pending entry of the Final Order.  This relief

will enable the Debtor to preserve and maximize the value of its assets and, therefore, avoid

immediate and irreparable harm and prejudice to its estate and all parties in interest, pending the

Final Hearing.

**F.      Bankruptcy Rule 6004 Should be Waived and the
          DIP Orders Should be Deemed Immediately Effective**

35.      To the extent that any aspect of the relief sought herein constitutes a use

of property under Bankruptcy Code Section 363(b), the Debtor seeks a waiver of the fourteen-

day stay under Bankruptcy Rule 6004(h).  As described above, the relief that the Debtor seeks in

this Motion is immediately necessary in order for the Debtor to be able to continue to operate its

business and preserve the value of its estate.  The Debtor thus submits that the requested waiver

of the fourteen-day stay imposed by Bankruptcy Rule 6004(h) is here appropriate.  Thus, the

Interim Order and the Final Order should each be deemed effective immediately upon entry.

**G.      Notice Procedures and the Final Hearing**

36.      Pursuant to Local Rule 4001-2(c), the Final Order may only be entered

after notice and a hearing, and a hearing to consider the Final Order is ordinarily not held until at

least ten (10) days after the organizational meeting of the creditors' committee.  The Debtor will,

within three (3) business days of the entry of the Interim Order by the Court, serve by first-class

mail, a copy of the Interim Order and a notice of the Final Hearing to consider entry of the Final

Order on the date established by the Court in the manner proscribed by the Interim Order.

37.      The Debtor respectfully requests that the Court schedule the Final Hearing

on this Motion no later than forty (40) days after the Petition Date.  Such relief is necessary in

order to avoid a default under the DIP Credit Agreement and to avoid immediate and irreparable

harm and prejudice to the Debtor's estate.

**NOTICE OF MOTION**

38.    Notice of this Motion will be given to: (a) the United States Trustee for the District of Delaware, (b) counsel to the DIP Lender, (c) counsel to the Consenting Noteholders, (d) counsel to the Debtor's preferred stockholders, (e) counsel to the DOE and (f) the parties included on the Debtor's list of twenty (20) largest unsecured creditors (collectively, the "Initial Notice Parties").  In addition, as required by Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, the Debtor will serve copies of the Motion and the Interim Order (and/or any such other order entered in respect of the Motion) on the Initial Notice Parties, all parties that have requested notice pursuant to Bankruptcy Rule 2002(i) and any other parties as may be ordered.  The Debtor submits that, under the circumstances, no other or further notice is required.

DC\2959900.26

**WHEREFORE**, the Debtor respectfully requests that the Court (i) enter the

Interim Order, substantially in the form attached hereto as <u>Exhibit A</u>, (ii) following the Final

Hearing (if such hearing is required) enter the Final Order in the form to be submitted to the

Court in advance of the Final Hearing, and (iii) grant the Debtor such other and further relief as

is just and proper.

Dated: Wilmington, Delaware
      March 5, 2014

    RICHARDS, LAYTON & FINGER, P.A.

    Mark D. Collins (No. 2981)
    Michael J. Merchant (No. 3584)
    920 N. King Street
    Wilmington, Delaware 19801
    Telephone: 302-651-7700
    Facsimile: 302-651-7701
    Email: collins@rlf.com
          merchant@rlf.com

    - and -

    D. J. Baker
    Rosalie Walker Gray
    Adam S. Ravin
    Annemarie V. Reilly
    LATHAM & WATKINS LLP
    885 Third Avenue
    New York, New York 10022-4834
    Telephone: 212-906-1200
    Facsimile: 212-751-4864
    Email: dj.baker@lw.com
          rosalie.gray@lw.com
          adam.ravin@lw.com
          annemarie.reilly@lw.com

    Proposed Counsel for Debtor and Debtor in
    Possession

31

DC\2959900.26